Thomas Spielbauer, Esq.
SBN 78281
THE SPIELBAUER LAW FIRM
1250 Oakmead Parkway, Suite 210
Sunnyvale, CA 94085
(408)451-8499
Fax: (610)423-1395
thomas@spielbauer.com

Attorneys for Jim E. Moore, Plaintiff

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIM E. MOORE,<br><br>                      Plaintiff.<br><br>v.s.<br><br><br>J. P. CHASE MORGAN BANK; BNC MORGAGE, INC.;  NDEx West LLC; STIRLING FUNDING CORPORATION; and KEVIN CAYLOR,<br><br>                    Defendants. | No. 3:08-cv-00350-SC<br><br>Contra Costa County Superior Court No: MSC08-00040<br><br>EXPARTE MOTION TO REMAND, AND MOTION TO REMAND, REQUEST FOR ATTORNEY FEES, AND IN THE ALTERNATIVE, REQUEST FOR A TEMPORARY RESTRAINING ORDER AND SETTING OF A PRELIMINARY INJUNCTION OSC |

Plaintiff Jim E. Moore files this ex-parte motion and motion to remand under 28 U.S.C. §1447(c).  On its face, the removed case  does not "arise under" federal law.  The Federal Court lacks subject-matter jurisdiction.[1]  When there is no subject-matter jurisdiction, remand is mandatory.[2]  The complaint is attached as Exhibit 1 to this motion.

---

[1] *Tillman v. CSX Transportation, Inc.* (5th Circuit 1991) 929 F.2d 1023, 1026-1027.

[2] 28 U.S.C. §1447(c); *International Primate Protestant League v. Tulane Education Fund* (1991) 500 U.S. 72, 89; *Anusbirian v. Trugreen/Chemlawn, Inc.* (6th Circuit 1996) 72 F.3d 1253, 1254.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**The Court does not need to conduct a hearing nor receive evidence if the lack of removal jurisdiction is apparent from the face of the pleadings.**[3] The district court can even remand a case for lack of subject-matter jurisdiction on its own, and without a motion by the plaintiff.[4]

## A. EXPARTE APPLICATION AUTHORITY

This exparte application is made under the authority of 28 U.S.C. §1446(c)(4) and *Bell v. Taylor*[5], cited above.  28 U.S.C. §1446(c)(4) mandates, "The United States district court in which such notice [of removal] is filed shall examine the notice promptly. If it clearly appears on the face of the notice and any exhibits annexed thereto that removal should not be permitted, the court shall make an order for summary remand."

## B. URGENCY

This matter is urgent and should be ruled on forthwith. The State Court action was triggered by J. P. Chase Morgan Bank's and NDEx West's non-judicial foreclosure upon Plaintiff Jim Moore's home.  On January 4, 2008, Jim Moore obtained a Contra Costa County Superior Court temporary restraining order prohibiting the sale of his home.  A copy of this TRO is attached as Exhibit 2 to this motion to remand.  As a direct and sole result of this TRO, **the trustee sale was postponed and is now scheduled to occur on February 7, 2008.   As a result, time is of the essence.**

## C.  BACKGROUND

Plaintiff is Jim E. Moore; the removing defendant is BNC Mortgage, Inc.,

---

[3] 28 U.S.C. §1446(c)(4) *; Bell v. Taylor* (5th Circuit 1975) 509 F.2d 808, 810.

[4] *Page v. City of Southfield* (6th Circuit 1995) 45 F.3d 128, 133; *In re Allstate Insurance Company* (5th Circuit 1993) 8 F.3d 219, 223.

[5] *Bell v. Taylor* (5th Circuit 1975) 509 F.2d 808, 810.

1  aka BNC Mortgage LLC, hereinafter referred to as BNC.  BNC is a Delaware
2  Corporation that does business in California.

3      On January 4, 2008, plaintiff filed a complaint in the Contra Costa County,
4  California Superior Court.  In the complaint, which is attached as Exhibit 1 to this
5  motion to remand, he alleged and brought only state-based and common law
6  causes of action.  Jim Moore did not bring nor allege any federal causes of action
7  nor raise any federal issues.

8      The causes of action alleged in the complaint are as follows: Request for a
9  Declaratory Judgment Pursuant to California Code of Civil Procedure §1060,
10 allegations of Unfair Business Practices under California Civil Code §§17200 and
11 17500, allegations of Unconscionableness pursuant to California Civil Code
12 §1670.5, allegations of Fraud, allegations of Violation of the duty of Good Faith
13 and Fair Dealing, and Request for an Accounting.

14     On the same date that Jim Moore filed his complaint, he also obtained a
15 temporary restraining order from the Contra Costa County Superior Court
16 prohibiting the sale of his home.  The sale had been scheduled for January 7th but
17 was in fact postponed to February 7, 2008 as a result of the temporary restraining
18 order.

19     Defendant BNC through its agent for the service of process in Wilmington,
20 Delaware, was personally served on January 7, 2008, a fact acknowledged by
21 BNC in its removal notice.

22     Defendant BNC Mortgage, Inc. filed its notice of removal on January 18,
23 2008.

24                          **D.  ARGUMENT**

25     The court may remand a case on the basis of any defect identified in a
26 motion for remand filed within 30 days after the notice of removal under 28

27
28

U.S.C. §1446(a).[6]

This court should remand this case to state court because the lawsuit does not involve a federal question.[7]  Defendant's allegations that this case arises under 28 U.S.C. §1334(b) (Bankruptcy), 28 U.S.C. §1441(a) (Federal Question), and 28 U.S.C. §1367 (Supplemental or Pendent Jurisdiction) are without foundation and are incorrect.

BNC's citation to 28 U.S.C. §1334(b) is puzzling, and has no application to this matter.  Section 1334(b) discusses exclusive Federal Jurisdiction in matters brought under the Bankruptcy Code.  Bankruptcy is not at issue in this matter. Jim Moore, and to plaintiff's knowledge, BNC, have not filed for bankruptcy. BNC does not disclose in its moving papers that it has filed for Title 11 bankruptcy protection in the Northern District of California.   28 U.S.C. §1334(b) does not apply.

BNC next cites to 28 U.S.C. §1441(a) in its notice of removal.  This statute provides jurisdiction based on a federal question, or original jurisdiction.  In support of this claim of jurisdiction, BNC argues that plaintiff's complaint makes reference to the Federal Truth in Lending Act,  Regulation Z, the Real Estate Settlement Procedures Act (RESPA), the Homeowner's Equity Protection Act, HOEPA, and the Fair Debt Collection Practices Act.[8]  BNC then goes on to argue that "plaintiff prays for remedies based upon violations of these Federal Acts, including but not limited to a rescission of the subject loan pursuant to TILA. Plaintiff's right to relief, if any, under these Federal Acts depends upon the resolution of substantial questions of Federal Law and confers federal

---

[6] 28 U.S.C. §1447(c).

[7] 28 U.S.C. §1447(c); *see Int'l Primate Protestant League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 89, 111 S. Ct. 1700, 1710 (1991).

[8] BNC Notice of Removal, page 1, line 25 through page 2, line 6.

1    jurisdiction."[9]

2         BNC's argument is patently false and is misleading.  Plaintiff Jim Moore's

3    complaint alleges solely violations of California law.  In support of these

4    violations, Jim Moore alleges multiple acts, which multiple acts include but are

5    not limited to actions which are violations of the above mentioned Federal

6    Statutes.  These supporting or predicate acts do not constitute causes of action in

7    themselves but simply support the facts which constitute the alleged violation of

8    law, in this case California State law only.  None of the pled causes of action are

9    violations of Federal Law.

10         A fact which BNC does not mention in its notice of removal, but which is

11   germane to the issue of federal question, is the fact that TILA's, RESPA's, and the

12   Fair Debt Collection Practices Act statutes of limitation, up to three years, have

13   expired.  Jim Moore could not bring causes of action under these statutes even if

14   he wanted to, which he does not.

15         BNC then goes on to argue that since rescission is a remedy under the

16   Federal Truth-in-Lending Act (TILA), TILA is automatically implicated despite

17   the fact that it is not pled nor articulated as the basis of the prayer for relief.  BNC

18   neglects to mention that rescission is a remedy of choice for a number of

19   California State causes of action, in this matter Fraud and Unconscionableness.

20         BNC finally argues supplemental or pendent jurisdiction pursuant to 28

21   U.S.C. §1367.  Supplemental jurisdiction, of course, requires Federal Question

22   jurisdiction of the other claims in order for Supplemental Jurisdiction for the

23   remaining issues to exist.  However, even if it could be found that there is

24   somehow a federal question in Jim Moore's State Court complaint, the case

25   should nonetheless be remanded to the Contra Costa County Superior Court.  In a

26   case which in reality involves only pendent state-law claims despite a theoretical

27

28

         [9] BNC Notice of Removal, page 2, lines 6 through 12.

1  and technical existence of a federal question, the federal court may retain the case
2  or remand it to state court.[10]

3      BNC makes mention of OCWEN in its notice of removal.[11]  Ocwen is not a
4  named party in this matter and is not referred to in plaintiff's complaint.  BNC
5  does not explain Ocwen's role in its notice of removal.  As a result, Jim Moore
6  cannot address the removal allegations concerning Ocwen.

7      BNC's removal notice is contrived and without legal foundation.  In
8  assessing the arguments of Jim E. Moore's motion to remand,  Jim Moore asks
9  this Court consider the fact that **Courts strictly construe the removal statutes in**
10  **favor of remand and against removal**.[12]

11     The reality of this case is that it is a State Court matter based on non-
12  judicial foreclosure.  Jim Moore refinanced his home with BNC under BNC's
13  fraudulent misrepresentations in September 2004.   BNC apparently sold off the
14  note after this refinance.  The loan's "teaser" rate expired after two years, and the
15  exploding adjustable rate mortgage did in fact explode.  This predatory BNC loan
16  had an interest cap of 15.225%, a fact misrepresented to and concealed from Jim
17  Moore. When Jim Moore could no longer afford these skyrocketing mortgage
18  payments, J.P. Chase Morgan Bank and NDEx West initiated non-judicial
19  foreclosure proceedings[13] in an attempt to auction his home.  It was at this time
20

21  _____

22  [10]   *Carnegie-Mellon*, 484 U.S. at 355-357; see *Things Remembered, Inc. v. Petrarca* (1995) 516 U.S. 124-130; *In re City of Mobile* (11th Circuit 1996) 75 F.3d
23  605, 607-608.

24  [11]   BNC Notice of Removal, page 2, lines 10 through 13.

25  [12]   *Bosky v. Kroger Tex., LP* (5th Circuit 2002) 288 F.3d 208, 211; *Diaz v.*
26  *Sheppard* (11th Circuit 1996) 85 F.3d 1502, 1505; *Brown v. Francis* (3rd Circuit
27  1996) 75 F.3d 860-864-865; see *Duncan v. Stuetzle* (9th Circuit 1996) 76 F.3d
   1480, 1485.

28  [13] Pursuant to California Civil Code §2924 et seq..

that Jim Moore filed his action in State Court in order to prevent the foreclosure sale of his home.  He obtained a Contra Costa County Superior Court temporary restraining order, without bond, prohibiting the sale of his home.  He obtained this prohibition three days (one business day) prior to the scheduled sale of his home, on Friday, January 4, 2008.

### E. URGENCY, AGAIN

As mentioned at the beginning of this motion to remand, it is urgent that his Court consider and decide this motion forthwith.

There is a preliminary injunction hearing set in this matter in the Contra Costa Superior Court for January 25, 2008 at 8:30 a.m.. If this court promptly remands this matter back to State Court and prior to that date, the temporary restraining order will remain in effect and subject to the preliminary injunction hearing which is calendared for January 25, 2008.

