1  ERIC D. HOUSER (SBN 130079)
   HOUSER & ALLISON
2  A Professional Corporation
   9970 Research Drive
3  Irvine, California 92618
   Telephone: (949) 679-1111
4  Facsimile: (949) 679-1112

5  Attorneys for Defendants,
6  BNC MORTGAGE, LLC, erroneously sued
   herein as BNC MORTGAGE, INC.

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| JIM E. MOORE, | Case No.: C 08-0350 SC |
| Plaintiffs, | **BNC'S OPPOSITION TO EX PARTE MOTION TO REMAND ACTION; DECLARATIONS OF ERIC D. HOUSER AND LINDA DENICOLA IN SUPPORT THEREOF** |
| v. | |
| CHASE BANK; BNC MORTGAGE, INC.; NDEx West LLC; STIRLING FUNDING CORPORATION; KEVIN CAYLOR; and DOES 1-20, | |
| Defendants. | |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

**BNC'S OPPOSITION TO EX PARTE MOTION TO REMAND ACTION**

1

1

# TABLE OF CONTENTS

I.     **INTRODUCTION** ............................................................................................. 1

II.    **STATEMENT OF FACTS AND PLAINTIFF'S ALLEGATIONS** ................................ 2

III.   **THE COMPLAINT ASSERTS CLAIMS THAT ARE PREEMPTED  BY FEDERAL LAW** ............... 5

IV.    **PLAINTIFF'S STATE LAW CLAIMS ASSERTED IN THE  COMPLAINT NECESSARILY**

**REQUIRE RESOLUTION OF  SUBSTANTIAL FEDERAL QUESTION** ........................................... 9

V.     **PLAINTIFF'S REQUEST FOR FEES AND COSTS IS IMPROPER** ............................. 12

VI.    **CONCLUSION** ............................................................................................. 13

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

**BNC'S OPPOSITION TO EX PARTE MOTION TO REMAND ACTION**

i

# TABLE OF AUTHORITIES

**Cases**

Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905 (1997) .........................................................7

Bank of Am. v. City & County of San Francisco, 309 F.3d 551, 558 (9th Cir. 2002) ..................5

Barnett Bank v. Nelson, 517 U.S. 25, 32 (1996) ........................................................................5

Beneficial National Bank v. Anderson 539 U.S. 1, 8, 123 S. Ct. 2058 (2003)..............................8

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc. 467 U.S. 837 (1984)...............7

De la Cuesta, supra, 458 U.S. at 141, 153 (1982).......................................................................6

Fidelity Fed. Sav. & Loan Ass'n v.] de la Cuesta, 458 U.S. [141,] 145 [(1982)] ..........................5

Franchise Tax Bd. Of St. of Cal. v. Construction Laborers Vacation Trust, 463 U.S. 1, 9, 103 S. Ct. 2841(1983) ..............................................................................................................................10

Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg., 545 U.S. 308, 318, 125 S.Ct. 2363  (2005)...................................................................................................................................9

McCulloch v. Maryland, 17 U.S. 316, 325-26 (1819)..................................................................5

NationsBank of North Carolina v. Variable Annuity Life Ins. Co., 513 U.S. 251, 262 (1995) .....7

Phipps v. Guar. Nat'l. Bank of Tallahassee 203 U.S. Dist. Lexis 16984, at 13-14 (W.D.Mo. September 17, 2003) ....................................................................................................................9

Taylor v. Wells Fargo Home Mortgage, Inc. 204 U.S. Dist. Lexis 6910 at 10 (E.D.La. April 19, 2004) ...........................................................................................................................................9

**Statutes**

12 U.S.C. §§1461.........................................................................................................................8

15 U.S.C. § 1601-1666j...............................................................................................................3

15 U.S.C. § 1602 et seq............................................................................................................1, 4

15 U.S.C. § 1635f........................................................................................................................2

15 U.S.C. § 1692a(6) .................................................................................................3

15 U.S.C. §§ 1601-1666j ..........................................................................................1

28 U.S.C. § 1447(c) .................................................................................................12

**Rules**

12 C.F.R. § 560.2(a) ..................................................................................................6

12 C.F.R. § 560.2(c) ..................................................................................................6

12 C.F.R. §§ 560.2(b)(5), (b)(10) .............................................................................6

24 C.F.R. §§ 3500.1-3500.17.................................................................................1, 3

## I.    <u>INTRODUCTION</u>

There is no urgency that would require granting Plaintiff's Ex Parte Motion to remand. The foreclosure sale has been postponed to April 7, 2008. More importantly, Plaintiff's claim that there is no subject matter jurisdiction is contradicted by the litany of federal statutes, regulations, and case law cited below and in Plaintiff's own Complaint.

Plaintiff's case is premised upon the alleged failure to comply with federal statutes at loan origination by a federally regulated financial institution such as BNC.[1]

Plaintiff attempts to disguise his federal claims with state law headings, however, there is no doubt from the pleadings that Plaintiff's claims arise out of the alleged violation of federal statutes. No less than 14 times in his Complaint Plaintiff cites to BNC's alleged violation of federal statutes. In his Complaint, Plaintiff alleges and relies upon:

- The Federal Truth in Lending Act (TILA), 15 U.S.C. §§ 1601-1666j;

- Regulation Z, 24 C.F.R. §§ 3500.1-3500.17;

- Federal Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601-2617;

- The Home Owners Equity Protection Act (HOEPA), 15 U.S.C. § 1602 et seq.

---

[1] BNC Mortgage, LLC is an operating subsidiary of Lehman Brothers Bank, FSB.

Plaintiff also alleges that on December 31, 2007, he sent the Defendants "a Notice of Rescission pursuant to the federal Truth in Lending Act, 15 U.S.C. § 1635f." Further, state law claims against federally chartered financial institutions premised upon allegations of excessive finance and other charges are completely preempted by federal law and thus removable to federal court.

Even if Plaintiff's claims did not arise directly from federal law and were not preempted, all of the claims depend upon a resolution of substantial predicate questions of federal law. Plaintiff's ex parte motion to remand should be denied.

## II.    STATEMENT OF FACTS AND PLAINTIFF'S ALLEGATIONS

Plaintiff obtained his loan in September 2004 but waited until the eve of the foreclosure sale on December 31, 2007 to notify BNC of his intent to rescind the loan under TILA. Plaintiff's rescission letter does not disguise that his claims are based upon federal law. Throughout the thirteen page letter, Plaintiff cites to federal law as the basis for his claims. A copy of the letter is attached as **Exhibit "1"**.

Five days later, Plaintiff filed his lawsuit against BNC, and others. Although each cause of action contained in the Complaint contains a state law heading, each claim is premised upon an alleged violation of federal law. Plaintiff alleges:

"As a result of their mortgage activities, Defendants BNC, Stirling, Kevin Caylor and Chase are subject to and must comply with the

---

**BNC'S OPPOSITION TO EX PARTE MOTION TO REMAND ACTION**

2

Federal Truth in Lending Act (15 U.S.C. § 1601-1666j) and with the

Acts' corresponding Regulation Z (24 C.F.R. §§ 3500.1-3500.17)."

(Cplt. ¶ 6)

The Complaint further alleges that:

"7. Defendants BNC, Chase and NDEx, and their agents and

successors, are debt collectors…as defined by 15 U.S.C. § 1692a(6),

the Federal Fair Debt Collection Practices Act.

8. Defendants, and each of them were at all times alleged in this

Complaint required to comply with the Federal Real Estate Settlement

Procedures Act (RESPA) 12 U.S.C. § 2601-2617."

At paragraphs 16-24 of the Complaint, Plaintiff alleges that the

**preliminary** Federal Truth in Lending Disclosure he received differed from the

**final** Truth in Lending Disclosure he received. The preliminary disclosure

statement given before loan approval states on its face that "This is neither a

contract nor a commitment to lend." The **final** Truth in Lending Disclosure

reflected the actual loan which Plaintiff qualified for because of his low credit

score. (DeNicola Declaration at ¶ 4-5). Plaintiff signed and acknowledged each

disclosure statement and accepted the loan, including the adjustable rate feature

and the fees and costs which Plaintiff now claims were excessive. Copies of some

of the disclosures signed for by Plaintiff are attached collectively as **Exhibit "2"**.

1    Plaintiff also claims that the loan he received violated the Homeowners

2    Equity Protection Act (HOEPA).  15 U.S.C. § 1602 et seq.  (Cplt. at ¶¶ 34-35).

3

4    Plaintiff further alleges that the loan contained inaccurate and excessive finance

5    charges.  (Cplt.  at ¶¶ 26 and 33).  Plaintiff also alleges that the three day Notice of

6
     Right to Cancel required by TILA was defective because according to Plaintiff the
7

8    notice that he received did not state the date of the transaction nor the date by

9    which the three day rescission period terminated.  (Cplt. at ¶ 28).[2]  Plaintiff

10   concludes in paragraph 36 of his Complaint that pursuant to Regulation Z, Section
11
     226.32(e)(3) that "the Defendants are thereby culpable for the acts of each other.
12

13   Any successors in interest are subject to this HOEPA and Regulation Z

14   provision."  These are just some of the allegations in the Complaint arising under
15

16   federal law.

17    Defendant BNC was subsequently served with Plaintiff's Complaint and

18   retained counsel.  On January 18, 2008, BNC filed its Notice of Removal.  On
19

20   January 21, 2008, BNC informed Plaintiff's counsel in writing that the foreclosure

21   sale set for February 7, 2008 would not go forward.  (Houser Decl. ¶ 3).  Thus,

22   allowing Plaintiff time to apply to this Court for any type of injunctive relief.  On
23

24   January 21, 2008 Defendant JP Morgan Chase filed it's Joinder to BNC's removal.

25

26

27
     _____
     [2] Attached as **Exhibit "3"** is a copy of the three day notice containing those dates and is signed for and
28   acknowledged by Plaintiff.  The document which Plaintiff signed for states that Plaintiff received 2 fully executed
     copies of the 3 day Notice in compliance with TILA.

## III.  THE COMPLAINT ASSERTS CLAIMS THAT ARE PREEMPTED BY FEDERAL LAW

Few areas of business activity are as pervasively regulated by federal law as the banking and thrift industries. Literally for centuries, Congress has viewed federally charted financial institutions such as BNC as protected from attempts to regulate their operations by state law.  As one federal court of appeals recognized:

> Congress has legislated in the field of banking from the days of *McCulloch v. Maryland,* 17 *U.S.* 316, 325-26 (1819), creating an extensive federal statutory and regulatory scheme. The history of national banking legislation has been "one of interpreting grants of both enumerated and incidental `powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank v. Nelson,* 517 U.S. 25, 32 (1996) (citations omitted). Indeed, since the passage of the National Bank Act in 1864, the federal presence in banking has been significant. *See id* at 32-33. Similarly, since the passage of the [Home Owners Loan Act ("HOLA")] in 1933, OTS regulations have governed the "powers and operations of every federal savings and loan association from its cradle to its corporate grave." *[Fidelity Fed. Sav. & Loan Ass'n v.] de la Cuesta,* 458 U.S. [141,] 145 [(1982)].