On the other hand, if this Court retains this matter, Jim Moore by this motion asks this Court to reissue the same temporary restraining order made by the Contra Costa Superior Court until it can conduct a preliminary injunction hearing.  On January 4, 2008, the Superior Court ordered, in part, the following:

> This temporary restraining order shall remain in full
> force and effect until a preliminary injunction hearing is
> held in this matter by this court or the Federal District
> Court or the United States Bankruptcy Court should this
> matter be removed.

It is clear from the face of the verified complaint that there is no federal question involved in this matter.  That being said, Jim Moore repeats what he stated at the commencement of this motion.  This Court does not need to conduct a hearing to receive evidence if the lack of removal jurisdiction is apparent from the face of the pleadings.[14]  The district court can even remand a case for lack of

---

[14] *Bell v. Taylor* (5th Circuit 1975) 509 F.2d 808, 810.

subject-matter jurisdiction without a motion by the plaintiff.[15]

## F. ATTORNEY FEES

If this Federal Court grants this motion to remand, its order may require payment of costs, expenses, and attorney fees incurred as a result of the improper removal.[16] Under the fee shifting provisions of 28 U.S.C. §1447(c), a District Court can award attorney fees when the removing party lacked an "objectively reasonable basis" for seeking removal.[17] In determining whether to award fees, the district court must remain "faithful to the purposes" of awarding fees under §1447(c), namely to deter removals sought for the purposes of prolonging litigation and imposing costs on the opposing party while affording defendants a right to remove generally.[18] The standard for awarding fees turns on the reasonableness of the removal.[19] When making an award, the court typically limits it to the plaintiff's fees and costs associated with opposing the removal and seeking a remand, and any other expenses incurred because of the improper removal.[20]

The obvious question becomes, did BNC have an objectively reasonable

---

[15] *Page v. City of Southfield* (6th Circuit 1995) 45 F.3d 128, 133; *In re Allstate Insurance Company* (5th Circuit 1993) 8 F.3d 219, 223.

[16] 28 U.S.C. §1447(c); *Martin v. Franklin Capital Corporation* (2005) No. 04-1140 (Supreme Court 12/7/2005); see *Garcia v. Amfels, Inc.* (5th Circuit 2001) 254 F.3d 585, 587.

[17] *Martin v. Franklin Capital Corporation* (2005) No. 04-1140 (Supreme Court 12/7/2005); see *Valdes v. Wal-Mart Stores, Inc.* (5th Circuit 2000) 199 F.3d 290, 293.

[18] *Martin v. Franklin Capital Corporation* (2005) No. 04-1140 (Supreme Court 12/7/2005).

[19] *Id.*

[20] *Avitts v. Amoco Production Company* (5th Circuit 1997) 111 F.3D 30, 32.

1
2
3

basis for seeking removal?  The answer is no.  Another way of asking this same question is why did BNC file this contrived  removal into Federal District Court?  There are a number of motives which quickly appear, all of which are improper.

4
5
6
7
8
9
10
11
12
13
14
15

The Contra Costa Superior Court ordered that Plaintiff serve BNC by January 7, 2008.  Jim Moore accomplished this task over the weekend and even though BNC does not have a registered agent for the service of process in California, and service had to be effected upon BNC through its agent for process in the State of Delaware.  The temporary restraining order required BNC to submit its response to Jim Moore's request for a preliminary injunction by no later than Thursday, January 17, 2008.  Despite having ten days, BNC did nothing.  Instead, BNC sought to avoid going into State Court empty-handed on January 25, 2008, the date of the preliminary injunction hearing, by removing this matter into Federal District Court the day _after_ its response was due in State Court.  BNC filed its removal in the afternoon of the Friday before the three day Martin Luther King weekend.

16
17
18
19
20
21
22
23
24
25
26
27
28

At the time Jim Moore had the complaint served upon BNC in Delaware, Mr. Moore also served upon BNC a Request for the Production of Documents.  This Request is attached as Exhibit 3 to this motion to remand.  Compliance with this Document Production Request, which compliance was due by February 21, 2008, could and probably will substantiate his claims about the circumstances of the loan and BNC's malfeasance as alleged in the complaint.  It would be the proverbial smoking gun.  If these documents were provided prior to the preliminary injunction hearing date, they could be devastating to BNC's, as well as the other defendants', opposition to the preliminary injunction grant.  BNC, being aware of this, sought to thwart this discovery by removal into Federal District Court.  Hiding behind Federal Rule 26, BNC  would not have to furnish these documents until well after any hearing prohibiting the foreclosure sale had occurred, and at least several months into this litigation.  This concealment would

1  bolster its attempts to argue lack of merit to Jim Moore's verified complaint.

2      It goes without saying that this removal and motion for remand has imposed

3  upon plaintiff Jim Moore substantial additional costs.  Jim Moore is a modest

4  income family man with three children who could not afford the exploding

5  adjustable rate mortgage he was misled into.  Now he has to face exploding costs

6  of litigation given rise by meritless removal motions such as this.  While BNC

7  may have significant financial resources to play with, which would be no surprise

8  given the predatory loans it engaged in, Jim Moore does not.

9      The propriety of BNC's removal quickly dissipate when one examines the

10  logic of BNC's arguments.  All home real estate purchases and  refinances involve

11  Federal Law.  TILA and RESPA are but two which automatically come into play

12  in a home loan.  The essence of BNC's argument is that if any cause of action

13  refers to or mentions any Federal Statute or Federal Case, that lawsuit can be

14  removed into Federal District Court even though it is thoroughly rooted in State

15  Court Action and pleads only State Causes of Action. In no time flat, Federal

16  District Courts will be the jurisdiction of all foreclosure cases throughout the

17  entire fifty United States.   This may be a happy thought to the State Courts which

18  now have to deal with the volume cases caused by the subprime mortgage

19  collapse.   One somehow would believe that Federal Courts have more weighty

20  matters to attend to than non-judicial foreclosure sales and their subsequent

21  unlawful detainer actions.

22                          **G. PRAYER**

23      For these reasons set forth in this motion, plaintiff Jim Moore asks that this

24  Court grant his motion to remand, and that this Court forthwith remand this suit to

25  the state court where it was originally filed.

26      Jim Moore further asks that this Court award him his court costs, expenses,

27  and attorney fees incurred in this bringing of this motion.  As established by the

28  attached declaration of Thomas Spielbauer, Esq., Jim Moore prays that this Court

1  award $6,500 in attorney fees.  Jim Moore further requests that this Court order

2  defendant BNC Mortgage, Inc., aka BNC Mortgage, LLC, and if appropriate their

3  attorneys, to tender payment of attorney fees to counsel for plaintiff within two

4  weeks of the issuance of its order of remand.  Jim Moore requests that this Court

5  retain jurisdiction solely on the issue of BNC's payment of attorney fees, and that

6  this Court set a hearing date to insure compliance, and an Order to Show Cause

7  date thereafter if BNC and their counsel have not performed according to the

8  Court's order.

9        Alternatively, if this Court retains jurisdiction, Jim Moore prays that this

10  court issue a temporary restraining order reiterating the same terms and conditions

11  as the State Court Temporary Restraining order, and setting the matter for a

12  preliminary injunction hearing at its earliest convenience.

Respectfully Submitted
THE SPIELBAUER LAW FIRM

by Thomas Spielbauer, Esq.
Attorney for Plaintiff, Jim Moore

Thomas Spielbauer, Esq.
SBN 78281
THE SPIELBAUER LAW FIRM
1250 Oakmead Parkway, Suite 210
Sunnyvale, CA 94085
(408)451-8499
Fax: (610)423-1395
thomas@spielbauer.com

Attorneys for Jim E. Moore, Plaintiff

**F I L E D**

JAN 0 4 2008

K. TORRE, CLERK OF THE COURT
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF CONTRA COSTA
By _____
. Deputy Clerk

# IN THE SUPERIOR COURT
## OF THE STATE OF CALIFORNIA
### CONTRA COSTA COUNTY

JIM E. MOORE,

                Plaintiff.

v.s.

CHASE BANK; BNC MORTGAGE,
INC.; NDEx West LLC; STIRLING
FUNDING CORPORATION; KEVIN
CAYLOR; and DOES 1-20,

                Defendants.

No: **C08 · 00040**

COMPLAINT FOR
DECLARATORY JUDGMENT
PURSUANT TO CCP §1060,
UNFAIR BUSINESS PRACTICES,
UNCONSCIONABLENESS,
FRAUD, GOOD FAITH AND
FAIR DEALING, AND FOR AN
ACCOUNTING

PER LOCAL RULE 5 THIS
CASE IS ASSIGNED TO
DEPT ____ _16_ .

Plaintiff, Jim Moore, alleges:

**PARTIES**

SUMMONS ISSUED

1. Plaintiff Jim Moore is and at all times herein mentioned was a resident of Contra Costa County, California. Jim Moore resides at 1258 Duffy Drive, Brentwood, CA 94513.

2. Defendant JP CHASE BANK (herein after referred to as CHASE) is a business entity with a principal place of business at 1111 Polaris Parkway, Columbus, OH 43240. CHASE is a New York Corporation. CHASE does business in California and within the County of Contra Costa, California on a regular basis. CHASE's agent for the service of process in the State of California is C. T. Corporation System, 818 West Seventh Street, Los Angeles,

-1-

1    CA 90017.  Plaintiff is uncertain as to the role of CHASE at the time of the loan

2    origination.  However, CHASE was directly involved and appears to be the

3    decision maker in the foreclosure process.

4        3.  Defendant NDEx LLC (herein after referred to as NDEx) is a business

5    entity with a principal place of business located at 15000 Surveyor Blvd., Ste.

6    100, Addison, TX 75001.  NDEx is a Delaware Corporation.   NDEx's agent for

7    the service of process in the State of California is C. T. Corporation System, 818

8    West Seventh Street, Los Angeles, CA 90017.  NDEx is the trustee of an alleged

9    deed of Trust on the property of 1258 Duffy Drive, Brentwood, CA 94513.   That

10   trust deed number is Contra Costa County number 2004-037887220.  NDEx

11   regularly conducts business in Contra Costa County, California.

12       4.  BNC Mortgage Corporation (herein after referred to as BNC) is a

13   business entity with a principal place of business in California at 1901 Main

14   Street, Irvine, CA 92614.  BNC is a Delaware Corporation.   BNC regularly

15   conducts business in Contra Costa County, California.  BNC Mortgage

16   Corporation does not have an agent registered with the California Secretary of

17   State for the service of process in California.  BNC Mortgage was the loan

18   originator in this matter.

19       5.  Stirling Funding Corporation (herein after referred to as STIRLING) is a

20   business entity with a principal place of business at 1800 Thibodo Road #300,

21   Vista, CA 92083.  STIRLING does not have an agent for the service of process in

22   the State of California.  STIRLING regularly conducts business in Contra Costa

23   County, California.  STIRLING was the loan broker in this matter.  Kevin Caylor

24   was the loan broker agent in this matter.

25       6.  As a result of their mortgage activities, defendants BNC, Stirling, Kevin

26   Caylor and Chase are subject to and must comply with the Federal Truth in

27   Lending Act (15 U.S.C .§§1601-1666j) and with the Act's corresponding

28   Regulation Z (24 C.F.R. §§3500.1-3500.17).

1    7. Defendants BNC, CHASE and NDEx, and their agents and successors,

2  are debt collectors as defined by California Civil Code §1788.2(c), the California

3  Fair Debt Collection Practices Act, and as defined by 15 USCA § 1692a(6), the

4  Federal Fair Debt Collection Practices Act.

5    8. Defendants, and each of them, were at all times alleged in this complaint

6  required to comply with and the federal Real Estate Settlement Procedures Act

7  (RESPA), 12 U.S.C. §2601-2617.