*Bank of Am. v. City & County of San Francisco,* 309 F.3d 551, 558 (9th Cir. 2002) (Court held that federal regulations preempted municipal ordinances related to federal banks and fees charged).  Consistent with this broad and exclusive regulation federal regulation, both Congress and the federal banking authorities including the Office of Thrift Supervision (" OTS") have the power to preempt

---

I:\CIVIL\AURORA LOAN SERVICES\Moore (42262)\Pld\OPP2EXP.doc

1  state law that purports to impose obligations on federal banks and thrifts related to

2  their lending operations. *De la Cuesta, supra, 458* U.S. at 141, 153 (1982).

3

4      OTS regulations make clear that state laws do not apply to the lending

5  practices of federal thrifts.  The principal OTS preemption regulation provides that:

6
> OTS hereby **occupies the entire field of lending regulation** *for*
7  > ***federal savings associations.*** OTS intends to give federal
> savings associations maximum flexibility to exercise their
8  > lending powers in accordance with a uniform scheme of
> regulation. Accordingly, federal savings associations may
9  > extend credit as authorized under federal law, including this
10 > part, ***without regard to state laws purporting to regulate or***
> ***otherwise affect their credit activities.***
11

12 12 C.F.R. § 560.2(a) (Emphasis added). State statues, regulations, rules, orders, and

13
14 judicial decisions are all subject to this broad preemption provision. *Id.*

15      As noted above, OTS regulations have expressly preempted state laws

16 that affect "loan-related... fees, including without limitation, initial charges, late

17
18 charges, prepayment penalties, servicing fees, and overlimit fees" assessed by

19 federal thrifts, as well as state laws that affect federal thrifts' "**[p]rocessing,**

20 **origination**, servicing, sale or purchase of, or investment or participation in,

21
22 mortgages." 12 C.F.R. §§ 560.2(b)(5), (b)(10).  (Emphasis Added.)

23      The regulation enumerates limited categories of claims that are not

24
25 preempted. *See* 12 C.F.R. § 560.2(c).  But it does not permit plaintiffs to invoke state

26 law to attack the *very* practices that OTS is charged with regulating merely by

27 denominating their claims as "contract" or "tort" claims rather than claims under

28

---

I:\CIVIL\AURORA LOAN SERVICES\Moore (42262)\Pld\OPP2EXP.doc

direct state banking laws. Both the clear purpose and language of OTS's Regulations make that clear.   OTS has stated unambiguously that section 560.2(c) is wholly inapplicable if the preempted areas set forth in Section 560.2(b) are at issue:

> *[T]he first step will be to determine whether the type of law in question is listed in paragraph (b).  If so, the analysis will end there; the law is preempted.*  *If* the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c).  *For these purposes, paragraph (c) is intended to be interpreted narrowly.  Any doubt should be resolved in favor of preemption.*

61 Fed. Reg. 50951, 50966-50967 (Sept. 30, 1996) (emphasis added).

As the controlling federal agency, OTS is entitled to considerable deference regarding the interpretation of its own preemption regulation. *See, NationsBank of North Carolina v. Variable Annuity Life Ins.* Co., 513 U.S. 251, 262 (1995) (holding that formal federal bank regulatory interpretations are entitled to judicial deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* *467* U.S. 837 (1984); *Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905 (1997) (agency interpretation of its own regulation is controlling unless "plainly erroneous or inconsistent with the regulation") (citations omitted). Thus, the limited exceptions enumerated in the OTS preemption regulation cannot save plaintiffs' state-law claims because those claims are directed specifically at "loan-related fees" as contemplated by 560.2(b)(5), and directly challenge BNC's

"[p]rocessing, origination, servicing, sale or purchase of, or investment or participation in, mortgages" as described in 560.2(b)(10).

Federal question jurisdiction exists over actions against federally chartered financial institutions like BNC "When a federal statute wholly displaces the state law cause of action through complete preemption." *Beneficial National Bank v. Anderson* 539 U.S. 1, 8, 123 S. Ct. 2058 (2003). Under the doctrine of complete preemption, the Federal Statute "provides the exclusive causes of action for the claim asserted and also sets forth procedures and remedies governing that cause of action." *Id.* at 9.

Here, Plaintiff's state law claims are based on the excessiveness of finance charges and alleged misconduct at loan origination. Such claims are completely preempted. The Homeowners' Loan Act ("HOLA"), 12 U.S.C. §§1461 et seq., expressly preempts state laws that limit the amount of finance charges that may be assessed by federally regulated institutions such as BNC. *Id.* § 1463(g)(1). HOLA also provides the exclusive remedy for borrowers who believe a federal thrift has assessed excessive finance charges, whereby "the person who paid it may recover, in a civil action," certain monetary and other relief. *Id.* § 1463(g)(2).

Accordingly, state law claims against federally chartered financial institutions premised on allegations of excessive finance and other charges are completely preempted and removable to federal court. *See, Beneficial National Bank*, 539 U.S. at 11; *See also, Taylor v. Wells Fargo Home Mortgage, Inc.* 204

---

**BNC'S OPPOSITION TO EX PARTE MOTION TO REMAND ACTION**

8

U.S. Dist. Lexis 6910 at 10 (E.D.La. April 19, 2004) (upholding removal by

operating subsidiary of national bank because plaintiff's "state law claim that the

defendants arbitrarily assessed excessive fees and charges, including late charges,

to the [plaintiffs] when they redeemed their loan is preempted by federal law").

*Phipps v. Guar. Nat'l. Bank of Tallahassee* 203 U.S. Dist. Lexis 16984, at 13-14

(W.D.Mo. September 17, 2003) (approving removal of plaintiffs' claims for

unlawful "loan origination fees and loan discount fees" on complete preemption

grounds).  Here, plaintiff's allegations contained at paragraph 33 to 36 of his

complaint leave no doubt that his claims are in fact based upon the alleged

violation of federal law in the loan origination process.  This action should not be

remanded.

## IV.    PLAINTIFF'S STATE LAW CLAIMS ASSERTED IN THE COMPLAINT NECESSARILY REQUIRE RESOLUTION OF SUBSTANTIAL FEDERAL QUESTION

Even where a particular claim does not arise directly under federal law and

is not completely preempted, it is removable to federal court if it depends on

resolution of substantial predicate questions of federal law.  *Grable & Sons Metal*

*Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 318, 125 S.Ct. 2363

(2005).  Here, Plaintiff's claims depend on the determination of plaintiff's rights

and defendants' duties, if any, under federal law.  These claims will necessarily

"turn on some construction of federal law," and are thus deemed to "arise under

federal law" for purposes of federal question jurisdiction. *Franchise Tax Bd. Of St. of Cal. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 9, 103 S. Ct. 2841(1983).

Plaintiff alleges that the Defendants were governed by and violated TILA, HOEPA, Regulation Z, and RESPA.  Plaintiff's further demand rescission of the loan under TILA.  (Cplt. at ¶ 43).  The claims asserted in Plaintiff's Complaint necessitate the resolution of substantial, disputed questions of  federal law sufficient to confer subject matter jurisdiction on this Court.

Plaintiff's Ex Parte Motion is an attempt to force the Court to quickly rule and avoid the federal issues presented by the Complaint.  Plaintiff's entire action is premised on alleged misconduct in violation of federal law at the loan origination process.  Plaintiff cannot rely on Federal Truth in Lending disclosures and federal statutory law to assert duties and violations of those duties and then boldly proclaim to this Court that his Complaint does not "raise any federal issues." (Remand Motion at p. 3, line 7).  But for BNC's alleged violations of TILA, HOEPA, and Regulation Z, Plaintiff has no action.  For example, in his second cause of action entitled "Unfair Business Practices" plaintiff alleges:

> "They failed to comply with the disclosure provisions of the Federal
>
> Truth in Lending Act.  They have failed to comply with the disclosure
>
> provisions of the Home Owner Equity Protection Act, a part of the
>
> Truth in Lending Act. …amounts consisting of foreclosure fees, late

fees, additional interest, and other fees, which defendants BNC,

Chase, and NDEx have demanded from Plaintiff are erroneous and

fraudulent and are based on fraudulent representations, violations of

the Federal Truth in Lending Act, violations of HOEPA, and

concealed excessive charges and fees." (Complaint at ¶ 60 and 64).

The basis for Plaintiff's unfair business practice claim is the violation of federal

law. Without these allegations, there is no claim for alleged unfair business

practices.

Plaintiff's third cause of action for fraud and fourth cause of action for

unconscionability are based on the same allegations. Plaintiff alleges that

"Defendant sought the [sic] charge plaintiff inflated and unlawful fees."

(Complaint at ¶77). The fifth cause of action for contractual breach of the

covenant of good faith and fair dealing is based on defendants' conduct as

"outlined in the second, third and fourth causes of action." (Complaint at ¶ 89).

The only claim which appears to not hinge on the violation of federal law is

Plaintiff's first cause of action for declaratory relief. Plaintiff alleges violations of

various sections of California foreclosure law. However, the first cause of action

also requests that the loan be rescinded which again requires an analysis of federal

laws and/or over which the Court has supplemental jurisdiction.  (Complaint at ¶ 54).[3]

The disingenuous nature of Plaintiff's argument is shown by his statement that this matter is merely a "state court matter based on non-judicial foreclosure." (Ex Parte Motion at pg 6).  The next nine sentences of his motion proceed to describe the alleged wrongful conduct at loan origination.

## V.    PLAINTIFF'S REQUEST FOR FEES AND COSTS IS IMPROPER

Plaintiff's request for attorneys' fees under 28 U.S.C. § 1447(c) is improper. Plaintiff cannot repeatedly cite to and rely upon federal statutes for alleged violations by BNC and then claim that BNC did not have an "objectively reasonably basis" for seeking removal.  Further, Plaintiff's attempt to assign "motives" is false and not supported by any evidence.  (Ex Parte Motion at pgs. 9-10).

Plaintiff first speculates that the removal was done because "BNC sought to avoid going to state court empty handed on January 25, 2008."  BNC's decision to remove eliminated any need to file at that time an opposition to the preliminary injunction request.

Plaintiff's second argument that BNC filed the removal to purportedly avoid discovery (not due until February 21, 2008) makes no sense.  Attached as part of

---

[3] The fact that some or all of Plaintiff's claims based upon federal law would be precluded because of the statute of limitations does not support remand. "The nature of the relief available after (removal) jurisdiction attaches is, of course, different from the question whether there is (removal) jurisdiction..."  *Caterpillar Inc. v. Williams* 482 U.S. 386, 391 fn. 4 (1987).

Exhibits 2 and 3 to this Opposition are some of the documents BNC will be producing in discovery. These documents contain Plaintiff's signature on every page acknowledging his receipt and acceptance of the terms of the loan. Further, if BNC had any intent of "hiding behind Federal Rule 26" until after the foreclosure sale date, BNC would not have requested the postponement of the foreclosure sale until April 7, 2008.

Finally, there is no evidence to support Plaintiff's request for $6,500.00 in attorneys' fees. BNC objectively and properly concluded the matter could be removed. The only improper conduct in this matter is the Plaintiff's attempt to disguise federal claims with state law headings to avoid this Federal Court.