8    9. Plaintiff is informed and believes, and thereon alleges, that each

9  Defendant is and at all relevant times herein was, the agent, employee, alter-ego,

10  principal, employer, or co-conspirator of each of the remaining co-Defendants,

11  and in committing the acts herein alleged, was acting in the scope of their

12  authority as such agents, employees, principals, employers, alter-egos, or co-

13  conspirators and with the permission and consent of the remaining co-

14  Defendants.

15    10. DOES 1-20, inclusive, are individuals and/or businesses whose forms

16  are unknown and were agents, principals, employees, employers, and co-

17  conspirators of each and every other named or unnamed Defendant in this

18  complaint.  Plaintiff is informed and believes, and thereon alleges, that each of

19  such Defendants is, and at all relevant times was, acting within the scope of their

20  authority as such agents, employees, or alter-egos and with the permission and

21  consent of the remaining named and un-named co-Defendants.

22    11. The true names and/or capacities of Defendants 1-20, inclusive, are

23  unknown to Plaintiff, and therefore he sues said Defendants by such fictitious

24  names.  Plaintiff is informed and believes and thereon alleges that each of the

25  Defendants fictitiously named herein as a DOE is responsible for the events and

26  happenings hereinafter referred to, and thereby proximately caused the injuries

27  and damages to Plaintiff as hereinafter alleged.  Plaintiff will seek leave of the

28  Court to amend this complaint to allege the true names and/or capacities of said

1    fictitiously named Defendants when ascertained.

2        12. Whenever in this Complaint an act or omission of a corporation or

3    business entity is alleged, the said allegation shall be deemed to mean and include

4    an allegation that the corporation or business entity acted or omitted to act

5    through its authorized officers, directors, agents, servants, and/or employees,

6    acting within the course and scope of their duties, that the act or omission was

7    authorized by corporate managerial officers or directors, and that the act or

8    omission was ratified by the officers and directors of the corporation.

9                              **JURISDICTION**

10       13. The transactions and events which are the subject matter of this

11   complaint all occurred within the County of Contra Costa, State of California.

12       14. The property located at 1258 Duffy Drive, Brentwood, CA 94513 is

13   located in the County of Contra Costa, California.  The APN 017-201-019-1.

14                            **JURY TRIAL DEMAND**

15       15. Plaintiff Jim Moore  requests a jury trial on all issues in this matter.

16                           **FACTUAL ALLEGATIONS**

17       16. During September 2004, Kevin Caylor of Sterling Funding Corporation

18   telephoned Plaintiff Jim Moore concerning a refinance of his home.  This

19   telephone call was a cold call and not one made in response to a request for

20   information from Mr. Moore. The caller, Kevin Caylor, was an officer or

21   representative of Stirling Funding.   At the time Mr. Caylor made the telephone

22   call, he advised that Stirling Funding could refinance Mr. Moore's home under

23   very favorable terms.  He explained that he could obtain a loan with lower interest

24   rates and lower monthly mortgage payment.  Based on these presentations, Jim

25   Moore  agreed to refinance through Stirling Funding.

26       17. Jim Moore informed Mr. Caylor during September 2004 that he, Mr.

27   Moore,  required  a 30 year fixed rate loan between 6.5% and 7.5%, with

28   impounds.  Mr. Caylor advised that he could and would arrange for this financing

1   under those terms.

2      18. Mr. Caylor, STIRLING and BNC thereafter provided to Jim Moore

3   initial disclosure loan documents.  The Truth In Lending disclosure quoted an

4   APR of 7.706%.  This was to be the interest rate for the first two years with a

5   mortgage payment during those two years of $1948.23.   Mr. Caylor, STIRLING

6   and BNC further told Jim Moore that the interest rate would adjust to a payment

7   of a little less than ten dollars more per month thereafter, to an amount of

8   $1,957.44  and for the remaining twenty-eight years of the loan.  The last

9   payment was to be for $1,950.47.

10     19. These representations were confirmed by the Truth in Lending

11  Disclosure of September 15, 2004  provided to Mr. Moore.  The Truth in Lending

12  Disclosure is attached to this complaint as Exhibit 2.  This Truth in Lending

13  Disclosure clearly reflected that the monthly mortgage payments for the first two

14  years was to be $1,948.23.  In the third year, the rate was to adjust for the

15  remaining 28 years to monthly mortgage payments of $1,957.44.  The last

16  payment was to be for $1,950.47.

17     20. Within two weeks,  Mr. Caylor and STIRLING advised Jim Moore by

18  telephone that he had been approved for this loan and the documents had been

19  drawn.  He was told that a notary would visit him thereafter and he would then

20  sign the loan documents.  No terms were discussed during this telephone

21  conversation.   The loan was to be a 30 year note for the approximate amount of

22  $300,000+.

23     21. A week later, on September 23, 2004, a notary and signing agent came

24  to Mr. Moore's home in order to have Jim Moore sign the loan documents which

25  had been prepared by Stirling and BNC.

26     22. The Truth in Lending statement provided at the last minute, and at the

27  time of signing on September 23, 2004 revealed a different story concerning the

28  loan.  This truth in lending disclosure advised that the there would be 24 initial

-5-

monthly mortgage payments of $2,268.02. Thereafter, there would be 335 payments of $2,428.98 with one last payment of $2,420.87. This disclosure, however, did not take into account the six month increase in interest permitted by the promissory note. This second Truth in Lending disclosure was inaccurate. This September 23, 2004 Truth in Lending disclosure is attached as Exhibit 3.

23. The ceiling of interest according to this promissory note of September 23, 2004 was 15.225%. This ceiling was concealed from Jim Moore up to and during the time of signing of the promissory note.

| Monthly Mortgage Payments | | |
|---|---|---|
| **Promised** | **TILA Disclosed** | **Actual** |
| 24 payments of $1,948.23 | 24 payments of $2,268.02 | Ceiling of 15.225%. Adjustable 6.925% above index every 6 months after first 2 years. |
| 335 payments of $1,954.44 | 335 payments of $2,428.98 | |
| 1 payment of $1,950.47 | 1 payment of $2,420.87 | |

24. These were the only disclosures which Mr. Caylor and defendants STIRLING and BNC made to Jim More concerning the loan and the adjustability of the mortgage. No other explanations were provided.

25. A Good Faith Estimate was provided at the time of signing. This good faith estimate, however, did not reflect the real interest rate. It quoted a broker fee of $2,800 plus processing fee of $695 and an Administration Fee of $595. All of this was false. The broker fee, excluding the yield spread premium, was $5,995 instead of $2,800.

26. On or about September 23, 2007, a notary public arrived at Mr. Moore's home for the purpose of his signing the loan documents. This notary acted as the agent for Mr. Caylor, STIRLING and BNC. The signing took place in Jim Moore's home located at 1258 Duffy Way, Brentwood, CA. Throughout

1    this signing, the notary was in a hurry and rushed Mr. Moore through the signing

2    process.  She began handing papers for Mr. Moore to sign without giving him the

3    opportunity to review the papers and the terms of the loan.  The documents were

4    voluminous.  As a result, Jim Moore relied upon the representations which had

5    been made to him concerning the rates, monthly mortgage payments, adjustable

6    interest rate, fees and commissions upon the prior representations of Mr. Caylor,

7    STIRLING and BNC, as well as upon the documents which had previously been

8    provided to him.   He relied on Exhibit 2.  The notary made no explanations to

9    Mr. Moore.  She was gone within fifteen minutes, and all documents had been

10   signed.  The loan note was for $302,600 and was a thirty year note.  This note is

11   attached to this complaint as Exhibit 5.  The Trust Deed is attached as Exhibit 6.

12        27. The promissory note contains an attorney fee provision whereby the

13   losing party would be required to pay the losing party's attorney fees in the event

14   of litigation.

15        28. One of the documents which the notary provided to Jim Moore was the

16   NOTICE OF RIGHT TO CANCEL.  A true and correct copy of that document is

17   attached to this complaint as Exhibit 4.   This notice was defective in that the

18   alleged notice did not conspicuously state the date of the transaction nor the date

19   by which the three day rescission period terminated.   As such, Mr. Moore's time

20   to rescind never perfected and never began to run.

21        29. Kevin Caylor and STIRLING originally represented to Jim Moore that

22   the broker fee was going to be $2,800.  In reality, it turned out to be $11,824,

23   including the yield spread premium, and $5,995 not including the yield spread

24   premium.

| Broker Commission | |
|-------------------|-------------------|
| **Promised** | **Actual** |
| $2,800 | $11,824 |

1
2
3

30. The broker included a rebate/yield spread premium of $4,539. This Yield Spread Premium was never disclosed to Jim Moore prior to his signing the loan documents and trust deed.

4
5
6
7
8

31. The loan was to have been a 30 year fixed loan with an interest rate of 6.5% to 7.5%, and an APR of 7.706% as initially promised. The loan provided on September 23, 2004, however, was a two year fixed rate loan which would then adjust 2% after two years and then 1% every six months. The ceiling of the loan was 15.225%. The initial APR of the September 23, 2004 loan was 9.186%.

9
10
11
12
13
14
15

| Interest Rate | | |
|---|---|---|
| **Promised** | **Actual** | |
| 6.5% to 7.5% | 8.225% for two years. Adjustable 6.925% above index every 6 months after first 2 years. | Ceiling interest rate of 15.225%. |
| APR of 7.706% | APR of 9.186%, and climbing | |

16
17
18
19
20
21
22
23
24
25
26
27

32. The language which Defendants Kevin Caylor, STIRLING and BNC used in the promissory note was incomprehensible, filled legalese and filled with mumbo-jumbo, all designed to confused the average purchaser such as Plaintiff Jim Moore. It was designed to insure that he did not comprehend the nature of the agreement and the extraordinary costs that it contained. Additionally, these defendants did not provide a copy of this document prior to requiring Jim Moore to sign this and the other documents. Additionally, they did not provide Mr. Moore time to review these documents but in fact rushed him through the signing. As a result, Mr. Moore relied upon the Truth in Lending Disclosure which is Exhibit 2 to this complaint and the representations which Mr. Caylor, STERLING and BNC had made to him previously.

28

1    33. The Truth in Lending Act, 15 U.S.C. §1639, mandates that the annual

2    percentage rate, the finance charge and the amount of the maximum monthly

3    payment based on the maximum interest rate allowed be disclosed in a clear and

4    conspicuous manner and in a tabular format.  15 U.S.C. §1639 requires that all

5    material disclosures be made at least 3 business days prior to the consummation of

6    the loan.   The September 23, 2004 disclosures, Exhibit Jim, were in fact grossly

7    inaccurate.

8    34. The September 23, 2004 loan was also governed by The Homeowner's

9    Equity Protection Act, HOEPA, 15 U.S.C. 1602 et seq..   To be governed,  a loan

10   must have an APR in excess of 8% of the yield on treasury securities having a

11   comparable maturity at the time the loan was made.  The T-Bill yield is and was

12   approximately 5.03%, bringing the trigger rate of a covered loan 13.03%.  The

13   ceiling or cap of this loan was in fact 15.225%.

14   35. Defendants never provided to the plaintiff the notice that this loan

15   transaction was covered by HOEPA.