## VI. **CONCLUSION**

Based upon the foregoing, it is respectfully requested that Plaintiff's Ex Parte Motion to remand be denied. Based on the postponed foreclosure sale date of April 7, 2008, Plaintiff has more than enough time to bring his injunction request on a regularly noticed basis.

DATED: January 23, 2008                         HOUSER & ALLISON
                                                A Professional Corporation


                                                /s/ Eric D. Houser
                                                Eric D. Houser
                                                Attorneys for Defendant,
                                                BNC MORTGAGE, LLC,
                                                erroneously sued herein as BNC
                                                MORTGAGE, INC.

## DECLARATION OF ERIC D. HOUSER

I, Eric D. Houser, declare as follows:

1.     I am an attorney at law licensed to practice before this Court and the shareholder of Houser & Allison, APC.  Houser & Allison, APC is counsel of record for Defendant BNC Mortgage, LLC, erroneously sued herein as BNC Mortgage, Inc.  I have personal knowledge of the facts set forth in this declaration and if called upon as a witness, could and would testify competently as to those facts.

2.     There is no evidence to support any of the unfortunate allegations contained in the Ex Parte Motion as to why BNC removed this action to federal court.  This action was removed based upon the numerous allegations contained in the Complaint and the December 31, 2007 letter from Plaintiff's counsel alleging violations of federal law.

3.     I have been informed by John Sorich, counsel for JP Morgan Chase that the foreclosure sale has been postponed to April 7, 2008.  I have informed Plaintiff's counsel in writing that the foreclosure sale will not proceed on February 7, 2008.  Plaintiff has more than enough time to file with this Court any request for injunctive relief concerning the foreclosure sale.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

1    Executed this 23rd day of January, 2008 at Irvine, California.

2

3                                                    /s/ Eric D. Houser
                                                     Eric D. Houser

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF LINDA DENICOLA

I, Linda DeNicola, declare as follows:

1.      I am a Senior Vice President of Quality Control with BNC Mortgage, LLC.  In my capacity as Senior Vice President of Quality Control, I have custody and control of the business records of BNC as they relate to the subject loan.  The records of BNC are made and kept in the ordinary course of business by persons who have a business duty to make such records on behalf of BNC.  The records are made at or near the time of the occurrence of the events that are recorded.  I have personally reviewed the records of BNC as they relate to the subject loan and have personal knowledge of the matters below.  If called upon as a witness, I could and would testify competently as to the information contained in those records and below.

2.      As a Senior Vice President of Quality Control for BNC, I have acquired an understanding and knowledge of the corporate structure of BNC. BNC is an operating subsidiary of Lehman Brothers Bank, FSB.

3.      I have attached as **Exhibit "1"** a true and correct copy of a letter dated December 31, 2007 that BNC received from Plaintiff's counsel.

4.      I have examined Plaintiff's loan origination file.  Attached as **Exhibit "2"** are true and correct copies of some of the documents which Plaintiff signed acknowledging the terms of the loan.  These documents include the Promissory

---

1    Note, Deed of Trust, Adjustable Rate Rider, final Truth in Lending Disclosure

2

3    Statement, Good Faith Estimate of fees and costs, Mortgage Broker Fee

4    Disclosure Statement of loan, and Final Conditional Loan Approval. All of the

5    documents attached bear Plaintiff James E. Moore's signature.

6

7       5.     BNC's loan origination file also reflects that Mr. Moore's credit score

8    was only around 504. The terms of the loan were based on Mr. Moore's low

9    credit score and the additional funds sought by Mr. Moore. The final loan amount

10

11    was $302,600.00 which was substantially higher than the original amount sought

12    as reflected in the preliminary Truth in Lending Disclosure Statement. The

13    docuents attached as part of Exhibit "2" reflect the interest rate, 2 year fixed rate

14

15    term and adjustable rate feature of the loan. All of these terms were

16    acknowledged in writing by Mr. Moore.

17       6.     Attached as **Exhibit "3"** is a true and correct copy of the Notice of

18

19    Right to Cancel signed by Mr. Moore. The document which Mr. Moore signed

20    states he acknowledges receiving 2 completed copies of the Notice of Right to

21    cancel.

22

23       I declare under penalty of perjury under the laws of the United States of

24    America that the foregoing is true and correct. Executed this 23rd day of January,

25    2008 at Lake Forest, California.

26

27                              Linda DeNicola

28

---

**BNC'S OPPOSITION TO EX PARTE MOTION TO REMAND ACTION**

**EXHIBIT "1"**

**EXHIBIT "1"**

# THE SPIELBAUER LAW FIRM

### Attorneys at Law

*Keeping Clients Where They Belong . . . in Their Homes*

1250 Oakmead Parkway, Suite 210 • Sunnyvale, CA 94085 • (408)451-8499 • Fax: (610)423-1395
thomas@spielbauer.com    RECEIVED

JAN    9 2008

AURORA LOAN SERVICES
LEGAL DEPARTMENT

Monday, December 31, 2007

BNC Mortgage, Inc.
1901 Main Street
Irvine, CA 92614
EB090056249US

Kevin Caylor
Stirling Funding Corporation
26391 Crown Valley Pky, Ste.220
Mission Viejo, CA 92691
Fax: (760)860-9829
EB090056235US

Barrett Burke Wilson Castle Daffin
Attn: Christie
15000 Surveyor Boulevard #100
Addison, TX 75001
(972)386-7673
EB090056221US

Priority Posting and Publishing
17501 Irvine Blvd., Suite One
Tustin, CA 92780
EB090056218US

Edwina Costella
Chase Home Finance
1820 E.Sky Harbor Cir. So.
#AZ12175
P. O. Box 78116
Phoenix, AZ 85034
Fax: (877)287-7559
EB090054075US

NDEx West LLC
15000 Surveyor Blvd # 500
Addison, TX 75001
Fax: (972)661-7800
rein@ndexwest.com
EB090054061US

Stirling Funding Corporation
1800 Thibodo Road #300
Vista, CA 92083
Fax: (760)860-9829
EB090054058US

Re: 1258 Duffy Drive, Brentwood, CA 94513
Trustee Sale Number 20070161903582
Trust Deed 2004-037887220
Loan Number COS0088341
Contra Costa APN 017-201-019-1
Trustee Sale date of Monday, January 7, 2008 at 1:30 p.m.

-1-

**EXHIBIT "1"**
**1 of 15**

<u>Delivery by Fax and by Overnight Mail</u>

Dear Ladies and Gentlemen,

I am writing you on behalf of my client, James Moore. I am writing you for a number of reasons. The most urgent at this time is that BNC, Chase, NDEx and Priority Posting postpone the scheduled foreclosure sale which is set for January 7, 2008. Your records will reveal that the sale has been postponed previously. Mr. Moore is diligently attempting to refinance with the assistance of Patrick Pulatie of Loan Country, (925)522-0371. This, however, is not the only purpose of this letter.

## FACTUAL BACKGROUND

During September 2004, James Moore was contacted by Sterling Funding Corporation telemarketing concerning a refinance of his home. The caller was Kevin Caylor, an officer or representative of Stirling Funding. At the time Mr. Caylor made the telephone call, he advised that Stirling Funding could refinance Mr. Moore's home under very favorable terms. He explained that he could obtain a loan with lower interest rates and lower monthly mortgage payments. Based on these presentations, James Moore agreed to refinance through Stirling Funding.

James Moore informed Mr. Caylor during September 2004 that he, Mr. Moore, required a 30 year fixed rate loan between 6.5% and 7.5%, with impounds. Mr. Caylor advised that he could and would arrange for this financing under those terms.

Mr. Caylor, STIRLING and BNC thereafter provided to James Moore initial disclosure loan documents. The Truth In Lending quoted an APR of 7.706%. This was to be the interest rate for the first two years with a mortgage payment during those two years of $1,948.23. Mr. Caylor, STIRLING and BNC further told James Moore that the interest rate would adjust to a payment of a little less than ten dollars more per month thereafter, to an amount of $1,957.44 and for the remaining twenty-eight years of the loan. The last payment was to be for $1,950.47.

EXHIBIT "1"
2 of 15

These representations were confirmed by the Truth in Lending Disclosure of September 15, 2004 provided to Mr. Moore. The Truth in Lending Disclosure is attached to this letter as an exhibit. This Truth in Lending Disclosure clearly reflected that the monthly mortgage payments for the first two years was to be $1,948.23. In the third year, the rate was to adjust for the remaining 28 years to monthly mortgage payments of $1,957.44. The last payment was to be for $1,950.47.

The Truth in Lending statement provided at the last minute, and at the time of signing on September 23, 2004, revealed a different story. This truth in lending disclosure advised that the there would be 24 initial monthly mortgage payments of $2,268.02. Thereafter, there would be 335 payments of $2,428.98 with one last payment of $2,420.87. Even this disclosure, however, was inaccurate as it did not take into account the six month increase in interest permitted by the promissory note. This last minute modification was a classic bait and switch maneuver.

The ceiling of interest according to this promissory note was 15.225%. This ceiling was concealed from James Moore up to and throughout the time of signing of this promissory note.

These were the only disclosures which Mr. Caylor, STIRLING and BNC made to James Moore concerning the loan and the adjustability of the mortgage. No other explanations were provided.

| Monthly Mortgage Payments | | |
|---|---|---|
| Promised | TILA Disclosed | Actual |
| 24 payments of $1,948.23 | 24 payments of $2,268.02 | Ceiling of 15.225%. Adjustable 6.925% above index every 6 months after first 2 years. |
| 335 payments of $1,954.44 | 335 payments of $2,428.98 | |
| 1 payment of $1,950.47 | 1 payment of $2,420.87 | |

EXHIBIT "1"
3 of 15

A Good Faith Estimate was included. It did not reflect the real interest rate. It quoted a broker fee of $2,800 plus processing fee of $695 and an Administration Fee of $595. This turned out to be false. The broker fee ended up being in excess of $11,824.

Within two weeks, Mr. Caylor and STIRLING advised James Moore by telephone that he had been approved for this loan and the documents had been drawn. He was told that a notary would visit him thereafter and he would then sign the loan documents. No terms were discussed during this telephone conversation. The loan was to be a 30 year note for the approximate amount of $300,000+.

On or about September 23, 2007, a notary public arrived at Mr. Moore's home for the purpose of his signing the loan documents for the $302,600 mortgage. This notary acted as the agent for Mr. Caylor, STIRLING , Chase, and BNC. The signing took place in his home located at 1258 Duffy Way, Brentwood, CA. Throughout this signing, the notary was in a hurry and rushed Mr. Moore through the signing process. She began handing papers to Mr. Moore to sign without giving him the opportunity to review the papers and the terms of the loan. As a result, James Moore relied upon the prior representations which had been made to him concerning the rates, monthly mortgage payments, adjustable interest rate, fees and commissions by Mr. Caylor, STIRLING and BNC, Chase, as well as upon the documents which had previously been provided to him. The notary made no explanations to Mr. Moore. She was gone within fifteen minutes, and all documents had been signed. The loan note was for $302,600 and was a thirty year note.