16   36. Regulation Z, §226.32(e)(3) mandates that BNC provide the following

17   notice to any successors to the note: "NOTICE: This is a mortgage subject to

18   special rules under the federal Truth in Lending Act.  Purchasers or assignees of

19   this mortgage could be liable for all claims and defenses with respect to the

20   mortgage that the borrower could assert against the creditor."  The defendants are

21   thereby culpable for the acts of each other.  Any successors in interest are subject

22   to this HOEPA and Regulation Z provision.

23   37. Jim Moore thereafter commenced making mortgage payments under the

24   new loan.  He was able to make his payments during the first two years of the

25   loan, when the rate was fixed.  However, after two years, he had significant

26   difficulty making the increasing mortgage payments, particularly after the interest

27   rate on the loan began to explode.  As a result, Mr. Moore was not able to tender

28   the full monthly mortgage payments during the year 2007.

1

2

3

     38. Plaintiff is informed and believes that during August 2007, BNC and NDEx and Chase recorded a notice of default on the property of 1258 Duffy Drive, Brentwood, CA 94513.

4

5

6

7

8

     39.  During November 2007, BNC and NDEx and Chase recorded a notice of trustee sale on the property of 1258 Duffy Drive, Brentwood, CA 94513.  This notice of trustee sale is attached to this complaint as Exhibit 1.  This notice of trustee sale set the sale date for December 6, 2007 at 1:30 p.m..  The sale date, however, was postponed to January 7, 2008 at 1:30 p.m..

9

10

11

12

13

14

     40.  During December 2007, Jim Moore attempted to refinance into an affordable loan.  He qualifies for FHA Secured, a loan program with a reasonable and fixed interest rate.  Mr. Moore, however, has been unable to re-finance due to the high fees and charges which BNC, Chase and NDEx are demanding from Jim Moore.  These bloated charges and fees caused the balance on this loan to exceed the maximum borrower debt ratio permitted by FHA Secured.

15

16

17

18

     41. The notice of trustee sale demanded $307,967.68 as the reasonably estimated amount due on this loan.  This amount is more than $5,000 the original principal of the loan and is being demanded despite the fact that Jim Moore has made over two years of payments of approximately $2,000 per month on this loan.

19

20

21

22

23

24

25

26

27

     42. On or about December 31, 2007, plaintiff Jim Moore sent to defendants a reinstatement request (beneficiary statement), and a payoff demand request pursuant to California Civil Code §2943; a request for verification of the amounts demanded and of the alleged debt pursuant to the Fair Debt Collection Practices Act 15 U.S.C. 1692g; a qualified written request pursuant to the Real Estate Settlement and Procedures Act (RESPA), 12 U.S.C. 2605(e); and a request for an accounting.  These requests were sent via United States Express mail and were delivered to the defendants and/or their agents on January 2, 2008 and January 3, 2008.

28

43. On or about December 31, 2007, plaintiff Jim Moore sent to the defendants a notice of rescission pursuant to the Federal Truth in Lending Act, 15 U.S.C.§1635f.  This rescission was sent via United States Express mail and was delivered to the defendants and/or their agents on January 2, 2008 and January 3, 2008.

**FIRST CAUSE OF ACTION**
**REQUEST FOR DECLARATORY JUDGMENT**

44.  Plaintiff Jim Moore re-alleges and incorporates by reference paragraphs 1 to 43 of this complaint.

45.  An actual controversy has arisen and now exists between plaintiff and defendants concerning their respective rights and duties.  Plaintiff desires a judicial determination of his rights and duties.

46. A valid foreclosure by the private power of sale requires strict compliance with the requirements of California Civil Code §2924 et seq..

47.  California Civil Code §2924f mandates that the Notice of Trustee Sale contain an ***accurate*** statement of the total amount of the unpaid balance and reasonably estimated costs, expenses, advances at the time of the initial publication of the notice of sale.

48.  California Civil Code §2924f(b)(1) requires that defendants state the total amount of the unpaid balance of the secured obligation and a reasonable estimate of the costs, expenses, and advances as of the initial publication of the notice in the notice of sale.

49. California Civil Code §2924c(e) permits plaintiff the right to reinstate the loan at any time up to five business days before the trustee sale.

50. Plaintiff is informed and believes and thereupon alleges that the amount stated in the Notice of Trustee Sale is grossly inaccurate.  Defendants have not provided an itemized accounting for these amounts.  This inaccuracy is significant and invalidates the foreclosure process.  This inaccuracy has made it impossible

1    for plaintiff to undertake effective action to reinstate or redeem the secured

2    obligation.   These inaccuracies denied plaintiff of the protections and procedures

3    of California Civil Code §2924 et seq..   They specifically have precluded him

4    from refinancing with FHA Secured.

5       51.  Defendants have scheduled a trustee sale and intend to proceed with the

6    sale on January 7, 2008 despite their violations of California Non-Judicial

7    Foreclosure Law, California Civil Code §2924 et seq..

8       52.  Plaintiff also requests that this court find that the agreement which

9    defendant BNC entered into with plaintiff be found to be unconscionable as

10   defined by California Civil Code §1670.5.

11      53.  The Notice of Trustee Sale, Exhibit 1, further does not contain the

12   information required in California Civil Code §2924f(b)(1).  Specifically, this

13   code section requires either a toll-free telephone number or a telephone number in

14   California of the Trustee.  The Notice of trustee sale merely contains a sales

15   telephone number of (714)573-1695 to Priority Posting.  This telephone number

16   provides recorded information about property sales.  One cannot speak with a live

17   person nor leave a message.  This "telephone number" on the Notice of Trustee

18   Sale does not comply with the requirements of California Civil Code §2924f(b)(1).

19      54.  Plaintiff also requests that this court find that the agreement which

20   defendant BNC entered into with plaintiff be found to be void and be subject to

21   rescission.

22      55. A judicial declaration is necessary and appropriate at this time and under

23   these circumstances in order that plaintiff may ascertain his rights and duties and

24   avoid the specter of a foreclosure sale and the loss of his property.  Such trustee's

25   sale, absent a judicial determination negating the Notice of Trustee Sale, or the

26   issuance of a restraining order, is scheduled to occur on Monday, January 7, 2008

27   at 1:30 p.m., or thereafter.  Such a trustee's sale would for surely cause Jim Moore

28   the unjust loss of his home.

56. Defendants' actions in this matter have been wilful and knowing.

**SECOND CAUSE OF ACTION**
**UNFAIR BUSINESS PRACTICES**
(BNC, Caylor, Stirling, Chase and NDEx)

57. Plaintiff realleges and incorporates by reference paragraphs 1 to 56 of this complaint.

58. California Business and Professions Code §17200 prohibits any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Business and Professions Code §17500 et seq..

59. California Business and Professions Code §17500 et seq. prohibits the making of a statement or a publication or a declaration concerning any circumstance or matter of fact connected with the proposed performance or disposition of real or personal property, which pronouncements is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

60. Defendants BNC, Caylor, and Stirling made the following untrue and misleading statements, and engaged in the following unfair business practices. They misrepresented the terms of the loan, first by agreeing to provide a 30 year fixed rate interest loan of 6.5% to 7.5% and then switching the loan to an exploding ARM with a ceiling of 15.225%. They failed comply with the disclosure provisions of the Federal Truth in Lending Act. They failed to comply with the disclosure provisions of the Homeowner Equity Protection Act, a part of the Truth in Lending Act. They engaged in unfair business practices through the manner in which their signing agent rushed Jim Moore through the signing process.

61. Defendants BNC, Chase and NDEx then unlawfully initiated a non-judicial foreclosure on the plaintiff's home by recording without proper legal basis a notice of default and notice of trustee sale.

62. California Civil Code §§2924 and 2924c(b)(1) require that the notice of default contain an accurate statement that a breach of the secured obligation has occurred and specification of the nature of the default.

63. Defendants BNC, Chase and NDEx have falsely stated in their notice of sale that the reasonable estimate of costs, expenses, and advances is $307,967.68 on a loan principal of $302,600, and after Jim Moore has made two years of monthly mortgage payments.

64. Amounts consisting of foreclosure fees, late fees, additional interest, and other fees, which defendants BNC, Chase, and NDEx have demanded from plaintiff are erroneous and fraudulent, and are based on fraudulent representations, violations of the Federal Truth in Lending Act, violations of HOEPA, and concealed excessive charges and fees. These are facts which the defendants, and each of them, knew and should have reasonably known.

65. Defendants BNC, Chase and NDEx attempted to mislead and defraud plaintiff by requiring him to pay sums of money which he did not and does not owe to defendants, and by requiring this money under threat of foreclosure, with the intent of taking possession of plaintiff's home if he did not pay these sums.

66. Defendants further violated Business and Professions Code §17200 and §17500 et seq. by violating California Civil Code §2924c(b)(1), California Civil Code §2924f, subd. (b)(1), California Civil Code §2924 and by their actions as alleged in this complaint.

### THIRD CAUSE OF ACTION
### FRAUD

67. Plaintiff realleges and incorporates by reference paragraphs 1 to 66 of this complaint.

68. California Civil Code §1572 states that fraud exists when any of the following act and situations occur. Actual fraud consists in any of the following

1  acts, committed by a party to the contract, or with his connivance, with intent to

2  deceive another party:

3      a. The suggestion, as a fact, of that which is not true, by one who does
    not believe it to be true; b. The positive assertion, in a manner not

4      warranted by the information of the person making it, of that which is
    not true, though he believes it to be true; c. The suppression of that

5      which is true, by one having knowledge or belief of the fact; d. A
    promise made without any intention of performing it; or, e. Any other

6      act fitted to deceive.

7      69. Defendants BNC, Caylor, and Stirling committed fraud in the following

8  ways. They misrepresented the terms of the loan, first by agreeing to provide a 30

9  year fixed rate interest loan of 6.5% to 7.5% and then switching the loan to an

10  exploding ARM with a ceiling of 15.225%, and without disclosing this act at the

11  time of signing nor prior to signing.  They failed comply with the disclosure

12  provisions of the Federal Truth in Lending Act.  They failed to comply with the

13  disclosure provisions of the Homeowner Equity Protection Act, a part of the Truth

14  in Lending Act.  They committed fraud through the manner in which their signing

15  agent rushed Jim Moore through the signing process.

16      70. Defendants BNC, Chase and NDEx then committed fraud by unlawfully

17  demanding money they were not legally entitled to.  Then they initiated a non-

18  judicial foreclosure on the plaintiff's home by recording without proper legal basis

19  a notice of default and notice of trustee sale.

20      71. Defendants BNC, Chase and NDEx committed fraud by falsely stating

21  in their notice of sale that the reasonable estimate of costs, expenses, and advances

22  is $307,967.68 on a loan principal of $302,600, and after Jim Moore has made two

23  years of  monthly mortgage payments.

24      72. Amounts consisting of  foreclosure fees, late fees, additional interest,

25  and other fees, which defendants BNC, Chase, and NDEx have demanded from

26  plaintiff are erroneous and fraudulent, and are based on fraudulent representations,

27  violations of the Federal Truth in Lending Act, and concealed excessive charges

28

1  and fees.  These are facts which the defendants, and each of them, knew and

2  should have reasonably known.

3      73. Defendants BNC, Chase and NDEx attempted to mislead and defraud

4  plaintiff by requiring him to pay sums of money which he did not and does not

5  owe to defendants, and by requiring this money under threat of foreclosure, with

6  the intent of taking possession of plaintiff's home if he did not pay these sums.

7      74. Defendants' actions in engaging in the actions alleged in this complaint

8  have been wilful and malicious.

9                    **FOURTH CAUSE OF ACTION**
                    **UNCONSCIONABILITY**
10

11     75. Plaintiff realleges and incorporates by reference paragraphs 1 to 74 of

12  this complaint.