One of the documents which the notary provided to James Moore is the NOTICE OF RIGHT TO CANCEL. A true and correct copy of the document which the notary provided to James Moore is attached to this letter as an exhibit. Significantly, this notice of the right to cancel was never properly completed. As such, Mr. Moore's time to rescind never perfected and never began to run.

Kevin Caylor and STIRLING originally presented to James Moore that the broker fee was going to be $2,800. In reality, it turned out to be $11,824, including the yield spread premium and $4,539 not including the yield spread premium.

-4-

| Broker Commission | |
|---|---|
| Promised | Actual |
| $2,800 | $11,824 |

The broker included a rebate/yield spread premium of $4,539. This Yield Spread Premium was never disclosed to James Moore prior to his signing the loan documents and trust deed.

The interest rate was not 6.5% to 7.5% with an APR of 7.706% as promised. The actual interest rate was, then going adjustable every six months thereafter. The APR of 9.186%.

| Interest Rate | | |
|---|---|---|
| Promised | Actual | |
| 6.5% to 7.5% | 8.225% for two years. Adjustable 6.925% above index every 6 months after first 2 years. | Ceiling interest rate of 15.225%. |
| APR of 7.706% | APR of 9.186%, and climbing | |

The language which Defendant Mr. Caylor, STIRLING and BNC used in the promissory note was incomprehensible, filled legalese and filled with mumbo-jumbo, all designed to confused the average purchaser such as James Moore. It was designed to insure that he did not comprehend the nature of the agreement and the extraordinary costs that it contained. These documents were not provided to Mr. Moore prior to signing. Additionally, Mr. Moore was not permitted time to review these documents but in fact was rushed through the signing. As a result, Mr. Moore relied upon the Truth in Lending Disclosure of September 15, 2004 which is exhibit to this letter and the representations which Mr. Caylor, STERLING and BNC and Chase had made to him previously.

## LEGAL CONSIDERATIONS

I have had the opportunity of reviewing this loan transaction and have made the following observations. I have concluded that this loan is riddled with problems and is rescindable under a number of legal theories. There are violations of Truth in Lending, Fair Debt Collection, Unfair Business Practices law, Fraud, breach of fiduciary relationship, predatory lending, and California non-judicial foreclosure law.

● The Truth in Lending disclosures are so inaccurate as to invalidate the loan transaction and subject it to rescission.

● The basic Truth in Lending procedures were not complied with. As but one example, Mr. Moore was never provided two completed copies of his notice of the right to rescind.

● The transaction was concluded in a manner which insured that Mr. Moore could not know of the last minute changes made to the loan terms. As I mentioned above, this entire transaction contained the elements of a classic bait and switch.

● Exacerbating the situation for BNC and the current holders of the note or security is the fact if the holder of the mortgage has initiated "any judicial or non-judicial foreclosure process on the principal dwelling of the obligor," the tolerance for errors in the finance charge is a mere $35. It is rather clear that the finance errors discussed in this letter are far in excess of $35. This in turn triggers extended rights of rescission under Truth in Lending.[2]

---

[2] 15 U.S.C. §1605(f)(2); 15 U.S.C. §1635(i)(l),(2); See *Payton v. New Century Mortgage Corporation* (ND Illinois October 2003) 2003 WL 23349118 (consumer has extended rights to rescind where the finance charge is underdisclosed by more than $35); *Layell v. Home Loan and Investment Bank* (E.D. Va 1999) 244 B.R. 345 (applying $35 tolerance in suit challenging non-judicial foreclosure), appeal dismissed (4th Circuit 2000) 211 F.3d 1265.

EXHIBIT "1"
6 of 15

## NOTICE OF RECISSION

You are hereby notified that James Moore hereby rescinds the note secured by a first trust deed on the premises of 1258 Duffy Drive, Brentwood, CA 94513. The note is for the principal amount of $305,600 and was executed by Mr. Moore on September 24, 2004. This promissory note was secured by a deed of trust, which is now a foreclosing document. The security interest held by BNC, Chase and their successors is void upon Mr. Moore's rescission. See 15 U.S.C. §1635; Regulation Z § 226.23.

We are prepared to discuss a tender obligation, should it arise, and satisfactory ways in which my client may meet his duty to tender. Please be advised that if you do not cancel the security interest and return all consideration paid by our client within 20 days of receipt of this letter, you will be responsible for actual and statutory damages pursuant to 15 U.S.C. § 1640(a).

James Moore makes this rescission on the ground that the terms of the note and the consequent trust deed violate the Federal Truth in Lending Act and Regulation Z.[3]

The Truth in Lending Act mandated a complete disclosure of all significant costs of the financing. BNC and Chase were required to disclose in a clear, conspicuous, and meaningful sequence the amount to be financed, the amount of the finance charge, the annual percentage rate, the method of calculating finance charges, the balance upon which a finance charge was imposed, the total payments, the number and amount of payments, and the due dates or schedule of payments to pay the indebtedness. BNC was required to disclose this information prior to the close of escrow.

BNC's failure to clearly set forth the terms of financing, its costs and payments violates the Federal Truth in Lending Act. As a result, 15 U.S.C.§1635f

---

[3]The Truth-in-Lending Act (15 USC §§1601-1666j), together with Regulation Z (12 CFR pt 226), requires lenders to make detailed disclosures to borrowers in consumer credit transactions. These provisions apply to loans secured by residential real property. Remedies for violations of the Act are in 15 USC §1635 (rescission of specified residential loans) and 15 USC §1640 (civil liability).

-7-

calls for the remedy of rescission.

James Moore hereby demands that you restore to him all consideration furnished by him. Such consideration includes but is not limited to all moneys paid to BNC and its agents and brokers, the immediate cancellation of the trust deed securing the enclosed promissory note, and all moneys of Mr. Moore paid to other parties or retained by BNC or Chase.

You are advised that by this rescission, James Moore is not liable for any finance or other charge since the inception of the loan. Additionally, any security interest given by James Moore, including any such interest arising by operation of law, becomes void as a result of this rescission.

James Moore requests that within 20 days after receipt of this notice of rescission, BNC, Chase and their agents and successors return to him any money or property given as earnest money, downpayment, or otherwise, as well as the accounting demanded above. James Moore further requests that BNC, Chase and their nominors and agents and successors take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.

Mr. Moore has already tendered moneys in the approximate amount of $70,964. He would be further entitled to loan credits in the approximate amount of $14,753. My calculations are that balance owed on the loan would be approximately $216,883.

This Notice is coming to you via fax, which will be delivered on today's date. This Notice is also coming to you via United States Overnight Mail, which will be delivered to all of you on Wednesday, January 2, 2008. The TILA twenty-day period discussed above will therefore expire on midnight of Tuesday, January 22, 2008.

James Moore hereby advises BNC, Chase and their successors that upon the timely performance of their obligations, Mr. Moore is prepared to make arrangements for his tender obligation.

I remind you that the Truth in Lending Act imposes additional civil liability for failure to make the required disclosures. These statutory civil remedies are in addition to any other common-law remedies that may be available.

-8-

EXHIBIT "1"
8 of 15

Significantly, BNC and its successors are further liable for twice the amount of the finance charge from this loan, along with court costs and attorney fees, in the event that court action becomes necessary.   Case law has made it clear that since any proven violation of the Act is presumed to frustrate the purpose of the Act, an action may be brought without any showing of actual damages.[4]   These violations of Truth in Lending and Regulation Z have been made all the more egregious by the pending non-judicial foreclosure of James Moore's home.

Beyond the direct language of Truth in Lending, you should be aware that the Federal Reserve has taken the position that the voiding of a security interest is automatic upon sending a rescission notice, particularly during a foreclosure.[5]

This office is aware that there may be the claim that James Moore does not have the right to rescind under TILA despite the legal principle of extended right to rescind in light of the fraud and the foreclosure involved.[6]   Assuming this argument is correct, which I do not concede, I also remind you that rescission is a proper  remedy, and the TILA violations the basis for a plethora of other causes of action.  These causes of action will be pled should legal action become necessary. California law specifically permits the rescission of this promissory note and trust deed as a remedy for fraud.

## FAIR DEBT COLLECTION PRACTICES ACT

James Moore  hereby advises BNC, Chase, NDEx and Priority Posting and their successors and agents that he disputes the amounts being demanded in this matter. He disputes the very existence of the debt claimed by BNC, Chase, NDEx and Priority Posting and their successors and agents. James Moore hereby requests,  pursuant to the Fair Debt Collections Act (15 U.S.C. 1692 et seq.),

---

[4] See *Dzadovsky v. Lyons Ford Sales, Inc.*, 593 F.2d 538, 539 (3d Cir. 1979).

[5] Official Staff Commentary §§226.15(d)(4) -1, 226.23(d)(4)-1; See also Comptroller of Currency, OCC Bulletin 2004-19 (May 7, 2004).

[6] See *Payton v. New Century Mortgage Corporation* (ND Illinois October 2003) 2003 WL 23349118 (consumer has extended rights to rescind where the finance charge is underdisclosed by more than $35).

California foreclosure law, and California Civil Code §2943, that BNC, Chase, NDEx and Priority Posting furnish to him forthwith a detailed accounting of the amounts they are demanding. James Moore further requests that BNC, Chase, NDEx and Priority Posting provide him written notice containing the precise amount of the debt, the name of the creditor, and a detailed accounting and verification of the amounts being demanded.

James Moore reminds BNC, Chase, NDEx and Priority Posting and their successors and agents that, pursuant to the FDCA, for a 30-day period during which the debt is disputed, collection efforts must cease until verification of the debt is sent to James Moore. Mr. Moore further reminds BNC, Chase, NDEx and Priority Posting of the 5 day notice requirement of 15 U.S.C. 1692g(a).

I also remind you that the Federal Fair Debt Collection Act is considered a "strict liability" statute: i.e., debt collectors generally are liable for violating the FDCPA's requirements without regard to intent, knowledge or willfulness.[7]

## REAL ESTATE SETTLEMENT PROCEDURE ACT
## (RESPA)

Please further consider this letter to be a qualified written request as discussed in 12 U.S.C. 2605(e) (RESPA). I am sure that you are aware that you are required by law to acknowledge receipt of this correspondence within 20 days and to undertake and notify this office of corrective actions within 60 days. Furthermore, you are forbidden by law from providing any "information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency." Clearly, the conduct of a foreclosure sale and its con-commitant recordation and public reports falls within the prohibited acts of the federal RESPA law. James Moore hereby disputes this alleged debt and the validity of the trust deed which secures it. He also disputes the amounts being demanded in the notice of default and the notice of trustee sale.

---

[7] *Russell v. Equifax A.R.S.* (2nd Cir. 1996) 74 F.3d 30, 33; *Booth v. Collection Experts*, Inc. (ED WI 1997) 969

-10-

By this letter, I am also specifically requesting on behalf of James Moore that BNC, Chase, NDEx and Priority Posting render a full and detailed accounting of all payments made to BNC or to anyone else in this matter. Mr. Moore also requests a full and detailed accounting of the amounts being demanded by BNC, Chase, NDEx and Priority Posting and their successors and agents in this matter.