13     76. Civil Coded §1670.5(a) states:

14          If the court as a matter of law finds the contract or any clause
           of the contract to have been unconscionable at the time it was made,
15          the court may refuse to enforce the contract, or it may enforce the
           remainder of the contract without the unconscionable clause, or it
16          may so limit the application of any unconscionable clause as to avoid
           any unconscionable result.
17

18     77. The mortgage agreement which plaintiff entered into with BNC and

19  which was apparently assigned to Chase, is unconscionable. The unconscionability

20  of the contract has been detailed in this complaint.  Defendants sought the charge

21  plaintiff inflated and unlawful fees.  They misrepresented the loan they would

22  provide to plaintiff.  They threatened, and in fact attempted, to seize plaintiff's

23  home through a non-judicial foreclosure sale if plaintiff did not pay their

24  demanded fees, or agree to pay them.   Defendants, and each of them, sought to

25  impose upon plaintiff a mortgage agreement which carried excessive interest fees

26  and whose true nature was concealed from plaintiff.

27     78. The September 2004 BNC promissory note was incomprehensible, filled

28  legalese and filled with mumbo-jumbo.  This incomprehensibility was intended to

1    insure that the plaintiff did not comprehend its terms, which in turn permitted the

2    defendant BNC, Chase and their successors to mislead the plaintiff and thereby

3    financially profit from its terms.

4        79. Defendants' actions in engaging in the actions alleged in this complaint

5    have been wilful and malicious.

### FIFTH CAUSE OF ACTION
### CONTRACTUAL BREACH OF THE CONVENANT OF GOOD FAITH AND FAIR DEALING

8        80. Plaintiff realleges and incorporates by reference paragraphs 1 to 78 of

9    this complaint.

10       81. Every contract imposes upon each party a duty of good faith and fair

11   dealing in its performance and its enforcement.  This implied covenant of good

12   faith and fair dealing requires that no party will do anything that will have the

13   effect of impairing, destroying, or injuring the rights of the other party to receive

14   the benefits of their agreement.  This covenant implies that in all contracts each

15   party will do all things reasonably contemplated by the terms of the contract to

16   accomplish its purpose.   This covenant protects the benefits of the contract that

17   the parties reasonably contemplated when they entered into the agreement,

18       82. The terms of the promissory note and trust deed imposed upon the

19   defendants a duty of good faith and fair dealing in this matter.

20       83. Defendants enjoyed substantial discretionary power affecting the rights

21   of plaintiff during the events alleged in this complaint.  Defendants were required

22   to exercise such power in good faith.

23       84. California foreclosure law and procedure is based on the social policy.

24   The goal of California non-judicial foreclosure law under California Civil Code

25   §2924 et seq. is to provide fast, efficient and non-judicial remedies to beneficiaries

26   while at the same time providing protection to trustors. California non-judicial

27   foreclosure law also is intended to protect the trustor from the wrongful or unfair

28   loss of his property.

1     85. California non-judicial foreclosure law requires strict compliance on the

2     part of beneficiaries and trustees.

3     86. Defendants wilfully breached their implied covenant of good faith and

4     fair dealing with plaintiff Jim Moore.  BNC, Chase, and NDEx attempted to non-

5     judicially foreclose on plaintiff's home

6     87. Defendants breached their covenant of good faith and fair dealing with

7     plaintiff by violating California Civil Code §§2924f and by their actions as alleged

8     in this complaint.

9     88. The September 2004 BNC promissory note was incomprehensible, filled

10    legalese and filled with mumbo-jumbo.  This incomprehensibility was intended to

11    insure that the plaintiff did not comprehend its terms, which in turn permitted the

12    defendant BNC, Chase, and NDEx and their successors to mislead the plaintiff and

13    thereby financially profit from its terms.  In this manner, defendants breached their

14    duty of good faith and fair dealing.

15    89. Defendants have wilfully breached their implied covenant of good fath

16    and fair dealing for the reasons and actions which are outlined in the Second,

17    Third and Fourth Causes of Action.

18    90. Defendants' actions in this matter have been wilful and knowing.

19    91. As a result of defendants' breach of this covenant, plaintiff Jim Moore

20    has suffered injury.  The injury has caused plaintiff to suffer the specter of a

21    foreclosure sale of his home  and incur attorney fees and other costs and expenses

22    in order to prevent this sale.

23    //

24    //

25

26

27

28

1
2

**SEVENTH CAUSE OF ACTION**
**ACCOUNTING**

3     92. Plaintiff realleges and incorporates by reference paragraphs 1 to 91 of
4  this complaint.

5     93. There is and was a relationship between and among defendants BNC,
6  Chase and their agents and successors and plaintiff Jim Moore.  In this
7  relationship, BNC, Chase and their agents and successors  received mortgage
8  payments from plaintiff.  BNC, Chase and their agents and successors had a legal
9  duty to accurately and timely account for these payments and to properly apply
10  these payments to the trust deed mortgage.

11     94. Only defendants BNC, Chase and their agents and successors have the
12  information as to how they received, accounted for, and applied the mortgage
13  payments tendered by plaintiff in this matter.  Only defendants BNC, Chase and
14  their agents and successors have information as to what charges and fees and costs
15  they added to the amounts they were demanding from Jim Moore and the
16  justification for these amounts.

17     95. An accurate amount that plaintiff Jim Moore owes and owed to
18  defendants BNC, Chase and their agents and successors can only be determined by
19  information in the possession of these defendants, and by a detailed and itemized
20  accounting.  The amounts which Jim Moore owes is uncertain at this time and
21  cannot be determined without an accounting.

22     96. *Whann v. Doell*[1] and *James Church v. Superior Court*[2] authorize an
23  accounting when there is an unknown amount due that cannot be determined
24  without an accounting.

25
26  ─────────────────

27     [1] *Whann v. Doell* (1923) 192 Cal. 680, 684.

28     [2] *James Church v. Superior Court* (1955) 135 Cal.App.2d 352, 359.

97. Jim Moore requests an accounting from the defendants in this matter so that he can know what is lawfully owed and what is not.

**PUNITIVE DAMAGES**

98. Plaintiff realleges and incorporates by reference paragraphs 1 to 97 of this complaint.

99. Plaintiff Jim Moore alleges that defendants, and each of them, are guilty of malice, fraud and oppression as defined by California Civil Code §3294, and that Jim Moore  should recover, in addition to actual damages, damages to make an example of and to punish defendants and each of them for their actions.

**PRAYER**

WHEREFORE, plaintiff prays judgment as follows:

1. For a declaration that the notice of trustee Sale filed on or about December 6, 2007 and attached as Exhibit 1 and is invalid, unlawful, and does not provide the necessary foundation for the conduct of a trustee sale, as described in California Civil Code §2924 et seq..

2. For a declaration that defendants have violated California Civil Code §2924f and §2624d in this non-judicial foreclosure process.

3. For a declaration that the promissory note executed on or about September 23, 2004 and secured by Alameda trust deed x1 is unconscionable.

4. This Court order the remedy of rescission of the loan in this matter.

5. For an injunction permanently prohibiting the defendants, and each of them, and their successors and agents from conducting a non-judicial foreclosure sale of plaintiff's home located at  1258 Duffy Drive, Brentwood, CA 94513.

6. Defendants render a full, complete, detailed, and itemized accounting reflecting the amounts they claim are  past due, the principal, interest, taxes, assessments, insurance premiums, or advances, and recurring obligations, and particularly attorney and trustee fees.  That they render proof of existence of their

alleged note and security interest on 1258 Duffy Drive, Brentwood, CA 94513.
That defendants substantiate their accounting with detailed documentation.

     7. That Plaintiff Jim Moore be declared to be the prevailing party.

     8. For attorney fees pursuant to California Civil Code §1717.

     9. For general and special damages.

     10. For punitive damages.

     11. For such other and further relief as the court may deem proper.

SPIELBAUER LAW FIRM

Thomas Spielbauer, Esq.
Attorney for Plaintiff
[Signature by Fax/Email]

## VERIFICATION

I, Jim E. Moore, am the plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

January 4, 2008



Jim E. Moore

# TABLE OF EXHIBITS

Exhibit

Notice of Trustee Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Truth in Lending Disclosure of September 15, 2004 . . . . . . . . . . . . . . . . . . . . . . . 2

Truth in Lending Disclosure of September 23, 2004 . . . . . . . . . . . . . . . . . . . . . . . 3

Notice of the Right to Cancel (TILA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Promissory (Exploding ARM) Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Deed of Trust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

# Exhibit 1

Notice of Trustee Sale

NOV-09-2007 FRI 03:33 PM PRIOITY POSTING                FAX NO. 01                    P. 27/34

Recording requested by:
STEWART TITLE OF CALIFORNIA, INC.



When Recorded Mail To:
NDEx West, L.L.C.
15000 Surveyor Boulevard, Suite 500
Addison, Texas 75001-9013


NTSP20070161903582

Space above this line for Recorder's use only

Trustee Sale No. : 20070161903582      Title Order No.: 00696401      FHA/VA/PMI No.: 21971669

# NOTICE OF TRUSTEE'S SALE

YOU ARE IN DEFAULT UNDER A DEED OF TRUST, DATED 09/23/2004. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

NDEx West, LLC, as duly appointed Trustee under and pursuant to Deed of Trust Recorded on 10/01/2004 as Instrument No. 2004-0378872-00 of official records in the office of the County Recorder of CONTRA COSTA County, State of CALIFORNIA.

EXECUTED BY:     JAMES E MOORE A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY,
WILL SELL AT PUBLIC AUCTION TO HIGHEST BIDDER FOR CASH, CASHIER'S CHECK/CASH EQUIVALENT or other form of payment authorized by 2924h(b), (payable at time of sale in lawful money of the United States).
DATE OF SALE:   12/06/2007      TIME OF SALE:      1:30 P.M.
PLACE OF SALE:   AT THE COURT ST. ENTRANCE TO THE COUNTY COURTHOUSE, 725 COURT ST., (CORNER OF MAIN AND COURT ST.) MARTINEZ, CA.
STREET ADDRESS and other common designation, if any, of the real property described above is purported to be:
                1258 DUFFY WY, BRENTWOOD, CALIFORNIA 94513
APN#:           017-201-019-1

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. Said sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by said Deed of Trust, with interest thereon, as provided in said note(s), advances, under the terms of said Deed of Trust, fees, charges and expenses of the Trustee and of the trusts created by said Deed of Trust. The total amount of the unpaid balance of the obligation secured by the property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of the Notice of Sale is $307,967.68. The beneficiary under said Deed of Trust heretofore executed and delivered to the undersigned a written Declaration of Default and Demand for Sale, and a written Notice of Default and Election to Sell. The undersigned caused said Notice of Default and Election to Sell to be recorded in the county where the real property is located.