I remind you that under 12 U.S.C. 2605(f) (RESPA) and under the Fair Debt Collection Act, BNC, Chase, NDEx and Priority Posting and their successors and agents will be legally liable and will continue to be liable for James Moore's attorney fees in the event that court action is necessary to sustain their rights.

## CALIFORNIA CIVIL CODE §2943

Please further consider this letter to be a request for a beneficiary statement as discussed in California Civil Code §2943. By this request, James Moore is requesting the following information:

●The amount of the unpaid balance of the obligation secured by the mortgage or deed of trust and the interest rate, together with the total amounts, if any, of all overdue installments of either principal or interest, or both.

●The amounts of periodic payments, if any.

●The date on which the obligation is due in whole or in part.

●The date to which real estate taxes and special assessments have been paid to the extent the information is known to the beneficiary.

●The amount of hazard insurance in effect and the term and premium of that insurance to the extent the information is known to the beneficiary.

●The amount in an account, if any, maintained for the accumulation of funds with which to pay taxes and insurance premiums.

●The nature and amount, *and a detailed itemization*, of any additional charges, costs, or expenses paid or incurred by the beneficiary which have or will become a lien on the real property involved and a detailed description, itemization and accounting of these charges, costs and expenses.

●Whether the obligation secured by the mortgage can be transferred to a new borrower.

Please also consider this letter to be a request for a payoff demand statement as discussed in California Civil Code §2943. By this request, James Moore is requesting the following information:

● A detailed written statement, including breakdown and itemization, setting forth the amounts required as of the date of preparation by the beneficiary, to fully satisfy all obligations secured by the loan that is the subject of the payoff demand statement. The written statement shall include information reasonably necessary to calculate the payoff amount on a per diem basis for the period of time, not to exceed 30 days, during which the per diem amount is not changed by the terms of the note.

I am sure that you are aware that California Civil Code §2943 requires that these statements be provided within 21 days of your receipt of this letter.

I request that you provide to me the requested statements and verifications forthwith. I invite you to contact me upon receipt of this letter.

## CONTINUANCE OF TRUSTEE SALE/TRO

Court action is now becoming James Moore's sole course of action of saving his home if BNC, Chase, NDEx and Priority decline to postpone the foreclosure sale which is set Monday, January 7, 2008.

I ask that you postpone or continue the trustee sale which is set for Mr. Moore's home on January 7, 2008. If, however, BNC, Chase, NDEx and Priority Posting decline to continue the trustee sale, I must advise you of the fact that I intend to file a complaint seeking a court declaration that BNC's, NDEx's and Priority Posting's attempt to non-judicially foreclose on James Moore home is void and invalid. I intend to file this complaint within the next four days.

If it becomes necessary to file a complaint, I can assure you that it will contain at the minimum causes of action pertaining to Truth in Lending, Fair Debt Collection, Unfair Business Practices (17200 and 17500), Fraud, predatory lending, breach of fiduciary relationship, and California non-judicial foreclosure law.

-12-

You must contact me by close of business of the day Wednesday, January 2, 2008 with an agreement to postpone the sale, if you wish to avoid court action. If for any reason you do not, I will complete preparation of the complaint and file it on Friday at the latest although I hope to file it on Thursday since I will be preparing it this week. I am confident of securing a temporary restraining order and a preliminary injunction. If BNC, Chase, NDEx and Priority require the filing of a civil action, I intend to pursue it to jury trial and demand punitive damages and attorney fees.

In anticipation of the need for litigation, I hereby provide you the following, and required, notice. Unless the trustee sale is postponed, I intend to approach the Superior Court with an exparte application that the court issue a temporary restraining order prohibiting the sale set for January 7, 2008 at 1:30 p.m. and an injunction prohibiting the sale generally. I will approach the Contra Costa Superior Court on **Friday, January 4, 2008 at 1:30 p.m.** on an exparte basis in **Department 60** seeking a temporary restraining order prohibiting the sale. The Superior Court is located at the same location as is the scheduled foreclosure sale which is set for the following Monday. The Courthouse is located at **649 Main Street, Martinez CA 94553.**

Please provide to me a telephone number to which I can verbally advise you of the department and time. Please also provide me a fax number to where this information and notice can be faxed. **You should immediately forward this letter to your legal counsel**, particularly if you are inclined to not postpone the foreclosure sale.

I request that you postpone the trustee sale and that you provide to me the requested statements. In the meantime, I invite you to contact me upon receipt of this letter and notice, particularly if you would like to discuss this matter with me.

Truly yours,

Thomas Spielbauer

-13-

Dec 04 07 12:41p    Patrick Pulatie          925-522-0371          p.2

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

CREDITOR:

BNC MORTGAGE, INC.
P.O. BOX 19656
IRVINE, CA 92623-9656
BORROWERS: JAMES MOORE

[X] Preliminary  [ ] Final
DATE: 09/15/2004
LOAN NO.: C08008341
Type of Loan: 2 YEAR FIXED 1/7

ADDRESS: 1258 DUFFY WY
CITY/STATE/ZIP: BRENTWOOD, CA 94513
PROPERTY: 1258 DUFFY WY BRENTWOOD CA 94513

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 7.706 (a) % | $ 432,642.93 (a) | $ 271,807.46 (a) | $ 704,450.39 (a) |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING |
|---|---|---|---|---|---|
| 24 | $2,948.23 | 12/01/2004 | | | |
| 335 | $1,957.44 | 12/01/2006 | | | |
| 1 | $1,950.47 | 11/01/2034 | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

DEMAND FEATURE:  [X] This loan does not have a Demand Feature.   [ ] This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
[X] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY:  You are giving a security interest in the property located at: 1258 DUFFY WY BRENTWOOD CA 94513

ASSUMPTION:  Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms
[ ] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES:  $70.00

PROPERTY INSURANCE:  [ ] Property hazard insurance in the amount of $0.00  with a mortgage clause to the lender
is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender.
Hazard insurance  [ ] is  [X] is not available through the lender at an estimated cost of  $0.00  for a  year term.

LATE CHARGES:  If your payment is more than 10  days late, you will be charged a late charge of  6.000  % of the
overdue payment.

PREPAYMENT:  If you pay off your loan early, you
[X] may  [ ] will not  have to pay a penalty.
[ ] may  [X] will not  be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date,
and prepayment refunds and penalties.
e means estimate  .  All of the numerical disclosures except the late fee disclosure are estimates.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

JAMES MOORE _____  BORROWER/DATE _____  BORROWER/DATE

_____  BORROWER/DATE _____  BORROWER/DATE

VMP-788 (0211)     VMP MORTGAGE FORMS - (800)521-7291     Page 1 of 2

**EXHIBIT "1"**
14 of 15

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

CREDITOR:
ENC MORTGAGE, INC.
P.O. BOX 19656
IRVINE, CA 92623-9656
BORROWERS: JAMES E. MOORE

Preliminary    X    Final
*DATE:* 09/23/2004
*LOAN NO.:* C0S0008341
*Type of Loan:* 2 YEAR FIXED 1/7

ADDRESS: 1258 DUFFY WY
CITY/STATE/ZIP: BRENTWOOD, CA 94513
PROPERTY: 1258 DUFFY WY BRENTWOOD CA 94513

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 9.186 (e) % | $ 577,381.07 (e) | $ 293,180.58 (e) | $ 870,561.65 (e) |

### PAYMENT SCHEDULE

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING |
|---|---|---|---|---|---|
| 24 | $2,269.02 | 11/01/2004 | | | |
| 335 | $2,428.98 | 11/01/2006 | | | |
| 1 | $2,620.87 | 10/01/2034 | | | |

DEMAND FEATURE:    [X] This loan does not have a Demand Feature.    [ ] This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
[X] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at: 1258 DUFFY WY BRENTWOOD CA 94513

ASSUMPTION:    Someone buying this property    [X] cannot assume the remaining balance due under original mortgage terms
[ ] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES:    $ 70.00

PROPERTY INSURANCE:    [ ] Property hazard insurance in the amount of $0.00    with a mortgagee clause to the lender
is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender.
Hazard insurance    [ ] is    [X] is not available through the lender at an estimated cost of $0.00    for a    year term.

LATE CHARGES:    If your payment is more than 10    days late, you will be charged a late charge of 6.000    % of the
overdue payment.

PREPAYMENT:    If you pay off your loan early, you

**EXHIBIT "1"**
**15 of 15**

**EXHIBIT "2"**

**EXHIBIT "2"**

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

CREDITOR:

BNC MORTGAGE, INC.
P.O. BOX 19656
IRVINE, CA 92623-9656
BORROWERS: JAMES E. MOORE

. Preliminary   X  Final
DATE: 09/23/2004
LOAN NO.: C08008341
Type of Loan: 2 YEAR FIXED 1/7

ADDRESS: 1258 DUFFY WY
CITY/STATE/ZIP: BRENTWOOD, CA 94513
PROPERTY: 1258 DUFFY WY BRENTWOOD CA 94513

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 9.186 (e) % | $ 577,381.07 (e) | $ 293,180.58 (e) | $ 870,561.65 (e) |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING |
|---|---|---|---|---|---|
| 24 | $2,268.02 | 11/01/2004 | | | |
| 335 | $2,428.98 | 11/01/2006 | | | |
| 1 | $2,420.87 | 10/01/2034 | | | |

DEMAND FEATURE:  [X] This loan does not have a Demand Feature.      [ ] This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
[X] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY:  You are giving a security interest in the property located at: 1258 DUFFY WY BRENTWOOD CA 94513

ASSUMPTION:  Someone buying this property    [X]  cannot assume the remaining balance due under original mortgage terms
[ ]  may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES:      $ 70.00

PROPERTY INSURANCE:     [ ] Property hazard insurance in the amount of $0.00                    with a mortgagee clause to the lender
is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender.
Hazard Insurance    [ ] is   [X] is not available through the lender at an estimated cost of $0.00          for a              year term.

LATE CHARGES:    If your payment is more than 10         days late, you will be charged a late charge of 6.000
overdue payment.                                                                                    % of the

PREPAYMENT:   If you pay off your loan early, you
[X] may    [ ] will not        have to pay a penalty.
[ ] may    [X] will not        be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate  . All of the numerical disclosures except the late fee disclosure are estimates.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_____                    9-26-04
JAMES E. MOORE                              BORROWER/DATE                          BORROWER/DATE

_____
                          BORROWER/DATE                                            BORROWER/DATE

-788 (0211)                        VMP MORTGAGE FORMS - (800)521-7291            Page 1 of 2                12/01
© 2003 GBF Systems, Inc.  The contents of this form in whole or in part are protected under the copyright laws of the United States.

## EXHIBIT "2"
## 1 of 29

 

## DEFINITION OF TRUTH-IN-LENDING TERMS

### ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate generally higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

### PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

### FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

### AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

### TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable).

### PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable). These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.