FOR TRUSTEE SALE INFORMATION PLEASE CALL:
PRIORITY POSTING & PUBLICATION                      NDEx West, L.L.C. MAY BE ACTING AS A DEBT
17501 IRVINE BLVD., SUITE ONE                       COLLECTOR ATTEMPTING TO COLLECT A
TUSTIN, CA 92780                                    DEBT. ANY INFORMATION OBTAINED WILL
714-573-1965                                        BE USED FOR THAT PURPOSE.
www.priorityposting.com

NDEx West, L.L.C. as Authorized Agent

_____      Dated:  11/09/2007

# Exhibit 2

Truth in Lending Disclosure
of September 15, 2004

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

CREDITOR:

BNC MORTGAGE, INC.
P.O. BOX 19656
IRVINE, CA 92623-9656

BORROWERS: JAMES MOORE

[x] Preliminary  [ ] Final

*DATE:* 09/15/2004
*LOAN NO.:* COS008341
*Type of Loan:* 2 YEAR FIXED 1/7

ADDRESS: 1258 DUFFY WY
CITY/STATE/ZIP: BRENTWOOD, CA 94513
PROPERTY: 1258 DUFFY WY BRENTWOOD CA 94513

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.706 (e) % | $ 432,642.93 (e) | $ 271,807.46 (e) | $ 704,450.39 (e) |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING |
|---|---|---|---|---|---|
| 24 | $1,948.23 | 12/01/2004 | | | |
| 335 | $1,957.44 | 12/01/2006 | | | |
| 1 | $1,950.47 | 11/01/2034 | | | |

DEMAND FEATURE: [X] This loan does not have a Demand Feature. [ ] This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
[X] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at: 1258 DUFFY WY BRENTWOOD CA 94513

ASSUMPTION: Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms
[ ] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES: $ 70.00

PROPERTY INSURANCE: [ ] Property hazard insurance in the amount of $0.00 with a mortgagee clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender.
Hazard insurance [ ] is [X] is not available through the lender at an estimated cost of $0.00 for a year term.

LATE CHARGES: If your payment is more than 10 days late, you will be charged a late charge of 6.000 % of the overdue payment.

PREPAYMENT: If you pay off your loan early, you
[X] may [ ] will not have to pay a penalty.
[ ] may [X] will not be entitled to a refund of part of the finance charge.

**See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.**
**e means estimate . All of the numerical disclosures except the late fee disclosure are estimates.**

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____    _____
JAMES MOORE          BORROWER/DATE                         BORROWER/DATE

_____    _____
                     BORROWER/DATE                         BORROWER/DATE

© 2003 CBF Systems, Inc. The contents of this form in whole or in part are protected under the copyright laws of the United States.

# Exhibit 3

Truth in Lending Disclosure
of September 23, 2004

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

CREDITOR:

    BNC MORTGAGE, INC.
    P.O. BOX 19656
    IRVINE, CA 92623-9656

BORROWERS: JAMES E. MOORE

Preliminary   **X**   Final
*DATE:* 09/23/2004
*LOAN NO.:* COS008341
*Type of Loan:* 2 YEAR FIXED 1/7

ADDRESS: 1258 DUFFY WY
CITY/STATE/ZIP: BRENTWOOD, CA 94513
PROPERTY: 1258 DUFFY WY BRENTWOOD CA 94513

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 9.186(e) % | $ 577,381.07 (e) | $ 293,180.58 (e) | $ 870,561.65 (e) |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE<br>monthly<br>BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE<br>monthly<br>BEGINNING |
|---|---|---|---|---|---|
| 24 | $2,268.02 | 11/01/2004 | | | |
| 335 | $2,428.98 | 11/01/2006 | | | |
| 1 | $2,420.87 | 10/01/2034 | | | |

**DEMAND FEATURE:**   **X** This loan does not have a Demand Feature.     ☐ This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:**
**X** This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at: **1258 DUFFY WY BRENTWOOD CA 94513**

**ASSUMPTION:** Someone buying this property   **X** cannot assume the remaining balance due under original mortgage terms
☐ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

**FILING / RECORDING FEES:** $ 70.00

**PROPERTY INSURANCE:** ☐ Property hazard insurance in the amount of $0.00     with a mortgagee clause to the lender
is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender.
Hazard insurance ☐ is   **X** is not available through the lender at an estimated cost of $0.00   for a     year term.

**LATE CHARGES:** If your payment is more than 10   days late, you will be charged a late charge of 6.000     % of the
overdue payment.

**PREPAYMENT:** If you pay off your loan early, you
**X** may ☐ will not   have to pay a penalty.
☐ may **X** will not   be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate . All of the numerical disclosures except the late fee disclosure are estimates.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____
JAMES E. MOORE           BORROWER/DATE

             BORROWER/DATE

             BORROWER/DATE

             BORROWER/DATE



# Exhibit 4

Notice of the Right to Cancel (TILA)

## NOTICE OF RIGHT TO CANCEL

Application No.  **COS008341**              Loan No.  **COS008341**
Borrowers: **JAMES E. MOORE**

Property Address:  **1258 DUFFY WY, BRENTWOOD, CA  94513**

**YOUR RIGHT TO CANCEL:**
You are entering into a transaction that will result in a mortgage, lien or security interest on/in your home. You have a legal right under federal law to cancel this transaction, within three business days from whichever of the following events occurs last:

ENTER<br>DATE

1. the date of the transaction, which is _____ ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on/in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL:**

If you decide to cancel this transaction, you may do so by notifying us by faxing this form to (877) 553-4058 or in writing, at:

BNC MORTGAGE, INC.
1901 Main Street
Irvine, CA 92614-6524
ATTN: Funding Dept.

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

ENTER<br>DATE

If you cancel by mail or telegram, you must send a notice no later than midnight of _____
(or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time. Please note that if more than one consumer has the right to cancel this transaction, any such consumer acting alone may exercise his or her right to cancel and such cancellation shall be effective as to all consumers.

### I WISH TO CANCEL

_____                _____
Date                                                    Consumer's Signature

ON THE DATE OF THE TRANSACTION LISTED ABOVE I/WE, THE UNDERSIGNED, EACH RECEIVED TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL IN THE FORM PRESCRIBED BY LAW ADVISING ME/US OF MY/OUR RIGHT TO CANCEL THIS TRANSACTION.

**JAMES E. MOORE** _____ Date _____    _____ Date _____

_____ Date _____    _____ Date _____

_____ Date _____    _____ Date _____

# Exhibit 5

Promissory (Exploding ARM) Note

# ADJUSTABLE RATE NOTE
(LIBOR 6-Month Index-Rate Caps)

Loan No.: COS008341

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

September 23, 2004          IRVINE                    CALIFORNIA
[Date]                     [City]                    [State]

1258 DUFFY WY, BRENTWOOD, CA 94513
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **302,600.00**      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **BNC MORTGAGE, INC., A DELAWARE CORPORATION** . I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **8.225**      %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making payments every month. I will make my monthly payments on the first day of each month beginning on **November 1, 2004**    .

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **October 1, 2034**    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **6501 IRVINE CENTER DRIVE, IRVINE, CA 92618**
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ **2,268.02** . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of **October, 2006**                    , and on that day every      **6th**    month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6-month U.S. dollar-denominated deposits in the London market based on quotations of major banks, as published in the "Money Rates" section of The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six And 925/1000**                percentage points ( **6.925**    %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125 %). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **10.225**      % or less than    **8.225**      % . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than    **one**      percentage points ( **1.000**      %) from the rate of interest I have been paying for the preceding    **6**    months. My interest rate will never be greater than **15.225**      % or less than    **8.225**      %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

If within **twenty-four**            (    24       ) months after the date of execution of the Security Instrument (as defined below) I make a full Prepayment or partial Prepayment(s), I will at the same time pay to the Note Holder a prepayment charge equal to six (6) months' advance interest on the amount of the Prepayment that, when added to all other amounts prepaid during the 12-month period immediately preceding the date of the Prepayment, exceeds twenty percent (20%) of the original Principal amount of this Note. However, for purchase loans only (this does not include refinance loans), I have a 90 day window period from the date of the "Notice of Interest Rate Change" to make a prepayment on my loan without a prepayment penalty charge. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial prepayment without imposition of a prepayment charge.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of        **10** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **6 %**            of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

ADJUSTABLE RATE NOTE-LIBOR 6-MONTH INDEX - Single Family

Borrower Initials _____  _____  _____  _____  _____

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
**JAMES E. MOORE**                      -Borrower                                              -Borrower

_____ (Seal)          _____ (Seal)
                                        -Borrower                                              -Borrower

_____ (Seal)          _____ (Seal)
                                        -Borrower                                              -Borrower

ADJUSTABLE RATE NOTE-LIBOR 6-MONTH INDEX - Single Family

Borrower Initials _____   _____   _____   _____   _____   _____

378872

Loan No · COS008341

## ADJUSTABLE RATE RIDER
### (LIBOR 6-Month Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this    23rd day of September, 2004 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
**BNC MORTGAGE, INC., A DELAWARE CORPORATION**
 (the "Lender") of the same date and covering the property described in the Security Instrument and located at

### 1258 DUFFY WY, BRENTWOOD, CA 94513
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT.  THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS.  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows·

### INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of    **8.225**    %  The Note provides for changes in the interest rate and the monthly payments, as follows

## "4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The interest rate I will pay may change on the first day of  October, 2006 , and on that day every   6th   month thereafter   Each date on which my interest rate could change is called a "Change Date "

### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index  The "Index" is  the average of interbank offered rates for 6-month U S  dollar-denominated deposits in the London market based on quotations of major banks, as published in the "Money Rates" section of <u>The Wall Street Journal</u>   The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information   The Note Holder will give me notice of this choice

---

**ADJUSTABLE RATE RIDER-LIBOR  6 MONTH INDEX**-Single Family-                Rev  10/95
Page 1  of 2

Borrower Initials

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six And 925/1000** percentage point(s) (    **6.925**    %) to the Current Index  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0 125%)  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that  I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments  The result of this calculation will be the new amount of my monthly payment

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    **10.225**    % or less than    **8.225**    %  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than    ONE AND 00/100    percentage point(s)    1 00    %) from the rate of interest I have been paying for the preceding    6    months. My interest rate will never be greater than    **15.225**    % or less than    **8.225**    %

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date   I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again

**(F) Notice of Changes**

The  Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change  The notice will include information required by law to be given me and  also the title and telephone number of a person who will answer any question I may have regarding the notice "

BY SIGNING BELOW,  Borrower accepts and agrees to the terms and covenants contained in pages 1 and 2 of this Adjustable Rate Rider

_____ (Seal)          _____ (Seal)
JAMES E. MOORE                     -Borrower                                       -Borrower


_____ (Seal)          _____ (Seal)
                                   -Borrower                                       -Borrower


_____ (Seal)          _____ (Seal)
                                   -Borrower                                       -Borrower

**ADJUSTABLE RATE RIDER-LIBOR  6 MONTH INDEX**-Single Family-                Rev  10/95
Page 2 of 2

Borrower Initials  _____  _____  _____  _____

END OF DOCUMENT

# Exhibit 6

Deed of Trust

# Exhibit 6

Deed of Trust

RECORDING REQUESTED BY
NEW CENTURY TITLE COMPANY.

Recording Requested By·

Return To·

BNC MORTGAGE, INC.
P.O. BOX 19656
IRVINE, CA 92623-9656

Prepared By.

*47042306*

**CONTRA COSTA Co Recorder Office**
**STEPHEN L. WEIR, Clerk-Recorder**
**DOC- 2004-0378872-00**
Acct 10- New Century Title
**Friday, OCT 01, 2004 08:00:00**
MIC   $1.00 MOD   $18.00 REC   $22 00
TCF  $17.00 DAF   $1.80 REF   $0.20
**Ttl Pd   $60.00        Nbr-0002361468**
                              **cgr/R2/1-18**

———————— [Space Above This Line For Recording Data] ————————

# DEED OF TRUST

MIN 100122200001177267

Loan No . COS008341

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21  Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **September 23, 2004** , together with all Riders to this document.
**(B) "Borrower"** is JAMES E. MOORE, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY.

Borrower's address is **1258 DUFFY WY**
**BRENTWOOD,CA 94513**                    . Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is BNC MORTGAGE, INC., A DELAWARE CORPORATION

Lender is a **corporation**
organized and existing under the laws of **Delaware**                    .