Initials:

**EXHIBIT "2"**
**2 of 29**

Lender: BNC MORTGAGE, INC., A DELAWARE CORPORATION          DATE: September 23, 2004
P.O. BOX 19656
IRVINE, CA 92623-9656

## GOOD FAITH ESTIMATE

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates -- the actual charges may be more or less. Your transaction may not involve a fee for every item listed.

The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A settlement statement that you will be receiving at settlement. The HUD-1 or HUD-1A settlement statement will show you the actual cost for items paid at settlement.

| HUD-1 OR HUD-1A | | PAYABLE TO | AMOUNT OR RANGE |
|---|---|---|---|
| 808 | Broker Fee* | BROKER | 5,995.00 |
| 809 | Processing Fee* | BROKER | 695.00 |
| 810 | Tax Service Fee* | LENDER | 70.00 |
| 813 | ADMINISTRATION FEE* | BROKER | 595.00 |
| 815 | FLOOD CERTIFICATION* | LENDER | 17.00 |
| 901 | Prepaid Interest for 3 days* | LENDER | 207.42 |
| 1101 | Settlement or Closing Fee* | CLOSING AGENT | 950.00 |
| 1108 | Title Insurance | TITLE COMPANY | 1,115.00 |
| 1201 | Recording Fees | RECORDING OFFICE | 70.00 |
| 1303 | Mortgage Broker Fee Paid by Lender (P.O.C.)** | BROKER | 4,539.00 |
| 1308 | ORIGINATION FEE | LENDER | 890.00 |

_J. E. Moore_____   _9-26-04_____
Applicant                        Date
JAMES E. MOORE

Applicant _____   Date _____

Applicant _____   Date _____

Applicant _____   Date _____

Applicant _____   Date _____

Applicant _____   Date _____

Authorized Official _____   Date _____

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property.

Applicants' Name and Address:          Loan Number:  COS008341
JAMES E. MOORE

1258 DUFFY WY                          Application Number:  COS008341
BRENTWOOD, CA 94513
*Prepaid Finance Charge
**P.O.C. means "paid outside of closing"    Loan Amount:  302,600.00    **EXHIBIT "2"**
                                                              3 of 29

APPLICANT:                                    LENDER: ●NC MORTGAGE, INC., A
JAMES E. MOORE                                DELAWARE CORPORATION
                          ●                   P.O. BOX 19656
                                              IRVINE, CA 92623-9656

## ADDENDUM TO GOOD FAITH ESTIMATE

### NOTICE REGARDING REQUIRED USE OF SETTLEMENT SERVICE PROVIDERS

Federal law requires that the Lender provide you with the following information about certain fees and charges associated with the loan for which you have applied, as disclosed on the accompanying Good Faith Estimate. If the Lender agrees to make a loan to you, the Lender will require you to use the following settlement service providers; if a fee or charge for a settlement service is disclosed on the accompanying Good Faith Estimate, you will be required to pay for that settlement service. These estimated fees and charges (or range of fees and charges) disclosed on the accompanying Good Faith Estimate are based on information provided by the provider of the designated settlement service.

**TAX SERVICE CONTRACT-** The estimated Tax Service Contract Fee will be paid to
TRANSAMERICA REAL ESTATE TAX SERVICE
2 EMBARCADERO CENTER, SUITE 310, SAN FRANCISCO, CALIFORNIA 94511
(415)392-2146
**FLOOD ZONE CERTIFICATION-** The estimated Flood Certification Fee will be paid to
( ) NATIONAL FLOOD RESEARCH, INC. 577 CENTRAL AVE. #225, BOULDER, CO 80301 (800)730-6374
( ) FIRST AMERICAN FLOOD DATA SERVICES, 11902 BURNET RD. STE. 400, AUSTIN, TX 78758 (800) 447-1772

**TITLE INSURANCE -** You may select any title insurance company or attorney ("Title Agent") to provide the Lender with a policy of title insurance provided that such Title Agent is authorized to issue title insurance for, or has been certified to perform title examinations and settlement services by, any one of the following companies, or is an agent upon whose certification of title any of the following companies issues title insurance:

Commonwealth Land Title Insurance Company, 8 Penn Center, 3rd Floor, Philadelphia, PA 19103; (800) 388-8822
First American Title Insurance Company, 114 E. Fifth Street, Santa Ana, CA 92701; (800) 675-3505
Lawyers Title Insurance Corporation, 6630 West Broad Street, Richmond, VA 23230; (800) 704-7047
Stewart Title Guaranty Company, 2200 West Loop South, Houston, TX 77027; (800) 729-1900
Ticor Title Insurance Company, 2393 South Congress Avenue, West Palm Beach, FL 33406; (800) 999-2842
Chicago Title Insurance Company, 625 West Ridge Pike, Plymouth Corporate Center, Bldg. E, 2nd Floor, Conshohocken, PA 19428; (800) 647-1320
Fidelity National Title, 19700 Fairchild, Suite 210, Irvine, CA 92715; (800)828-4013
Investors Title Insurance Company, 121 N. Columbia Street, P.O. Drawer 2687, Chapel Hill, N.C. 27514; (800) 326-4842
Old Republic Title Insurance Company, 400 2nd Avenue South, Minneapolis, MN 55401; (800) 328-4441
The Guarantee Title and Trust Company, 4445 Lake Forest Drive, Suite 400, Cincinnati, OH 45242; (800) 877-4882
TRW Title Insurance Company, 6800 College Boulevard, Suite 700, Overland Park, KS 66211; (800) 835-2764

You should ask the Title Agent you select whether it meets the above requirements. You may also call the telephone numbers listed above to determine the acceptability of the Title Agent you have selected. The estimated Title Insurance Fee will be paid to the Title Agent you select to provide the Lender with a policy of title insurance.

**APPRAISAL/REVIEWAPPRAISAL -** The Lender may require you to submit a complete appraisal of the property that is to act as security for the loan (the "Security Property"). The appraisal may be performed by any appraiser you select provided such appraiser is on the Lender's approved appraiser list. The Lender may also conduct a review appraisal of the security property. The Lender often will use state licensed or certified appraisers on the Lender's Appraisal Department staff to conduct the review appraisal. The Lender may, however, contract with an independent state licensed or certified appraiser to conduct the review appraisal. If an independent appraiser is engaged to conduct the review appraisal, the Lender will notify you of the independent appraiser's name, address and telephone number, and the estimated Review Appraisal Fee will be paid to such independent appraiser.

Although within the past twelve months the Lender has repeatedly required borrowers to use the above listed settlement service providers, none of these providers is an associate of the Lender nor has any such settlement service provider maintained an account or had an outstanding loan or credit arrangement with the Lender.

THIS IS NEITHER A COMMITMENT TO MAKE A LOAN NOR A FINAL BINDING AGREEMENT. THIS NOTICE DOES NOT DISCLOSE ALL FEES AND CHARGES YOU MAY BE OBLIGATED TO PAY IN CONNECTION WITH THE LOAN.

I/We have read this disclosure form and understand its contents, as evidenced by my/our signature(s) below.

_J. E. Moore_____  _9-26-04_____
Applicant                    Date            Applicant                    Date
JAMES E. MOORE

_____  _____      _____  _____
Applicant                    Date            Applicant                    Date

_____  _____      _____  _____
Applicant                    Date            Applicant                    Date

0-VX-01

**EXHIBIT "2"**
**4 of 29**

Loan No.: COS00834.

## STATEMENT OF LOAN - CLOSED END
(California Finance Lenders Law)

| Borrower Name and Address | Co-Borrower Name and Address |
|---|---|
| JAMES E. MOORE<br>1258 DUFFY WY<br>BRENTWOOD, CA 94513 | |

| Lender Name, Address and License Number | Broker Name, Address and License Number |
|---|---|
| BNC MORTGAGE, INC.<br>P.O. BOX 19656<br>IRVINE, CA 92623-9656<br>File No.: 6037829 | STERLING FUNDING CORPORATION<br>1800 THIBODO ROAD #300<br>VISTA, CA 92083<br>Not Applicable |

| Loan Date | Maturity Date | Principal Amount of Loan | Annual Percentage Rate |
|---|---|---|---|
| 09/23/2004 | 10/01/2034 | $ 302,600.00 | 9.186 % |

Terms of Repayment: Refer to the Note

Security for the Loan: 1258 DUFFY WY, BRENTWOOD, CA 94513

Amount of Funds Paid to Third Persons:
See your HUD-1 Settlement Statement for a statement of any fees, charges, costs, insurance premiums or other sums which have been paid or are to be paid by or on your behalf.

Check applicable box:

☐ A broker has not performed any act as a broker in connection with the making of this Loan.

☒ A broker has participated as a broker in connection with the making of this Loan. The broker has been paid or will be paid $ 11,824.00

See your HUD-1 Settlement Statement for a statement of any fees, charges, costs, insurance premiums or other sums which have been paid or are to be paid by or on your behalf.

You have the right to make payment in advance at any time and in any amount. (Please note that your loan may be subject to a prepayment penalty.)

### FOR INFORMATION, CONTACT THE
### DEPARTMENT OF CORPORATIONS, STATE OF CALIFORNIA.

This Loan is made pursuant to the California Finance Lenders Law, Division 9 (commencing with Section 22000) of the California Financial Code.

Signature of Borrower    JAMES E. MOORE          Date    9-26-04

Signature of Borrower          Date

Signature of Borrower          Date

Signature of Borrower          Date

Signature of Borrower          Date

Signature of Borrower          Date

Page 1 of 1

CA-CFL (2/02)

**EXHIBIT "2"**
**5 of 29**

Lender:  BNC MORTGAGE, INC., A DELAWARE
         CORPORATION

Application No.:  COS008341
Loan No.:  COS008341

## MORTGAGE BROKER FEE DISCLOSURE

Your application for a residential mortgage loan has been submitted to BNC Mortgage, Inc. ("BNC", "we", "I", "us" or "our") by STERLING FUNDING CORPORATION _____, a mortgage broker that you have hired to help you find a mortgage loan. Your broker may submit your application to more than one lender.

You can negotiate how much money your broker is paid and how the payment will be made. Your broker's compensation will typically take the form of "points" that you pay at closing. (One "point" equals 1 % of the loan amount.) You can pay the broker's fee out of funds you bring to the loan closing or, in some cases, have a portion of the broker's fee paid from the loan proceeds or by us. If we pay a portion of the broker's fee, we will generally increase the interest rate on your loan. For each point we pay to the broker, your interest rate will be between one quarter of one percentage point (0.25%) and one percentage point (1.0%) higher than the base interest rate for which you would otherwise qualify.

Whether the broker is paid directly by you or indirectly by us is up to you. We encourage you to discuss with your broker the specific effect these alternatives may have on the interest rate and total points that you will be obligated to pay under the terms of your loan.

We have provided you with a Good Faith Estimate of settlement costs that you will have to pay along with other disclosure documents. If your Good Faith Estimate disclosure shows any amounts described as "Mortgage broker fee paid by Lender" or similar language, then we have been instructed by your broker that we are to pay a portion of the broker compensation. As a result, your interest rate may be higher than it would be if you paid all of the broker's compensation yourself. If you want the lowest possible interest rate on your loan, you should ask your broker how much you will have to pay out of pocket at the loan closing so that the broker will not ask the lender to pay any of the broker's fees. A separate disclosure, called the HUD-1 or HUD-IA Settlement Statement, will be presented to you at the loan closing and will identify the actual amounts paid to your broker and whether they were paid by you or by us.