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005  1/01

(VMP) -6A(CA) (0207)
Page 1 of 15                Initials
VMP MORTGAGE FORMS - (800)521-7291

378872

Lender's address is **P.O. BOX 19656, IRVINE, CA 92623-9656**

**(D) "Trustee"** is **T.D. SERVICE COMPANY**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument**. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated **September 23, 2004**
The Note states that Borrower owes Lender **three hundred two thousand six hundred and 00/100** Dollars
(U S $**302,600.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **October 1, 2034**.

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable].

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument

VMP®  -6A(CA) (0207)              Page 2 of 15              Initials ___              Form 3005   1/01

378872

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S C  Section 2601 et seq ) and its implementing regulation, Regulation X (24 C F R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA
**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender. (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                  of                 **CONTRA COSTA, CALIFORNIA**                :
          [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
**LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HERETO AS EXHIBIT A.**

Parcel ID Number  **017-201-019**                         which currently has the address of
**1258 DUFFY WY**                                                                [Street]
**BRENTWOOD**                           [City], California **94513**        [Zip Code]
("Property Address")·

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right· to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances



378872

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges*and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order, (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note, (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property, (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

*For purchase loans only (this does not include refinance loans), borrower shall have a 90 day window period from the date of the "Notice of Interest Rate Change" to make a prepayment on Note without a prepayment penalty charge

378872

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded, or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

378872

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably Lender may require Borrower to pay, in connection with this Loan, either· (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender  Lender may make proof of loss if not made promptly by Borrower  Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed  Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds  Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

 

378872

the excess, if any, paid to Borrower Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument, (b) appearing in court, and (c) paying reasonable

378872

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Initials 

378872

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument, (b) is not personally obligated to pay the sums secured by this Security Instrument, and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note) Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure There may be only one designated notice address under this Security Instrument at any one time Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.



**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision

As used in this Security Instrument· (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa, and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of. (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument, (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate, or (c) entry of a judgment enforcing this Security Instrument Those conditions are that Borrower (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity, or (d) Electronic Funds Transfer Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

378872

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20

**21. Hazardous Substances.** As used in this Section 21· (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection, (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS  Borrower and Lender further covenant and agree as follows.

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

378872

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _Ji E Moore_____ (Seal)
                                          JAMES E. MOORE                    -Borrower


_____          _____ (Seal)
                                                                            -Borrower


_____ (Seal)           _____ (Seal)
                        -Borrower                                           -Borrower


_____ (Seal)           _____ (Seal)
                        -Borrower                                           -Borrower


_____ (Seal)           _____ (Seal)
                        -Borrower                                           -Borrower


VMP®-6A(CA) (0207)                    Page 14 of 15                    Form 3005   1/01

378872

State of California
County of Contra Costa                          } ss.

On September 26, 2004  before me, DENISE ANN GONSALVES

personally appeared

JAMES E. MOORE

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument

WITNESS my hand and official seal

_Denise Ann Gonsalves_ (Seal)

DENISE ANN GONSALVES
Commission # 1319867
Notary Public - California
Alameda County
My Comm. Expires Sep 3, 2005


-6A(CA) (0207)          Page 15 of 15          Initials ___          Form 3005   1/01

378872

Exhibit A

All that certain real property situated in the City of Brentwood, County of Contra Costa, State of California, described as follows:

Lot 19, as shown on the Amended Map of Subdivision 4249, filed December 4, 1972, Map Book 152, Page 47, Contra Costa County Records.

EXCEPTING THEREFROM:

A.  Rights reserved in the Deed from Zelma Dainty Beaman and Willma Dainty Seabury, recorded June 5, 1972, in Book 6667 of Official Records, Page 617, as follows:

"Fifty percent (50%) of all rights to extract gas, oil, hydrocarbons and minerals from the premises herein described which lie five hundred feet (500') beneath the surface of the earth."

By Quitclaim Deed recorded August 11, 1972, in Book 6723 of Official Records, Page 115, Zelma Dainty Beaman and Willma Dainty Seabury released and quitclaimed "All rights above a point 500 feet below the surface of the land."

B.  Rights reserved in the Deed from Beverly Peterson, recorded October 31, 1988, in Book 14686 of Official Records, Page 838, as follows:

The remaining 50% of "All oil, gas, casinghead gas, asphaltum and other hydrocarbons and all chemical gas, now or hereafter found, situated or located in all or any part of or portion of the land herein described lying more than five hundred feet (500') below the surface thereof, together with the right to slant drill for and remove all or any of said oil, gas, casinghead gas, asphaltum and other hydrocarbons and chemical gas lying below a depth of more than five hundred feet below the surface thereof; but without any right whatsoever to enter upon the surface of said land or upon any part of said lands within five hundred feet (500') vertical distance below the surface thereof.

Commonly known as:          1258 Duffy Way
APN:                        017-201-019

Loan No · COS008341

## ADJUSTABLE RATE RIDER
### (LIBOR 6-Month Index - Rate Caps)

**THIS ADJUSTABLE RATE RIDER** is made this                **23rd day of September, 2004** ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security
Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's
Adjustable Rate Note (the "Note") to
**BNC MORTGAGE, INC., A DELAWARE CORPORATION**
 (the "Lender") of the same date and covering the property described in the Security Instrument and located at

### 1258 DUFFY WY, BRENTWOOD, CA 94513
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE
AND THE MONTHLY PAYMENT.  THE NOTE LIMITS THE AMOUNT THE BORROWER'S
INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE
BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.**  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows·

### INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of         **8.225**               %  The Note provides for changes in
the interest rate and the monthly payments, as follows

## "4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
### (A) Change Dates
The interest rate I will pay may change on the first day of  October, 2006 , and on that day every   6th   month
thereafter   Each date on which my interest rate could change is called a "Change Date "

### (B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index  The "Index" is  the average of
interbank offered rates for 6-month U S  dollar-denominated deposits in the London market based on quotations of
major banks, as published in the "Money Rates" section of <u>The Wall Street Journal</u>   The most recent Index figure
available as of the date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable
information   The Note Holder will give me notice of this choice

---

**ADJUSTABLE RATE RIDER-LIBOR  6 MONTH INDEX-**Single Family-                    Rev  10/95
Page 1  of 2

Borrower Initials ___  ___  ___  ___  ___  ___

**(C)  Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six And 925/1000**                                                                                                                         percentage point(s) ( **6.925** %) to the Current Index  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0 125%)  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments  The result of this calculation will be the new amount of my monthly payment

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.225** % or less than **8.225** % Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than   ONE AND 00/100                                                                        percentage point(s)  1 00                     %) from the rate of interest I have been paying for the preceding            6             months. My interest rate will never be greater than         **15.225**                % or less than         **8.225**                %

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date   I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change  The notice will include information required by law to be given me and  also the title and telephone number of a person who will answer any question I may have regarding the notice "

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 and 2 of this Adjustable Rate Rider

_____ (Seal)        _____ (Seal)
JAMES E. MOORE                        -Borrower                                              -Borrower


_____ (Seal)        _____ (Seal)
                                     -Borrower                                              -Borrower


_____ (Seal)        _____ (Seal)
                                     -Borrower                                              -Borrower

**ADJUSTABLE RATE RIDER-LIBOR  6 MONTH INDEX**-Single Family-                      Rev 10/95
Page 2 of 2

Borrower Initials  _____  _____  _____  _____

END OF DOCUMENT

1  Thomas Spielbauer, Esq.
   SBN 78281
2  THE SPIELBAUER LAW FIRM
   1250 Oakmead Parkway, Suite 210
3  Sunnyvale, CA 94085
   (408)451-8499
4  Fax: (610)423-1395
   thomas@spielbauer.com
5
   Attorneys for Jim E. Moore, Plaintiff
6

FILED

2008 JAN -9  P 3:43

COURT

Deputy Clerk

7                  **IN THE SUPERIOR COURT**
                  **OF THE STATE OF CALIFORNIA**
8                  **CONTRA COSTA COUNTY**

9   JIM E. MOORE,                          No:   C 08-00040

10                        Plaintiff.

11  v.s.                                   ORDER TO SHOW CAUSE AND
                                           TEMPORARY RESTRAINING
12                                         ORDER

13                                         Code Civ.Proc. § 527(a)

14  CHASE BANK; BNC MORTGAGE,
    INC.; NDEx West LLC; STIRLING
15  FUNDING CORPORATION; KEVIN
    CAYLOR; and DOES 1-20,
16
                          Defendants.

17

18         On reading the verified complaint of plaintiff, declaration of counsel, and

19  the papers on file in the above-entitled action, it appears to the satisfaction of the

20  court that this is a proper case for granting a temporary restraining order and an

21  order to show cause for a preliminary injunction, and that, unless the temporary

22  restraining order prayed for be granted, great or irreparable injury will result to

23  plaintiff before the matter can be heard on notice.

24         IT IS HEREBY ORDERED that the above-named defendants, and each of

25  them, appear in Department __16__ of this Court, located the Wakefield Taylor

26  Courthouse, 725 Court Street, Martinez CA 94553, on __1/25/08__, at

27  __8:30a.m.__, or as soon thereafter as the matter may be heard, then and there

28  to show cause, if any they have, why they and their agents, servants, employees,

                                   -1-

1 and representatives should not be enjoined and restrained during the pendency of
2 this action from engaging in, committing, or performing, directly or indirectly,
3 any and all of the following acts: Undertaking or permitting actions of any kind
4 which shall cause the auction or foreclosure sale of the residence located at 1258
5 Duffy Drive, Brentwood, CA 94513 under authority of a trust deed recorded with
6 the Contra Costa County Recorder; From undertaking or permitting actions of
7 any kind which shall cause the sale of or the passing of title to the property of
8 1258 Duffy Drive, Brentwood, CA 94513 during the pendency of this action;
9 From the reporting of any kind of derogatory information concerning the sale and
10 the plaintiff during the pendency of this action.

11 Defendants CHASE BANK, BNC MORTGAGE CORPORATION and
12 NDEx West LLC, and their agents, servants, and employees are hereby restrained
13 and enjoined, pending a hearing for a preliminary injunction, from undertaking or
14 permitting any actions of any kind which shall cause the sale or foreclosure sale
15 or passing or slander of title of the residence located at 1258 Duffy Drive,
16 Brentwood, CA 94513. Defendants CHASE BANK, BNC MORTGAGE
17 CORPORATION and NDEx West LLC are further enjoined from undertaking
18 any action to effect an assignment of rents or hinder plaintiff's ability to manage
19 his property or enjoy the fruits of his property.

20 This temporary restraining order shall remain in full force and effect until a
21 preliminary injunction hearing is held in this matter by this court or the Federal
22 District Court or the United States Bankruptcy Court should this matter be
23 removed.

24 Defendants are further enjoined from undertaking any action which will
25 hinder or interfere or slander plaintiff's ability to manage his property or enjoy
26 the fruits of their property.

27 The defendants shall file their response to this order to show cause by no
28 later than __1/17/08__. Plaintiffs shall file their reply to defendants'

-2-

response by no later than ___1/22/08___ . ~~Both parties shall serve~~
~~courtesy copies to Department —/~~. Both parties may serve each other by
confirmed email or confirmed fax.

As a part of any response, defendants shall submit a detailed an itemized
accounting with supporting documentation of the amounts they are demanding as
reinstatement of the trust deed note on the property of 3903 Whitney Avenue,
Sacramento, CA 95821. Such documentation will supply all documentation
relevant to justify the fees and amounts they are demanding.