Your signature below indicates that you have read and understand this disclosure.

| | |
|---|---|
| _Js EMore_  9-26-04 | |
| Name                Date | Name                Date |
| JAMES E. MOORE | |
| | |
| Name                Date | Name                Date |
| | |
| Name                Date | Name                Date |

Loan No.: COS008341

**ADJUSTABLE RATE RIDER**
**(LIBOR 6-Month Index - Rate Caps)**

THIS ADJUSTABLE RATE RIDER is made this          23rd day of September, 2004 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security
Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's
Adjustable Rate Note (the "Note") to
BNC MORTGAGE, INC., A DELAWARE CORPORATION
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

1258 DUFFY WY, BRENTWOOD, CA  94513
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE
AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S
INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE
BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of          8.225          %. The Note provides for changes in
the interest rate and the monthly payments, as follows:

"4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the first day of October, 2006 , and on that day every   6th    month
thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of
interbank offered rates for 6-month U.S. dollar-denominated deposits in the London market based on quotations of
major banks, as published in the "Money Rates" section of The Wall Street Journal. The most recent Index figure
available as of the date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable
information. The Note Holder will give me notice of this choice.

---

ADJUSTABLE RATE RIDER-LIBOR   6 MONTH INDEX-Single Family-                    Rev. 10/95
Page 1 of 2

Borrower Initials

H-AMXXX

**EXHIBIT "2"**
**7 of 29**

**(C)  Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six And 925/1000                                                                                      percentage point(s) (      6.925      %) to the Current Index.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments.  The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than       10.225       % or less than       8.225       %.  Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than   ONE AND 00/100                                      percentage point(s)    1.00                       %) from the rate of interest I have been paying for the preceding             6                months.  My interest rate will never be greater than         15.225           % or less than               8.225           % .

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date.  I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and  also the title and telephone number of a person who will answer any question I may have regarding the notice. "

BY SIGNING BELOW,  Borrower accepts and agrees to the terms and covenants contained in pages 1 and 2 of this Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
JAMES E. MOORE                    -Borrower                                              -Borrower


_____ (Seal)          _____ (Seal)
                                  -Borrower                                              -Borrower


_____ (Seal)          _____ (Seal)
                                  -Borrower                                              -Borrower


ADJUSTABLE RATE RIDER-LIBOR  6 MONTH INDEX-Single Family-                 Rev. 10/95
Page 2 of 2

Borrower Initials   _____  _____  _____  _____  _____

B-300582

**EXHIBIT "2"**
**8 of 29**



# ADJUSTABLE RATE NOTE
(LIBOR 6-Month Index-Rate Caps)

Loan No.: COS008341

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

September 23, 2004                IRVINE                      CALIFORNIA
[Date]                            [City]                      [State]

1258 DUFFY WY, BRENTWOOD, CA  94513
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $   302,600.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  BNC MORTGAGE, INC., A DELAWARE CORPORATION . I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  8.225   %.  The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments

I will pay principal and interest by making payments every month. I will make my monthly payments on the first day of each month beginning on    November 1, 2004   .

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on       October 1, 2034       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  6501 IRVINE CENTER DRIVE, IRVINE, CA 92618
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $  2,268.02  . This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The interest rate I will pay may change on the first day of   October, 2006                    , and on that day every      6th      month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6-month U.S. dollar-denominated deposits in the London market based on quotations of major banks, as published in the "Money Rates" section of The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding Six And 925/1000             percentage points (  6.925        %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125 %). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 10.225           % or less than     8.225       % . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than  one           percentage points (    1.000         %) from the rate of interest I have been paying for the preceding    6   months. My interest rate will never be greater than 15.225    % or less than      8.225       %.

ADJUSTABLE RATE NOTE-LIBOR 6-MONTH INDEX - Single Family

Borrower Initials _____ _____ _____ _____

**EXHIBIT "2"**

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

If within   twenty-four       (   24   ) months after the date of execution of the Security Instrument (as defined below) I make a full Prepayment or partial Prepayment(s), I will at the same time pay to the Note Holder a prepayment charge equal to six (6) months' advance interest on the amount of the Prepayment that, when added to all other amounts prepaid during the 12-month period immediately preceding the date of the Prepayment, exceeds twenty percent (20%) of the original Principal amount of this Note. However, for purchase loans only (this does not include refinance loans), I have a 90 day window period from the date of the "Notice of Interest Rate Change" to make a prepayment on my loan without a prepayment penalty charge. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial prepayment without imposition of a prepayment charge.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of     10   calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 6 %                               of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

ADJUSTABLE RATE NOTE-LIBOR 6-MONTH INDEX - Single Family

BondWriter
Fixed   18.5858

Page 2 of 3
Borrower Initials _____  _____  _____  _____

**10. WAIVERS**

    I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE**

    In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

        If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

        If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_James E. Moore_

| | |
|---|---|
| _____ (Seal) | _____ (Seal) |
| JAMES E. MOORE -Borrower | -Borrower |
| | |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |
| | |
| _____ (Seal) | _____ (Seal) |
| -Borrower | -Borrower |

ADJUSTABLE RATE NOTE-LIBOR 6-MONTH INDEX - Single Family

Page 3 of 3

Borrower Initials _____ _____ _____ _____

**EXHIBIT "2"**

**11 of 29**

Recording Requested By:

Return To:

BNC MORTGAGE, INC.
P.O. BOX 19656
IRVINE, CA 92623-9656

Prepared By:

————————————[Space Above This Line For Recording Data]————————————

# DEED OF TRUST

MIN 1001228200001177267

Loan No.: COS008341

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated September 23, 2004 together with all Riders to this document.

(B) "Borrower" is JAMES E. MOORE, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY.

Borrower's address is 1258 DUFFY WY
BRENTWOOD, CA 94513                    . Borrower is the trustor under this Security Instrument.

(C) "Lender" is BNC MORTGAGE, INC., A DELAWARE CORPORATION

Lender is a corporation
organized and existing under the laws of Delaware

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3005  1/01

-6A(CA) (0207)
Page 1 of 15                Initials:
VMP MORTGAGE FORMS - (800)521-7291

**EXHIBIT "2"**
**12 of 29**

Lender's address is P.O. BOX 19656, IRVINE, CA 92623-9656

(D) "Trustee" is T.D. SERVICE COMPANY

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated September 23, 2004
The Note states that Borrower owes Lender three hundred two thousand six hundred and 00/100                                                                                        Dollars
(U.S. $302,600.00              ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than October 1, 2034

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
|---|---|---|
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

-6A(CA) (0207)                                Page 2 of 15                    Initials: _____              Form 3005  1/01

**EXHIBIT "2"**
**13 of 29**



(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

### TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                                of        CONTRA COSTA, CALIFORNIA                        :
    [Type of Recording Jurisdiction]                                [Name of Recording Jurisdiction]

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HERETO AS EXHIBIT A.

Parcel ID Number: 017-201-019                                        which currently has the address of
1258 DUFFY WY                                                                                                        [Street]
BRENTWOOD                                                        [City], California 94513            [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances



-6A(CA) (0207)                                Page 3 of 15                    Initials:                    Form 3005  1/01

EXHIBIT "2"
14 of 29

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges*and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

*For purchase loans only (this does not include refinance loans), borrower shall have a 90 day window period from the date of the "Notice of Interest Rate Change" to make a prepayment on Note without a prepayment penalty charge.

Initials: _____

-6A(CA) (0207)    Page 4 of 15    Form 3005  1/01

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



-6A(CA) (0207)                     Page 6 of 15            Initials _____            Form 3005   1/01



lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

**EXHIBIT "2"**
**17 of 29**



the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(CA) (0207)                    Page 7 of 15             Initials:                Form 3005   1/01



attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

EXHIBIT "2"
19 of 29

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

-6A(CA) (0207)                          Page 9 of 16                    Initials: ___          Form 3005   1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

EXHIBIT "2"
21 of 29



16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA



Initials:

**EXHIBIT "2"**
22 of 29

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

EXHIBIT "2"
23 of 29



NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

EXHIBIT "2"
24 of 29

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                           JAMES E. MOORE                    -Borrower


_____          _____ (Seal)
                                                                             -Borrower


_____ (Seal)   _____ (Seal)
                          -Borrower                                          -Borrower


_____ (Seal)   _____ (Seal)
                          -Borrower                                          -Borrower


_____ (Seal)   _____ (Seal)
                          -Borrower                                          -Borrower

**EXHIBIT "2"**
**25 of 29**

State of California
County of *Contra Costa*                                    } ss.

On *September 26, 2004* before me, *DENISE ANN GONSALVES*
personally appeared

JAMES E. MOORE

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

*Denise Ann Gonsalves*  (Seal)

DENISE ANN GONSALVES
Commission # 1319867
Notary Public - California
Alameda County
My Comm. Expires Sep 3, 2005

-6A(CA) (0207)                Page 15 of 15          Initials: _____          Form 3005  1/01

**EXHIBIT "2"**
**26 of 29**

Loan No.  COS008341
Application No.  COS008341

## PAYMENT LETTER FROM LENDER TO BORROWER

LENDER:  BNC MORTGAGE, INC., A DELAWARE CORPORATION
P.O. BOX 19656
IRVINE, CA 92623-9656
1-800-587-0371

BORROWER:  JAMES E. MOORE

1258 DUFFY WY , BRENTWOOD,CA 94513
BRENTWOOD,CA 94513

RE:    Property Address:  1258 DUFFY WY, BRENTWOOD, CA  94513

Dear Borrower:

The monthly payments on the above referred to loan are to begin on   November 1, 2004
, and will continue monthly until  October 1, 2034

Your  monthly payment (which may change in accordance with the terms of your loan) will consist of the following items:

| | |
|---|---|
| Principal and Interest ................................................................ | $  2,268.02 |
| MMI/PMI Insurance  ................................................................ | |
| Reserve for Taxes  ................................................................... | |
| Reserve for Insurance  ............................................................. | |
| Reserve for Flood Insurance  ................................................... | |
| ............................................................ | |
| | |
| Total Monthly Payments.......................................... | $  2,268.02 |

You are to make your payments to:
OPTION ONE MORTGAGE CORPORATION
P.O. BOX 44042, JACKSONVILLE, FL 32231-4042
1-800-648-9605

Please include your loan number or application number in any correspondence in reference to your loan.