In order to insure that the preliminary injunction hearing is held and
sufficient information is presented whereby this court can make an informed
decision as to whether it should issue a preliminary injunction in light of the
plaintiff's allegations in his verified complaint, defendants Defendants CHASE
BANK, BNC MORTGAGE CORPORATION and NDEx West LLC shall
furnish as a part of their response the following documentation to counsel for
plaintiff: any Loan Submission forms for plaintiff's September 2004 Loan,
Transmittal Form (#1008), Document Order Form, Initial Loan Application ( #
1003), Final Loan Application (#1003), Property Appraisal, Loan Benefit
Analysis, Underwriter's Worksheet, BNC's and Chase's Mortgage Loan Credit
Guidelines, Underwriting Guidelines, All documents regarding the sale or
attempted sale of the loan to Investors and any subsequent repurchase, all
documents pertaining to the securitization or attempted securitization of this loan,
Yield Spread Premiums earned in this matter, by the brokers or through the sale
to investors of this Moore loan, and Commissions and or Premiums paid to BNC
Mortgage Corporation and Chase Bank Employees or any of their successors
from this loan event.

//

//

-3-

1    IT IS FURTHER ORDERED that copies of the complaint, declaration, and
2    this order to show cause and temporary restraining order be served on defendants
3    not later than ~~JAN 7, 2008~~ ~~Such service may be effected upon defendants by~~
4    ~~United States Express Mail.~~
5    IT IS FURTHER ORDERED that copies of the complaint, declaration, and
6    this order to show cause and temporary restraining order be served on defendants
7    not later than JAN 7, 2008
8    Dated: January 4, 2008

9
10   _____
11   Judge of the Superior Court
12            Judith J. Craddick
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1  Thomas Spielbauer, Esq.
   SBN 78281
2  THE SPIELBAUER LAW FIRM
   1250 Oakmead Parkway, Suite 210
3  Sunnyvale, CA 94085
   (408)451-8499
4  Fax: (610)423-1395
   thomas@spielbauer.com
5
   Attorneys for Jim E. Moore, Plaintiff
6
7              **IN THE SUPERIOR COURT**
             **OF THE STATE OF CALIFORNIA**
8              **CONTRA COSTA COUNTY**

9  JIM E. MOORE,                          No: MSC08-00040

10                          Plaintiff.
                                          AMENDMENT TO COMPLAINT
11  v.s.

12

13

14  J.P. CHASE MORGAN BANK;  BNC
    MORTGAGE, INC.;  NDEx West LLC;
15  STIRLING FUNDING
    CORPORATION; KEVIN CAYLOR;
16  and DOES 1-20,

17                          Defendants.

18        Plaintiff Jim Moore makes the following amendments to his complaint:

19        1. In the caption of the complaint, change the named party from "Chase
20  Bank" to "J.P. Chase Morgan Bank."

21        2. At page 1, line 22, change "J.P. Chase Bank" to "J. P. Chase Morgan
22  Bank."

23        3. At page 20, line 19, change "Alameda County Trust Deed x1"  to read
24  "Alameda County Trust Deed 2004-037887220."

25  //

26  //

27

28

1  Dated: January 8, 2008

2

3                        THE SPIELBAUER LAW FIRM

4

5

6                        by Thomas Spielbauer, Esq.
                         Attorney for Plaintiff, Jim Moore

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Thomas Spielbauer, Esq.
   SBN 78281
2  THE SPIELBAUER LAW FIRM
   1250 Oakmead Parkway, Suite 210
3  Sunnyvale, CA 94085
   (408)451-8499
4  Fax: (610)423-1395
   thomas@spielbauer.com
5
   Attorneys for Jim E. Moore, Plaintiff
6
7              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
8

9  JIM E. MOORE,                          No. 3:08-cv-00350-SC

10                         Plaintiff.
                                          Contra Costa County Superior Court
11                                        No: MSC08-00040

12 v.s.
                                          DECLARATION TO THOMAS
13                                        SPIELBAUER IN SUPPORT OF
                                          MOTION TO REMAND AND FOR
14                                        ATTORNEY FEES
15 J. P. CHASE MORGAN BANK; BNC
   MORTGAGE, INC.;  NDEx West LLC;
16 STIRLING FUNDING
   CORPORATION; and KEVIN
   CAYLOR,
17
                          Defendants.
18

19      I, Thomas Spielbauer, do hereby declare.

20      I am the attorney for Jim E. Moore in this matter.

21      I am not a party to the within action.

22      If called to testify, I could and would testify competently to the facts as

23 stated within.

24      I am informed and believe that the foreclosure sale date which was,

25 originally set on January 7, 2008 has been continued to February 7, 2008.  The

26 property which is subject to foreclosure sale on that date and time is 1258 Duffy

27 Drive, Brentwood, CA 94513.  Jim Moore is married and lives on a modest

28 income.  He has a wife and three children.  They all live at the residence on Duffy

                                   -1-

1    Drive in Brentwood, CA.

2         The complaint which is attached as Exhibit 1 is a true and correct copy of

3    the complaint which was filed in Contra Costa County Superior Court Action x1

4    on January 4, 2008.  Exhibit 2 is a true and correct copy of the temporary

5    restraining order which the Superior Court issued on January 4, 2008.  Exhibit 2 is

6    a true and correct copy of the Temporary Restraining Order which the Superior

7    Court of Contra Costa County issued on January 7, 2008.  Exhibit 3 is a true and

8    correct copy of the Request for the Production of Documents which I had served

9    upon defendant BNC Mortgage, Inc. on or about January 7, 2008.

10        Prior to the service of process upon BNC in this matter, I checked with the

11   California Secretary of State to see if BNC had an active and registered agent for

12   the service of process in California.  To my surprise, I found that it did not, even

13   though it did business within the State of California.  Since BNC was a Delaware

14   Corporation, I checked with the Secretary of State for Delaware and thereafter

15   learned through investigation that BNC had a registered agent with the State of

16   Delaware for the service of process, that being Corporation Service Company,

17   2711 Centerville Road, Wilmington, DE 19808.  I subsequently had BNC served

18   through its agent on January 7, 2008.

19        I was surprised by the removal which defendant BNC effected on January

20   18, 2008, whereby it removed this matter from the Contra Costa Superior Court

21   into Federal Court.  This removal was accomplished without any kind of prior

22   warning or advisement or even communication from counsel for BNC.

23        I have invested on Friday, January 18th, and then Saturday, January 19th, and

24   finally on Sunday, January 21st a total of 9 hours in the preparation and filing of

25   this motion to remand this matter to State Court.  I personally have researched and

26   written this motion.  I spent 2 hours researching and preparing this motion on

27   Friday, the 18th, after I became aware of the removal.  I spent 6 hours researching

28   and writing this motion to remand on the following day, Saturday, January 19,

2008.  I further spent 1 hour and completing, serving and filing this motion on Sunday, January 20, 2008.

I anticipate that I will spend an additional three hours to write and file a reply or rebuttal to BNC's opposition to my motion to remand.  Thereafter, I anticipate 1 hour for the court appearance in this matter.

The hourly fee which Jim Moore has agreed to in this matter is $500.  This hourly fee takes into consideration the potential of delayed compensation in this case as well as the uncertainty of payment due to the uncertainty of outcome in this foreclosure matter.

I will have, as a result, invested approximately 13 hours in the filing and argument of this motion to remand.  In light of my hourly fee of $500, the attorney fees due to me for this motion is $6,500.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information and knowledge, and wherein alluded to, belief. Executed this January 20, 2008 in San Jose, California.

THE SPIELBAUER LAW FIRM

by Thomas Spielbauer, Esq.
Attorney for Plaintiff, Jim Moore

1  Thomas Spielbauer, Esq.
   SBN 78281
2  THE SPIELBAUER LAW FIRM
   1250 Oakmead Parkway, Suite 210
3  Sunnyvale, CA 94085
   (408)451-8499
4  Fax: (610)423-1395
   thomas@spielbauer.com
5
   Attorneys for Jim E. Moore, Plaintiff
6
7           **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
8

9  JIM E. MOORE,                         No. 3:08-cv-00350-SC

10                         Plaintiff.

11                                        Contra Costa County Superior Court
                                          No: MSC08-00040
12  v.s.

13                                        [PROPOSED] ORDER OF
                                          REMAND
14

15  J. P. CHASE MORGAN BANK; BNC
    MORTGAGE, INC.;  NDEx West LLC;
16  STIRLING FUNDING
    CORPORATION; and KEVIN
17  CAYLOR,

                           Defendants.
18

19      FOR GOOD CAUSE SHOWN, this Court hereby and forthwith remands

20  this action the Contra Costa County Superior Court, the California State

21  jurisdiction from which this matter was removed by Defendant BNC Mortgage on

22  January 18, 2008.

23      This Court finds from the documents which have been filed both by

24  defendant BNC and plaintiff Jim Moore that, on its face, the removed case does

25  not arise under federal law.  This Federal Court thereby lacks subject-matter

26  jurisdiction.  This lack of removal jurisdiction is clearly apparent on the face of

27  the pleadings in this matter.

28      This Court further orders that defendant BNC pay plaintiff's court costs,

-1-

1  expenses and attorney fees in the amount of $_____.  Defendant BNC is

2  to pay to counsel for plaintiff this amount by no later than February _____, 2008.

3         This Court retains jurisdiction of this matter solely on the issue of the

4  payment of expenses and attorney fees.  This matter is continued for a compliance

5  hearing to _____, 2008.  In the event that BNC does not tender payment

6  of fees as ordered herein, this continuance date shall also be a hearing date for

7  BNC to show legal cause for its failure to comply with this Court's order.

8                              **END OF ORDER**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Moore v. J. P. Chase Morgan Bank et Al.*
Northern District of California Case Number 3:08-cv-00350-SC

### CERTIFICATE OF SERVICE

I, Thomas Spielbauer, declare:

I am a resident of Santa Clara County, California.  I am now, and at all times herein mentioned was, over the age of eighteen years.  I am not a party to this action.  My business address is 1250 Oakmead Parkway, Suite 210, Sunnyvale, CA 94085.

On January 20, 2008, I filed electronically EXPARTE MOTION TO REMAND, AND MOTION TO REMAND, REQUEST FOR ATTORNEY FEES, AND IN THE ALTERNATIVE, REQUEST FOR A TEMPORARY RESTRAINING ORDER AND SETTING OF A PRELIMINARY INJUNCTION OSC with supporting documents and exhibits via the Northern District of California Court's website.  Counsel for BNC Mortgage, Inc., aka BNC Mortgage, LLC is a registered user of the ECF for the Northern District of California Federal Court.  His name is Eric D. Houser, Esq..  His email address of ehouser@houser-law.com appears on the docket of this matter.

Pursuant to Northern District General Order 45, the service of the EXPARTE MOTION TO REMAND, AND MOTION TO REMAND, REQUEST FOR ATTORNEY FEES, AND IN THE ALTERNATIVE, REQUEST FOR A TEMPORARY RESTRAINING ORDER AND SETTING OF A PRELIMINARY INJUNCTION OSC and supporting documents was effected at the time of filing, and notification by email to counsel for BNC by the ECF website.

However, out of an abundance of caution, I emailed a copy of this motion for remand to Mr. Houser at his email address of ehouser@houser-law.com with a request for a proof of acknowledgment of receipt.   I did this on January 20, 2008.
//
//

1    I declare under penalty of perjury that the foregoing is true and correct to

2  the best of my knowledge.  Executed in San Jose, California this January 20, 2008.

3

4

5                                 *Thomas J. Spiel*

6                                 Thomas Spielbauer