Copy received and acknowledged.

| | | | |
|---|---|---|---|
| _Jim E Moore_      8-26-04 | | | |
| JAMES E. MOORE      Date | | Date | |
| | | | |
| Date | | Date | |
| | | | |
| Date | | Date | |

**EXHIBIT "2"**
**27 of 29**

**bnc**
www.bncmortgage.com
Corporate Headquarters
Tel. (949)260-6000
1901 Main St
Irvine, CA 92614

**Final**
**Conditional Loan Approval**

Modified Approval Date: _____

Date: 09/23/2004
Application No.: COS008341
Borrower: JAMES E. MOORE
Co-Borrower:
Property Address: 1258 DUFFY WY
City, Sate, Zip: BRENTWOOD, CA 94513
Broker/Correspondent: STERLING FUNDING CORPORATION

Broker No. 12407
Agent Name: DIANA CASJENS
Agent Phone: (949) 475-5013
Program:
Occupancy: OWNER-OCCUPIED
Purpose: REFI-CASH OUT
Property Type: SFR

| Risk Grade | Start Rate | Margin | Index | Pre-Pay Penalty | | Approval Expires | OK to order Docs |
|---|---|---|---|---|---|---|---|
| B | 8.225 | 6.925 | LIBOR | YES | 2.0 Year | 10/02/2004 | YES |
| Loan Amount | LTV | CLTV | Review Value | Purchase Price | | Kind | Loan Term |
| 302,600.00 | 85.000 | 85.000 | | 0.00 | | 2 YEAR FIXED 1/7 | 360 |

| Fees to BNC Mortgage, Inc. | | Fees to Correspondent/Broker | |
|---|---|---|---|
| Points: | | Points: 1.98116% | 5,995.00 |
| Yield Spread Premium: 1.500 | 4,539.00 | Processing Fee: | 695.00 |
| Underwriting Fee: | | Appraisal: | |
| MERS Registration Fee: | | Credit: | |
| Funding Fee: | | Administration: | 595.00 |
| Tax Service Fee: | 70.00 | Courier: | |
| Flood Certification: | 17.00 | | |
| ORIGINATION | 890.00 | | |
| NY Mortgage Tax: | | | |
| Total Fees | 977.00 | Total Fees | 7,285.00 |

This approval is subject to federal, state and local rules in effect at time of funding. Additional loan conditions may be required in order to comply with changes to applicable laws. This conditional approval is subject to revocation at the lender's discretion in the event of a change in law or regulation affecting this transaction.

Loan Approval is made subject to all the following conditions:

**Mandatory Conditions**
A   Satisfactory Appraisal Review (Desk/Field) by a BNC designated reviewer for $356,000.00
B   Original Hazard Insurance Policy/Binder; Loss Payee to be as follows:
C   BNC Mortgage Inc.; Its Successors and/or Assigns; P.O. Box 19656 Irvine, CA 92623-9656
D   Property Taxes to be paid current.
E   Certified Copy of Final HUD-1 Settlement Statement.
F   Phone Certification of employment at minimum 7 days prior to funding.
G   All Original documents prior to funding.
H   All Appraisal Review conditions to be met (if any) and Appraiser to be approved by BNC.
I   Broker/Correspondent must be approved by Lender for the property state.
J   Proof of all Down Payment/Earnest Money deposits paid through Escrow.
K   Copies of invoices for third party appraisal and credit report fees charged to borrower.
L   This loan is subject to the HOEPA rules in effect at time of funding. BNC does not originate Section 32 loans
M   The interest rate and other terms of this loan approval may be subject to change if this loan is not funded on or before the approval expiration date specified on this loan approval.

**Underwriting Conditions**
**"D" Is for Prior to Doc and "F" is for Prior to Funding.**
7F   Certified Copy of Signed Escrow Instructions and Amendments.
8F   Debts to be paid according to page 2 of this approval.
9F   Typed or H/W Loan Application (1003), signed and dated.
10F   Demand to show current on all mortgages (no more than 29 days delinquent at funding) 1st & 2nd
11F   Spouse to sign quitclaim or all legal documents except note.
12F   Signed LOE from borrower re: why current ytd income so much lower than previous yrs mo. avg.

**SATISFIED CONDITIONS**
JORTEGA   1F   Complete pay history reflecting mortgage(s) lates; not to exceed established guidelines.
JORTEGA   2D   Signed Preliminary Title Report or Title Commitment which is satisfactory BNC Mortgage.
JORTEGA   3D   Original appraisal acceptable to BNC Mortgage with 36 months transfer & 12 months listing histories.
JORTEGA   5F   Current pay stubs within 30 days of funding for Borrower.
JORTEGA   6F   W-2s for 2002 & 2003, for Borrower .
JORTEGA   13D   12 month mortgage history max 1x60 last 12 months.

Borrower: _____   Co-Borrower: _____
          Signature                        Signature

Acknowledged & Agreed:          Date: _____
                  Broker Signature

**EXHIBIT "2"**
**28 of 29**



 DEBTS OR LIENS REQUIRED
TO BE PAID THROUGH ESCROW
PAGE 2.

1901 Main Street
Irvine, CA 92614
Tel (714)260-6000
Fax (714)260-6079

Payoff amounts are estimates only.
Closing agents must obtain individual
payoff demands

(Any items affecting title must be cleared whether listed or not... see lender's instructions to title and Escrow)

| | |
|---|---|
| Application Number: COS008341 | Loan Number: COS008341 |
| Borrower: JAMES E. MOORE | Loan Amount: 302,600.00 |
| Co-Borrower: | CLTV: 85 |
| Property Address: 1258 DUFFY WY | |

Estimated Payoff Amount:

| | |
|---|---|
| WFB | 218,954.00 |
| IRWIN | 44,802.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| | 0.00 |
| TOTAL | $263,756.00 |

_James E. Moore_                9-26-04
Borrower Signature         Date          Borrower Signature         Date

Borrower Signature         Date          Borrower Signature         Date

UNDERWRITING WORKSHEET

EXHIBIT "2"
29 of 29

**EXHIBIT "3"**

**EXHIBIT "3"**

**NOTICE OF RIGHT TO CANCEL**

Application No. COS008341
Borrowers: JAMES E. MOORE

Loan No. COS008341

Property Address: 1258 DUFFY WY, BRENTWOOD, CA 94513

**YOUR RIGHT TO CANCEL:**
You are entering into a transaction that will result in a mortgage, lien or security interest on/in your home. You have a legal right under federal law to cancel this transaction, within three business days from whichever of the following events occurs last:

ENTER DATE

1. the date of the transaction, which is  9-26-04                    ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on/in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL:**

If you decide to cancel this transaction, you may do so by notifying us by faxing this form to (877) 553-4058 or in writing, at:

BNC MORTGAGE, INC.
1901 Main Street
Irvine, CA 92614-6524
ATTN: Funding Dept.

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

ENTER DATE

If you cancel by mail or telegram, you must send a notice no later than midnight of  9-29-04
(or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time. Please note that if more than one consumer has the right to cancel this transaction, any such consumer acting alone may exercise his or her right to cancel and such cancellation shall be effective as to all consumers.

**I WISH TO CANCEL**

_____          _____
Date                                         Consumer's Signature

ON THE DATE OF THE TRANSACTION LISTED ABOVE I/WE, THE UNDERSIGNED, EACH RECEIVED TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL IN THE FORM PRESCRIBED BY LAW ADVISING ME/US OF MY/OUR RIGHT TO CANCEL THIS TRANSACTION.

_____  9-26-04        _____
JAMES E. MOORE           Date                            Date

_____                _____
                         Date                            Date

_____                _____
                         Date                            Date

BCANCEL-32

**EXHIBIT "3**
**1 of 2**

**EXHIBIT "3**
**2 of 2**

# PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             )  ss.
COUNTY OF ORANGE             )

I am employed in the County of Orange, State of California. I am over the age of eighteen and not a party to the within action. My business address is 9970 Research Drive, Irvine, California 92618.

On January 23, 2008, I served the following document described as:

**BNC'S OPPOSITION TO EX PARTE MOTION TO REMAND ACTION; DECLARATIONS OF ERIC D. HOUSER AND LINDA DENICOLA IN SUPPORT THEREOF**

On the following interested parties in this action:

| | |
|---|---|
| Thomas Spielbauer, Esq.<br>THE SPIELBAUER LAW FIRM<br>Spielbauer Law Firm<br>1250 Oakmead Parkway, Suite 210<br>Sunnyvale, CA 94085<br>thomas@spielbauer.com<br>Ph: (408) 451-8499<br>Fax: (610) 423-1395<br>*Attorneys for Plaintiff* | Thomas Spielbauer, Esq.<br>THE SPIELBAUER LAW FIRM<br>Spielbauer Law Firm<br>50 Airport Pkwy<br>San Jose, CA 95110<br>thomas@spielbauer.com<br>Ph: (408) 451-8499<br>Fax: (610) 423-1395<br>*Attorneys for Plaintiff* |
| John Sorich, Esq.<br>Adorno Yoss Alvarado & Smith<br>1 MacArthur Pl Ste. 200<br>Santa Ana, CA 92707<br>(714) 852-6800<br>(714) 852-6899 fx<br>*Attorneys for Chase Bank* | Edward A. Treder<br>Law Offices of<br>ROBERT E. WEISS INCORPORATED<br>920 S. Village Oaks Drive<br>Covina, CA 91724<br>(626) 967-4302 Ext. 139<br>(626) 339-7103 - FAX<br>(909) 322-9944 - Mobile<br>etreder@rewlaw.com<br>*Attorneys for NDEx West, LLC* |

**[XX]    VIA OVERNIGHT MAIL/COURIER -- CCP §§ 1013(c), 2015.5** (AS INDICATED IN ATTACHED SERVICE LIST) : By placing a true copy thereof enclosed in a sealed envelope, addressed as above, and placing each for collection by overnight mail service or overnight courier service. I am readily familiar with my firm's business practice of collection and processing of correspondence for mailing with the processing of correspondence for overnight mail or overnight courier service, and any correspondence placed for collection for overnight delivery would in the ordinary course of business, be delivered to an authorized courier or delivery authorized by the overnight mail carrier to

---

I:\CIVIL\AURORA LOAN SERVICES\Moore (42262)\PMfOPP2IEXP.doc

receive documents, with delivery fees paid or provided for, that same day for delivery on the following business day.

[ ]     **VIA FIRST CLASS MAIL—CCP §§ 1013(a); 2015.5:** By placing a true copy thereof enclosed in a sealed envelope(s) addressed as above, and placing each for collection and mailing on the date following ordinary business practices.  I am readily familiar with my firm's business practice and collection and processing of mail with the United States Postal Service and correspondence placed for collection and mailing would be deposited with the United States Postal Service at Irvine, California, with postage thereon fully prepaid that same day in the ordinary course of business.

[ ]     **VIA FACSIMILE -- CCP §§ 1011, 2015.5:** By arranging for facsimile transmission from facsimile number (949) 679-1112 to the above listed facsimile number(s) prior to 5:00 p.m.  I am readily familiar with my firm's practice of collection and processing of correspondence via facsimile transmission(s) and any such correspondence would be transmitted in the ordinary course of business.  The facsimile transmission(s) was reported as complete and without error.

I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.  Executed on January 23, 2008 at Irvine, California

Sherie L. Cleeré

---

**BNC'S OPPOSITION TO EX PARTE MOTION TO REMAND ACTION**

2

I:\CIVIL\AURORA LOAN SERVICES\Moore (42262)\Pld\OPP2EXP.doc