1  ERIC D. HOUSER (SBN 130079)
2  JEFFREY S. ALLISON (SBN 173620)
   HOUSER & ALLISON
3  A Professional Corporation
   9970 Research Drive
4  Irvine, California 92618
   Telephone:  (949) 679-1111
5  Facsimile:  (949) 679-1112

6  Attorneys for Defendants,
   BNC MORTGAGE, LLC, erroneously sued
7  herein as BNC MORTGAGE, INC.

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11  JIM E. MOORE,                        ) Case No.: C 08-0350 SC
                                         )
12                                       ) **DEFENDANT BNC'S OPPOSITION**
                        Plaintiffs,      ) **TO PLAINTIFF'S MOTION FOR**
13                                       ) **PRELIMINARY INJUNCTION;**
    v.                                   ) **MEMORANDUM OF POINTS AND**
14                                       ) **AUTHORITIES IN SUPPORT**
                                         ) **THEREOF; DECLARATION OF**
15  CHASE BANK; BNC MORTGAGE,            ) **LINDA DENICOLA IN SUPPORT**
    INC.; NDEx West LLC; STIRLING        ) **THEREOF**
16  FUNDING CORPORATION; KEVIN           )
    CAYLOR; and DOES 1-20,               )
17                                       ) DATE: April 4, 2008
                                         ) TIME: 10:00 a.m.
18                      Defendants.      ) The Honorable Samuel Conti
                                         ) Courtroom 1, 17th Floor
19                                       ) 450 Golden Gate Avenue
    _____) San Francisco. CA 94102
20

21

22

23

24

25

26

27

28

---

**BNC'S OPPOSITION PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I.   SUMMARY OF RESPONSE.............................................................................. 1

II.  SUMMARY OF FACTS AND RESPONSE TO PLAINTIFF'S
     PURPORTED FACTS................................................................................... 1

A.   Plaintiff's Specific Requests Dictated The Terms Of The Loan He
     Received ................................................................................................. 1

B.   Plaintiff's Loan Allowed Him To Pay Off Two Preexisting Mortgages..... 2

C.   Plaintiff's Credit Score Negatively Impacted The Terms Of The Loan He
     Received ................................................................................................. 2

D.   The Documents Plaintiff Signed Accurately Reflect The Loan He
     Received ................................................................................................. 3

E.   All Fees And Charges Were Properly Disclosed ........................................ 4

F.   Plaintiff Acknowledged In Writing Receipt Of Two Copies Of The Notice
     Of Right To Cancel ................................................................................. 4

G.   Plaintiff's Loan Is Not Governed By HOEPA............................................ 4

III. PLAINTIFF'S INJUNCTION REQUEST MUST BE DENIED BECAUSE
     IT IS NOT LIKELY THAT PLAINTIFF WILL PREVAIL ON THE
     MERITS ................................................................................................... 5

A.   Plaintiff Will Not Prevail On the Merits As To BNC.................................. 5

1.   Defendants Have Complied With California Foreclosure Statutes ............. 5

2.   The Loan Documents Signed By Plaintiff Directly Refute His Claims. ...... 9

     a.   The Act Of Attaching The Mortgage Agreement To The Motion Is Not
          Sufficient Proof That It Is Unconscionable Or Oppressive.................... 10

     b.   The Documents Which Make Up The Mortgage Agreement Do Not
          Establish That Plaintiff Was Misled ..................................................... 11

1       c.   Plaintiff's Allegation That The Foreclosure Process Is Invalid Because It
2           Did Not Meet The Requirements Of California Foreclosure Law Is
3           Fatally Flawed ........................................................................................ 13
4   IV.   FORECLOSURE IS NOT A VIOLATION OF PLAINTIFF'S RIGHTS .... 14
5   V.    PLAINTIFF CANNOT PRECLUDE FORECLOSURE WITHOUT FIRST
6        TENDERING THE AMOUNT OF THE LOAN DEBT. ............................. 14
7   IV.   PLAINTIFF MUST POST A BOND ........................................................... 15
8   IIV.  CONCLUSION ........................................................................................... 16

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Cases

4 Miller & Starr, Cal. Real Estate, (3d ed. 2000) § 10:183, p. 560 .......................... 6

Anderson v. Heart Federal Savings, 208 Cal. App. 3d 202, 205 (1989).... 7, 8, 9, 14

Bisno v. Sax (1959) 175 Cal.App.2d 714, 346 P. 2d 814 ...................................... 15

Butt v. State of California (1992) 4 Cal.4th 668, 677-78 ......................................... 5

Dickson, Carlson & Campillo v. Pole (2000) 83 Cal.App. 4th 436, 446, 99
Cal.Rptr. 2d 678, 686 ......................................................................................... 14

Doherty v. Knapp, 123 Cal. App. 4th 76, 97 (2004) ............................................ 6, 7

Faith Center Church Evangelistic Ministries v. Glover, 128 S.Ct. 143, (U.S. Oct
01, 2007) (NO. 06-1633) ....................................................................................... 10

Humboldt Savings Bank v. McCleverty (1911) 161 Cal. 285, 290 ....................... 14

LGS Architects, Inc. v. Concordia Homes, 434 F.3d 1150, 1158 (9th Cir. 2006). 10

Little v. Harbor Pacific Mortgage Investors, 175 Cal. App. 3d 717 (1985)............. 8

Meetz v. Mohr (1904) 141 Cal. 667, 75 P. 298 ..................................................... 15

Meyer v. Benko, 55 Cal. App. 3d 937, 943 (1976) ............................................... 12

N.A.M.E.S. v. Singer, 90 Cal. App. 3d 653, 654 (1979).......................................... 12

San Francisco Newspaper Printing Co., Inc. v. Superior Court (1985) 170
Cal.App. 3d 438, 442 ............................................................................................ 16

Williams v. Koenig (1934) 219 Cal. 656, 660........................................................ 14

Young v. Birchill (1929) 96 Cal.App. 341, 274 P. 379 .......................................... 15

## Statutes

15 U.S.C. § 1602 et seq. ........................................................................................... 4

## Other Authorities

California Civil Code § 2924............................................................................... 8, 14

California Civil Code § 2924f .................................................................................. 5

California Code of Civil Procedure § 526(a)(1)................................................. 5, 16

California Code of Civil Procedure § 529(a)......................................................... 15

## Rules

California Rule of Court 3.1150(f) .......................................................................... 15

California Rule of Court 359(f) ............................................................................... 15

## I.    SUMMARY OF ARGUMENT

On the eve of the scheduled foreclosure sale, and despite receiving the benefits of a loan made in September 2004, the Plaintiff Jim Moore ("Plaintiff") now claims that there was wrongdoing at the time the loan was made. Plaintiff attempts to raise a myriad of arguments to try and prevent the foreclosure sale and rescind the loan. However, Plaintiff ignores that each item he disputes concerning the loan was disclosed and acknowledged by him in writing. The Court should deny Plaintiff's request for preliminary injunction.

## II.    SUMMARY OF FACTS AND RESPONSE TO PLAINTIFF'S PURPORTED FACTS

In September 2004, Plaintiff applied for a loan with BNC Mortgage, Inc. ("BNC") through Defendants Stirling Funding Corporation ("Stirling") and Kevin Caylor ("Caylor"). The loan application documents reveal a factual story different than what is alleged by Plaintiff.

### A.    Plaintiff's Specific Requests Dictated The Terms Of The Loan He Received

The Truth in Lending Disclosure Statement dated September 15, 2004 and attached as **Exhibit "A"** expressly states that it is a "preliminary" disclosure statement. While Plaintiff argues that he relied on this statement for the terms of the loan, the statement itself reads: "This is neither a contract nor a commitment to lend." Plaintiff argues that through oral discussions and this statement he was led to believe that he was to receive a 30 year fixed rate loan. However, the September 15, 2004, "preliminary" statement reflects that Plaintiff had applied for a loan that was a "2 year fixed rate" loan that became adjustable after two years. (*See* DeNicola Decl. at ¶5.) Plaintiff contradicts this assertion in his verified Complaint and claims that it was represented to him that payments would adjust according to the schedule set forth in the September 15, 2004, Preliminary Disclosure Statement. While Plaintiff argues that it was represented to him that

the terms of the loan were as set forth in the September 15, 2004 statement, the statement itself reveals that the amount financed would be $271,807.46, a far less amount than the actual loan of $302,600.00. (*See* DeNicola Decl. at ¶¶5, 7.) The Preliminary Disclosure Statement was just preliminary and nothing more.

The Preliminary Disclosure Statement was submitted before the loan application was reviewed by BNC's loan underwriting and approved. (*See* DeNicola Decl. at ¶6.) The payment amount in any disclosure statement is estimated whenever there is an adjustable rate component to the loan because of future interest rate increases or reductions. (*See* DeNicola Decl. at ¶6.)

### B.    Plaintiff's Loan Allowed Him To Pay Off Two Preexisting Mortgages

During the loan application process the amount Plaintiff requested was increased to $302,600.00. (*See* DeNicola Decl. at ¶5.) The modification request was approved on September 23, 2004 by BNC. (*See* DeNicola Decl. at ¶5.) A copy of the loan approval modification request form is attached as **Exhibit "B."** The Plaintiff needed the loan to be modified to cover the payoff of a preexisting first mortgage with Wells Fargo Home Mortgage in the amount of $224,651.50 and a preexisting second mortgage with Irwin Home Equity in the amount of $49,202.35. (*See* DeNicola Decl. at ¶8.) Copies of payoff demand statements submitted by Wells Fargo Home Mortgage and Irwin Home Equity are attached as **Exhibits "C"** and **"D."** In addition, Plaintiff received cash proceeds from the loan in excess of $19,000.00. (*See* DeNicola Decl. at ¶8.)

### C.    Plaintiff's Credit Score Negatively Impacted The Terms Of The Loan He Received

There is no contradiction or misrepresentation between the preliminary Truth in Lending Disclosure Statement dated September 23, 2004, and the "final" Truth in Lending Disclosure Statement dated September 23, 2004. (*See* DeNicola Decl. at ¶9.) The final statement reflects the actual loan program which Plaintiff

---

qualified for and received after the loan application and underwriting process. (*See* DeNicola Decl. at ¶9.) The factors in considering loan approval include the loan amount, the loan to value of the property, and the borrower's financial information including his credit score. (*See* DeNicola Decl. at ¶10.) Plaintiff's credit score was only 515 based upon his poor credit history. (*See* DeNicola Decl. at ¶10.) A copy of Plaintiff's credit report reflecting serious delinquencies and foreclosure is attached as **Exhibit "E."** Therefore, Plaintiff's assertion that he somehow believed he would receive a 30 year fixed rate note at somewhere between 6.5 and 7.5% simply cannot be believed. (*See* DeNicola Decl. at ¶10.)

### D.   The Documents Plaintiff Signed Accurately Reflect The Loan He Received

The "final" disclosure statement dated September 23, 2004, sets forth the initial monthly payment amount of $2,268.02. (*See* DeNicola Decl. at ¶11.) It sets forth the amount financed excluding loan fees and settlement charges. (*See* DeNicola Decl. at ¶11.) The statement further sets forth the fact that it is a two year fixed rate loan. (*See* DeNicola Decl. at ¶11.) Plaintiff acknowledged his receipt of the final disclosure statement by signing the document. A copy of the signed final disclosure statement is attached as **Exhibit "F."** Plaintiff further acknowledged the terms of the loan as set forth in the promissory note and deed of trust. While Plaintiff argues that the terms of the note contain "legalese and filled with mumbo-jumbo," the reality is that the promissory note signed by Plaintiff is the standard form promissory note used in California. (*See* DeNicola Decl. at ¶12.) Plaintiff signed the promissory note and deed of trust and initialed each page acknowledging his receipt and review of the documents. Copies of the signed promissory note and deed of trust are attached as **Exhibit "G"** and **"H."** The promissory note at page one expressly states the following in bold: the payment is $2,268.02, that the interest rate Plaintiff pays may change on the first day of October 2006, that the initial interest rate was 8.225%, and that the maximum

interest rate may never be greater than 15.225%. Plaintiff also signed the Adjustable Rate Rider which once again sets forth the initial interest rate and the terms the rate would change. (*See* DeNicola Decl. at ¶14.) A copy of the adjustable rate rider is attached as **Exhibit "I."**

### E.    All Fees And Charges Were Properly Disclosed

Plaintiff's statements concerning the disclosure of fees and charges at the time of loan origination are incorrect. Plaintiff acknowledged by his signature receipt of the Good Faith Estimate setting forth each fee including the broker fee of $5,995.00 and the mortgage broker fee paid by a lender in the amount of $4,539.00. (*See* DeNicola Decl. at ¶15.) A copy of the Good Faith Estimate signed by Plaintiff is attached as **Exhibit "J."** Plaintiff also signed the Mortgage Broker Fee Disclosure. **(Exhibit "K.")** Plaintiff also signed the Statement of Loan-Closed End which sets forth the broker fee amount in the sum of $11,824.00. **(Exhibit "L.")** (*See* DeNicola Decl. at ¶16.) Plaintiff also signed the final conditional loan approval. The final conditional loan approval sets forth the fee of $5,995.00 representing points paid on the loan and the yield spread premium in the amount of $4,539.00. **(Exhibit "M.")** (*See* DeNicola Decl. at ¶17.)

### F.    Plaintiff Acknowledged In Writing Receipt Of Two Copies Of The Notice Of Right To Cancel

Plaintiff's claim that he did not receive the three day Notice of Right to Cancel is contradicted by **Exhibit "N"** which contains Plaintiff's signature, the date of the transaction, and the date to cancel the transaction. (*See* DeNicola Decl. at ¶18.) A copy of the Notice of Right to Cancel is attached as **Exhibit "N."**

### G.    Plaintiff's Loan Is Not Governed By HOEPA

Plaintiff's claim that the loan is governed by the Homeowner's Equity Protection Act ("HOEPA," 15 U.S.C. § 1602 et seq.) is incorrect. (*See* DeNicola Decl. at ¶19.) HOEPA concerns high cost loans. This loan did not qualify under HOEPA as a covered loan as reflected in **Exhibit "O."** (*See* DeNicola Decl. at

¶19.)   In Section 32 loan worksheet, the annual percentage rate ("APR") of the loan was 9.186.   Nearly five percentage points below the 13% required to qualify as a HOEPA loan. (*See* DeNicola Decl. at ¶19.) Under HOEPA, the APR at the time the loan is originated is the rate used not the ceiling or cap adjustable rate which in this case is 15.225%.   Plaintiff mistakenly uses the cap interest rate to conclude that the loan is governed by HOEPA. (*See* DeNicola Decl. at ¶19.)

## III.   PLAINTIFF'S INJUNCTION REQUEST MUST BE DENIED BECAUSE IT IS NOT LIKELY THAT PLAINTIFF WILL PREVAIL ON THE MERITS

*California Code of Civil Procedure* § 526(a)(1) provides that an injunction may not issue unless "it appears...that the plaintiff is entitled to the relief demanded."   In deciding whether to grant a preliminary injunction, a court evaluates 2 factors: "(1) the likelihood that the moving party will ultimately prevail on the merits and (2) the relative harm to the parties from issuance or nonissuance of the injunction." *Butt v. State of California* (1992) 4 Cal.4th 668, 677-78.

### A.   Plaintiff Will Not Prevail On the Merits As To BNC

Plaintiff attempts to raise a myriad of arguments to try and prevent the foreclosure sale and rescind the loan.   However, briefly evaluating each argument dislodges Plaintiff's claims that the highlighted factors can help him out of his present predicament.

#### 1.   Defendants Have Complied With California Foreclosure Statutes

Plaintiff alleges that the Notice of Default and the Notice of Trustee's Sale were statutorily deficient and defective.   Specifically, Plaintiff claims that the Notice of Trustee's Sale violated *California Civil Code* § 2924f by providing an inaccurate statement of the total amount of the unpaid balance of the loan and not providing a toll free number that allowed Plaintiff to speak to a "live person or

leave a message." Plaintiff's Motion does not identify how the Notice of Default was allegedly defective.

It is clear that Plaintiff is grasping for any argument that he thinks may extend his stay at the property. Plaintiff's argument that the lack of a telephone number on the Notice of Trustee's Sale is sufficient to overturn the entire foreclosure process is wrong. In *Williams v. Koenig* the Court reasoned that substantial compliance in accord with the spirit and purpose of the statute is sufficient. *Williams v. Koenig*, 219 Cal. 656, 660 (1934). Inadvertently omitting a toll free telephone number on the Notice of Default does not erase the actions which did comply with the controlling statute.

Plaintiff's reasoning is also contradicted by the reasoning applied in *Doherty v. Knapp*. In *Doherty* the borrower sought to overturn a foreclosure sale because the Notice of Default listed the wrong default date. *Doherty v. Knapp*, 123 Cal. App. 4th 76, 97 (2004). As a result of the error on the Notice of Default the Notice of Trustee's Sale was sent prematurely. *Doherty*, 123 Cal. App. 4th at 98. However, the foreclosure sale was not overturned because there was no evidence that the borrowers were misled by the erroneous date. One of the signal purposes of the notice of default is to advise the trustor of the amount required to cure the default. (*4 Miller & Starr, Cal. Real Estate,* (3d ed. 2000) § 10:183, p. 560.) There is no evidence that Borrowers were misled in any way by the Default Notice. *Doherty*, 123 Cal. App. 4th at 96. The same reasoning should be applied here. The lack of a toll free telephone number is not an error which would confuse a borrower about the amount required to cure the default. There is no evidence that Plaintiff did not have the telephone numbers or was unable to contact any of the Defendants. Plaintiff was not misled and must not be allowed to take further advantage of the Defendants by hiding behind an injunction which his actions did not entitle him.

*Doherty* went on to find that, "Any suggestion by Borrowers that the Default Notice contained any material misstatements-such as an overstatement of the amount of default-is founded on nothing more than speculation." Here, Plaintiff speculates that the Notice of Trustee's Sale contains an overstatement. Plaintiff does not present an explanation for his belief that the amount is "too high" other than to say it is more than the amount he originally borrowed. Plaintiff has admitted that he did not make a loan payment during 2007. Therefore it is understandable and explainable that the amount owed increased.

The Court's decision in *Doherty* defeats Plaintiff's rational that a slight deviation from statutory notice requirements may invalidate the Defendants' foreclosure efforts and force Defendants to start the process over. *Id.* at 93.

> Stated otherwise, **does the need for "strict compliance" with foreclosure notice requirements recited in various cases mean that a trustee's sale must be invalidated no matter how trivial the procedural defect? We answer this question in the negative.** *Id.* at 93. [Emphasis Added.]

Based upon the lack of relevant evidence or argument presented in Plaintiff's Motion his request must be denied.

Erroneously, Plaintiff's Motion heavily relies upon *Anderson v. Heart Federal Savings*. However, *Anderson* is distinguishable from the case at hand on its facts. In *Anderson*, Heart Federal Savings' Notice of Default set forth several claims of breach but conditioned some of them with the proviso "if any." *Anderson v. Heart Federal Savings*, 208 Cal. App. 3d 202, 205 (1989). Several times prior to the sale the trustor contacted the beneficiary to ascertain the amount of arrearages. *Anderson*, 208 Cal. App. 3d at 207-208. Each time the beneficiary gave a different amount and could not provide a specific break down of the amount. On the morning of the sale, Anderson tendered an amount greater than the amount specified in the Notice of Default and parallel to the quote received from the beneficiary. *Id.* at 208. The beneficiary refused to accept Anderson's

payment and the property was sold to a third party. *Id.* at 208. In *Anderson,* the beneficiary was found to have inadequately ascertained the existence of a breach based upon the "if any" proviso. Here, the beneficiary did adequately ascertain the existence of a breach which was clearly identified on the Notice of Default.

> "The provisions of *Civ. Code*, § 2924, regarding inclusion in the notice of default under a deed of trust of a statement setting forth the nature of the breach, must be strictly followed. **The trust beneficiary is bound by its notice of default and cannot insist on any grounds of default other than those stated in that notice.** The purpose of the § 2924 requirement that no power of sale be exercised until after the recording of a notice of default stating that a breach has occurred, is to put the beneficiary to the task of ascertaining the existence of a breach before the invocation of the power of sale and the trustor on notice of the obligations the beneficiary contends have been breached." *Id.* at 211 & 214.

Here, Plaintiff has not alleged that the trust beneficiary is overreaching the grounds set forth in its Notice of Default. Plaintiff merely alleges that the amount in the Notice of Default is incorrect because the amount is "too high." However, Plaintiff did not request an explanation of the figure on the Notice of Default until December 31, 2007, five days prior to filing the Complaint on January 4, 2008. The Notice of Default was recorded in August 2007. Plaintiff had several months to question the amount and instead waited until the eve of the foreclosure sale to act. As Plaintiff's Motion pointed out, "No one can take advantage of his own wrong." Here Plaintiff is attempting to do just that. He failed to acknowledge his financial shortcomings and instead allowed his lender to expend energies getting up to the eve of the foreclosure sale before he finally acted. Then he institutes this baseless lawsuit in an attempt to further take advantage of his own wrong.

*Anderson* incorporates the reasoning in *Little v. Harbor Pacific Mortgage Investors,* 175 Cal. App. 3d 717 (1985).

> **"The purpose of the statute is to put the debtor on notice as to *which breaches* the lienholder wishes cured. It would be sufficient if the original notice includes a specific reference to the obligation.** Here, for

---

example, the notice indicates Harbor will look to the Littles for delinquent taxes, if any. Thus, the notice would have been sufficient if it had also indicated a reference to delinquent payments, if any, on the first." (*Little, supra*, 175 Cal.App.3d at p. 721, fn. 6; original italics.)" *Anderson*, 208 Cal. App. 3d at 213. [Emphasis added.]

Here, the Notice of Default provided that Plaintiff had failed to make loan payments. The breach identified in the Notice of Default was the same breach identified in the Notice of Trustee's Sale. According to Plaintiff and *Anderson*, "The trust beneficiary is bound by its Notice of Default and cannot insist on any grounds of default other than those stated in that notice." *Id.* at 211 & 214. Plaintiff has not alleged that Defendants are pursuing a default for grounds other than those stated in the notices. Plaintiff is merely alleging that he does not agree with the amounts stated in the notices. These two assertions are not the same which is why the reasoning applied in Anderson will not help Plaintiff avoid his obligations any longer than he already has.

### 2.    The Loan Documents Signed By Plaintiff Directly Refute His Claims

Plaintiff's Motion sets forth several arguments which attempt to sway this Court into believing that the mortgage agreement is void. However, the Plaintiff fails to produce a single case which supports the position taken in any of the arguments. In addition, Plaintiff signed the loan documents, accepted the funds, and made a monthly mortgage payment for two years without notifying BNC that the loan terms were not what Plaintiff was allegedly promised. Finally, over three years later, Plaintiff filed his Complaint accusing BNC, Stirling and Caylor of using fraudulent means to obtain Plaintiff's business. Plaintiff does not dispute that the loan documents he signed on September 24, 2004, accurately reflect the terms of the loan which he received. However, Plaintiff denies reading the forms

and blames his carelessness on the notary for allegedly making Plaintiff believe he was being rushed.  Nonetheless, all of Plaintiff's arguments are addressed below.

> ### a.    The Act Of Attaching The Mortgage Agreement To The Motion Is Not Sufficient Proof That It Is Unconscionable Or Oppressive

Plaintiff argues that the mere presentation of his Motion proves that the loan was unconscionable.  Unfortunately for Plaintiff, there is a burden of proof which must be met prior to the granting of an injunction.  A party seeking a preliminary injunction must show either: (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor.  *Faith Center Church Evangelistic Ministries v. Glover*, 128 S.Ct. 143, (U.S. Oct 01, 2007) (NO. 06-1633). These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.  *LGS Architects, Inc. v. Concordia Homes*, 434 F.3d 1150, 1158 (9th Cir. 2006).

Plaintiff's Motion focuses on the second part of the first test which is the possibility of irreparable injury.  Plaintiff hits the second part of the test with fervor because he hopes to gain this Court's sympathy.  Plaintiff's Motion acknowledged that the test was on a sliding scale but then failed to present any credible evidence of probable success on the merits.  Instead, Plaintiff spends the majority of his time painting himself as a man who is only attempting to keep a roof over his family's head.  On the other side, he portrays the Defendants as a group of corporate giants who have specifically chosen the Plaintiff as a target of harassment.  Contrary to Plaintiff's assertion, the Defendants are injured by borrowers who refuse to make payments on loans they willingly enter into.  In

addition, contrary to Plaintiff's petitioning this Court cannot make a decision based upon its feelings of sympathy for him.

Plaintiff admitted that he failed to make loan payments during 2007 and that he signed the documents which accurately reflect the loan he received. Plaintiff couches his entire claim on the allegation that the amount on the Notice of Default and Notice of Trustee's Sale is wrong because he does not agree with the amount stated. The only hardship Plaintiff has shown is that if the foreclosure sale goes forward he will be forced to enter a living situation in which he has to pay for his residence.

Realizing that his position is very weak Plaintiff attempts to argue that public policy is also in his favor. However, Plaintiff's argument that public policy dictates that the injunction must be granted is irrational. In reality, public policy dictates that the foreclosure laws must be upheld. If investors, lenders and borrowers lose faith that the terms they choose in their agreements will be enforced instability will be the result. Plaintiff's reasoning for promoting this as a new "public policy" is clear. He has failed to abide by the terms he agreed to and now wants this Court to protect him by stepping back in time and rewriting the loan agreement.

Here, Plaintiff has not paid or tendered payment of the loan arrears to prevent the foreclosure sale. Enjoining the sale would only result in a continuing increase of the loan arrears, and result in yet another eventual foreclosure. Without sufficient tender, Plaintiff cannot attack the foreclosure sale. Plaintiff fails to do equity by failing to tender the amounts due under the loan.

> **b.    The Documents Which Make Up The Mortgage Agreement Do Not Establish That Plaintiff Was Misled**

Plaintiff claims that a mechanical review of the loan documents will prove to this Court that the loan was unconscionable. Again, Plaintiff's argument fails.

---

Plaintiff bases his opinion upon the assertion that the note contains "legalese and filled with mumbo-jumbo." The reality is that the promissory note signed by Plaintiff is the standard form promissory note used in California. In addition, the mere presentation of documents does not prove anything, especially when the documents were all acknowledged and signed by Plaintiff. The Motion is asking this Court to overlook not only the Motion's lack of sufficient argument but also the Plaintiff's signature on every single document he is now disputing.

Plaintiff argues that he was given insufficient time to review the loan documents because he allegedly believed he was being rushed by the notary. As shown above and by Plaintiff's credit report this was not Plaintiff's first encounter with a mortgage. In fact, Plaintiff knew the effect of entering into a mortgage and the serious consequences for failing to make payments. BNC cannot be charged, over three years later, of knowing that Plaintiff felt rushed and signed the loan documents without reviewing them.

> Existence of mutual consent is determined by objective, rather than subjective, criteria, test being what outward manifestations of consent would lead reasonable person to believe; accordingly, primary focus in determining existence of mutual consent is upon acts of parties involved. *Meyer v. Benko*, 55 Cal. App. 3d 937, 943 (1976).

Plaintiff's three years of silence concerning the terms show he was satisfied with the terms. Plaintiff failed to raise objection earlier because it did not exist. When Plaintiff realized that the consequences of failing to pay his monthly payment was catching up to him and that his property was going to be sold he fabricated this story and filed the Complaint.

Generally a party is bound by provisions in an agreement which he signs, even though he has not read them and signs unaware of their existence. *N.A.M.E.S. v. Singer*, 90 Cal. App. 3d 653, 654 (1979). Although *N.A.M.E.S.* does not deal with the parallel fact pattern the reasoning is applicable here. In

*N.A.M.E.S.* the appellant had signed an agreement and alleged that he did not notice the arbitration provision. The appellant's argument was rejected for several reasons. There the Court of Appeals reviewed the document and found that the provision was in substantially larger type, double spaced and clearly legible. Here, Plaintiff disputes the APR, the adjustable interest rate and the monthly payment. Those are all terms which stood out on the form. The terms of the promissory note which Plaintiff claims were, "legalese and filled with mumbo-jumbo" are actually terms that the Plaintiff has not raised once in this Motion.

Plaintiff ignores that each item he disputes concerning the loan was disclosed and acknowledged by him in writing. If Plaintiff did not understand the terms he had a responsibility to notify BNC then and refuse to sign the documents. Plaintiff's contentions are less believable because Plaintiff not only signed every single document he made the monthly loan payment for two years. Furthermore, Plaintiff has not identified a case or legal theory that would require BNC to inquire into Plaintiff's comprehension of the loan terms after the Plaintiff signed them.

### c.     Plaintiff's Allegation That The Foreclosure Process Is Invalid Because It Did Not Meet The Requirements Of California Foreclosure Law Is Fatally Flawed

Plaintiff states over and over that the Defendants should not be allowed to benefit from the harsh and severe consequences that non-judicial foreclosure law permits. However, Plaintiff fails to give a single valid reason why Defendants should be enjoined from exercising the remedies other than to continuously point out that the remedies are harsh.

California law recognizes that the remedies are harsh which is why the fact that the Notice of Default and the Notice of Trustee's Sale were accurate is paramount. Defendants performed as required under California non-judicial foreclosure law. Plaintiff has not presented any evidence to the contrary and in fact bases his argument that the amount stated was inaccurate not that the breaches

identified were incorrect. Even if the amount is no longer accurate by the time the sale occurs the Notice will not be void. According to *Anderson* the notice must not be updated every time the amount changes. The notice must tell the party what the default is based upon. *Anderson*, 208 Cal. App. 3d at 213. In addition, Defendants have not attempted to enlarge the grounds for the Notice of Default. This shows that the beneficiary, as required by *California Civil Code* § 2924, was aware of which obligations had been breached at the time the Notice of Default was filed. One significant point Plaintiff's Motion fails to address is Plaintiff's failure to make loan payments during 2007. The harsh consequences are the direct result of Plaintiff's own actions.

## IV.    FORECLOSURE IS NOT A VIOLATION OF PLAINTIFF'S RIGHTS

Plaintiff has benefitted from the transaction in 2004 by having his $224,651.50 first and $49,202.35 second mortgages paid off and received cash from the transaction in the excess of $19,000.00. (*See* DeNicola Decl. at ¶8.) Plaintiff made the decision to obtain the loan and chose to accept the terms and the benefits of the loan. Defendants are not violating Plaintiffs' rights by proceeding with a foreclosure sale which is provided for in the Deed of Trust and California law.

## V.    PLAINTIFF CANNOT PRECLUDE FORECLOSURE WITHOUT FIRST TENDERING THE DEBT

Injunctive relief is an equitable remedy. In ruling on motions for preliminary injunction, courts consider whether the moving party comes to the Court with clean hands in connection with the transactions forming the basis of the Complaint. *Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App. 4th 436, 446, 99 Cal.Rptr. 2d 678, 686. A plaintiff cannot seek equitable relief where the plaintiff has not done equity. *Humboldt Savings Bank v. McCleverty* (1911) 161 Cal. 285, 290; *Williams v. Koenig* (1934) 219 Cal. 656, 660. Thus to obtain

injunctive relief to prevent a foreclosure, the borrower must pay, or tender payment, of any amounts admittedly owed the lender. *See, Bisno v. Sax* (1959) 175 Cal.App.2d 714, 346 P. 2d 814; *Young v. Birchill* (1929) 96 Cal.App. 341, 274 P. 379. The court may dissolve an injunction if such payments are not made. *Meetz v. Mohr* (1904) 141 Cal. 667, 75 P. 298.

Enjoining the sale would only result in a continuing increase of the loan arrears, and result in yet another eventual foreclosure. Without sufficient tender, Plaintiff cannot attack the foreclosure sale. Plaintiff fails to do equity by failing to tender the amounts due under the loan.

## IV.    PLAINTIFF MUST POST A BOND

*Code of Civil Procedure* § 529(a) provides as follows:

> On granting an injunction, the Court or Judge **must** require an undertaking on the part of the applicant to the effect that the applicant will pay to the party enjoined such damages, not exceeding an amount to be specified, as the party may sustain by reason of the injunction, if the Court finally decides that the applicant was not entitled to the injunction. (Emphasis added).

Additionally, *California Rule of Court* 3.1150(f) mandates a court to **require** a bond upon the issuance of a preliminary injunction. The injunction does not become effective until the required bond is filed. The Court is required to balance the hardships to Defendant Chase that would result from a waiver of an adequate and mandatory bond. The amount is discretionary.

BNC submits that in the event the Court finds it necessary to issue an injunction, that Plaintiff is required to post an undertaking in the amount of the loan debt as set forth in the Notice of Trustee's Sale recorded on November 9, 2007. Under these circumstances such an undertaking is entirely equitable.

///

---

## IIV.  <u>CONCLUSION</u>

In light of these facts and the foregoing arguments, Plaintiff has not demonstrated that it is "reasonably probable that the moving party will prevail on the merits."  *Code of Civil Procedure* § 526(a)(1); *San Francisco Newspaper Printing Co., Inc. v. Superior Court* (1985) 170 Cal.App. 3d 438, 442.  BNC respectfully requests that this Court deny Plaintiff's request for preliminary injunction.

DATED:  March 14, 2008                          HOUSER & ALLISON
                                                A Professional Corporation


                                                /s/ Jeffrey S. Allison
                                                Eric D. Houser
                                                Jeffrey S. Allison
                                                Attorneys for Defendant,
                                                BNC MORTGAGE, LLC,
                                                erroneously sued herein as BNC
                                                MORTGAGE, INC.

# PROOF OF SERVICE

STATE OF CALIFORNIA      )
                                ) ss.
COUNTY OF ORANGE       )

     I am employed in the County of Orange, State of California. I am over the age of eighteen and not a party to the within action. My business address is 9970 Research Drive, Irvine, California 92618.

     On March 14, 2008, I served the following document described as:

On the following interested parties in this action:

| | |
|---|---|
| Thomas Spielbauer, Esq.<br>THE SPIELBAUER LAW FIRM<br>Spielbauer Law Firm<br>1250 Oakmead Parkway, Suite 210<br>Sunnyvale, CA 94085<br>thomas@spielbauer.com<br>Ph: (408) 451-8499<br>Fax: (610) 423-1395<br>*Attorneys for Plaintiff* | Thomas Spielbauer, Esq.<br>THE SPIELBAUER LAW FIRM<br>Spielbauer Law Firm<br>50 Airport Pkwy<br>San Jose, CA 95110<br>thomas@spielbauer.com<br>Ph: (408) 451-8499<br>Fax: (610) 423-1395<br>*Attorneys for Plaintiff* |
| John Sorich, Esq.<br>Adorno Yoss Alvarado & Smith<br>1 MacArthur Pl Ste. 200<br>Santa Ana, CA 92707<br>(714) 852-6800<br>(714) 852-6899 - FAX<br>*Attorneys for Chase Bank* | Edward A. Treder<br>Law Offices of<br>ROBERT E. WEISS INCORPORATED<br>920 S. Village Oaks Drive<br>Covina, CA 91724<br>(626) 967-4302 Ext. 139<br>(626) 339-7103 - FAX<br>(909) 322-9944 - Mobile<br>etreder@rewlaw.com<br>*Attorneys for NDEx West, LLC* |

**[XX]**   **VIA OVERNIGHT MAIL/COURIER -- CCP §§ 1013(c), 2015.5** (AS INDICATED IN ATTACHED SERVICE LIST) : By placing a true copy thereof enclosed in a sealed envelope, addressed as above, and placing each for collection by overnight mail service or overnight courier service. I am readily familiar with my firm's business practice of collection and processing of correspondence for mailing with the processing of correspondence for overnight mail or overnight courier service, and any correspondence placed for collection for overnight delivery would in the ordinary course of business, be delivered to an authorized courier or delivery authorized by the overnight mail carrier to receive documents, with delivery fees paid or provided for, that same day for delivery on the following business day.

---

**BNC'S OPPOSITION PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

[ ]    **VIA FIRST CLASS MAIL—CCP §§ 1013(a); 2015.5:** By placing a true copy thereof enclosed in a sealed envelope(s) addressed as above, and placing each for collection and mailing on the date following ordinary business practices.  I am readily familiar with my firm's business practice and collection and processing of mail with the United States Postal Service and correspondence placed for collection and mailing would be deposited with the United States Postal Service at Irvine, California, with postage thereon fully prepaid that same day in the ordinary course of business.

[ ]    **VIA FACSIMILE -- CCP §§ 1011, 2015.5:** By arranging for facsimile transmission from facsimile number (949) 679-1112 to the above listed facsimile number(s) prior to 5:00 p.m.  I am readily familiar with my firm's practice of collection and processing of correspondence via facsimile transmission(s) and any such correspondence would be transmitted in the ordinary course of business.  The facsimile transmission(s) was reported as complete and without error.

     I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.  Executed on March 10, 2008 at Irvine, California

Courtney Hershey

Dec 04 07 12:41p    Patrick Pulatie        925-522-0371        p.2

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

CREDITOR:
BNC MORTGAGE, INC.
P.O. BOX 19656
IRVINE, CA 92623-9656

[x] Preliminary  [ ] Final
DATE: 09/13/2004
LOAN NO.: ████8341
Type of Loan: 2 YEAR FIXED 1/7

BORROWERS: JAMES MOORE

ADDRESS: 1298 DUFFY WY
CITY/STATE/ZIP: BRENTWOOD, CA 94513
PROPERTY: 1298 DUFFY WY BRENTWOOD CA 94513

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.706 (e) % | $ 432,642.93 (q) | $ 271,807.46 (q) | $ 704,450.39 (q) |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING |
|---|---|---|---|---|---|---|---|---|
| 24 | $1,912.83 | 10/01/2004 | | | | | | |
| 335 | $1,901.41 | 12/01/2004 | | | | | | |
| 1 | $1,894.49 | 11/01/2004 | | | | | | |

DEMAND FEATURE: [X] This loan does not have a Demand Feature.  [ ] This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
[X] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at 1298 DUFFY WY BRENTWOOD CA 94513

ASSUMPTION: Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms
[ ] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES: $ 70.00

PROPERTY INSURANCE: [ ] Property hazard insurance in the amount of $0.00 with a mortgage clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender.
Hazard insurance [ ] is [X] is not available through the lender at an estimated cost of $0.00 for a year term.

LATE CHARGES: If your payment is more than 10 days late, you will be charged a late charge of 6.000 % of the overdue payment.

PREPAYMENT: If you pay off your loan early, you
[X] may [ ] will not have to pay a penalty.
[ ] may [X] will not be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate  * All of the numerical disclosures except the late fee disclosure are estimates.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

JAMES MOORE          BORROWER/DATE                    BORROWER/DATE

                     BORROWER/DATE                    BORROWER/DATE

VMP MORTGAGE FORMS - (800)521-7291          Page 1 of 2

EXHIBIT A                    PAGE 1 OF 1

**bncmortgage,inc**

COS0083 _Your_
MOORE, JAMES

1258 DUFFY WY
BRENTWOOD, CA 94513

## Loan Approval Modification Request Form

Original Loan Application Date: _____ Branch: _Cnn_

Date: _____ Requested By: _Travi_

**TYPE:**
- ☐ 6 Month 1/7
- ☐ 2 Year Fixed 1/7
- ☐ 3 Year Fixed 1/7
- ☐ 5 Year Fixed
- ☐ 15 Year Fixed
- ☐ 30 Year Fixed

**TERM:**
- ☐ 30/30
- ☐ 15/15
- ☐ 30/15

**PREPAYMENT PENALTY:**
- ☐ 1 yr.   ☐ 2 yr.   ☐ 3 yr.
- ☐ 4 yr.   ☐ 5 yr.
- ☐ None

**SUBJECT PROPERTY:**
- ☐ SFR
- ☐ Condo/PUD
- ☐ 2-4 Units

**OCCUPANCY STATUS:**
- ☐ Owner
- ☐ Non Owner
- ☐ Second Home

Loan Amount: 302,600
LTV: 00
Program: _D_
Appraised Value: $
Review Value:
Purchase Value: $
Rate: 0.000
Margin:
Points: ( 1.5 )
Debt Ratio: _____

Subordinate Financing: $ _____ _____ % $ _____ _____
                              Amount          CLTV            Payment        Maturity

Reasons for Requesting Modification: _Increase LTV to 95_ .

---

## Modified Approval Terms
### (Underwriting Department Utilization Only)

**TYPE:**
- ☐ 6 Month 1/7
- ☐ 2 Year Fixed 1/7
- ☐ 3 Year Fixed 1/7
- ☐ 5 Year Fixed
- ☐ 15 Year Fixed
- ☐ 30 Year Fixed

**TERM:**
- ☐ 30/30
- ☐ 15/15
- ☐ 30/15

**PREPAYMENT PENALTY:**
- ☐ 1 yr.   ☐ 2 yr.   ☐ 3 yr.
- ☐ 4 yr.   ☐ 5 yr.
- ☐ No

**SUBJECT PROPERTY:**
- ☐ SFR
- ☐ Condo/PUD
- ☐ 2-4 Units

**OCCUPANCY STATUS:**
- ☐ Owner
- ☐ Non Owner
- ☐ Second Home

Loan Amount: _____
LTV: _____
Program: _____
Appraised Value: $ _____
Review Value: _____
Purchase Value: $ _____
Rate: _____
Margin: _____
Points: _____
Debt Ratio: _____

Subordinate Financing: $ _____ _____ % $ _____ _____
                              Amount          CLTV            Payment        Maturity

Additional Conditions: (All conditions on the Conditional Final Approval Letter or Conditional Purchase Commitment REMAIN INTACT AND IN EFFECT)

1. _____
2. _____
3. _____

Date loan pricing expires: _____      Date loan approval expires: _____

Approved by: _____      Date: 9/23/04

Declined by: _____      Reasons for declination/modification: _____

Underwriter: _____      _____

Code #: _____      _____

Mod #: _____      _____

rev. 09.25.03

EXHIBIT B          PAGE 1 OF 1

08/17/2004 08:18AM  Wells Fargo Home Mortgage          PAGE 2 OF 4

472/  1207553/XP522/2/4/0000022405170

September 17, 2004

Attn Jed Grundy
949 348 3447                                    (800)985-5626

Mortgagor:           James E Moore
Property:            1258 Duffy Way
                     Brentwood CA 94513

FHA Case No. Sec: 042-7778836/000
472 Loan Number:    ████████
Loan Type:          FHA

THIS STATEMENT REFLECTS THE PAYOFF DATE YOU PROVIDED.  ALL FIGURES MUST
BE VERIFIED 24 HOURS PRIOR TO PAYOFF.  FOR YOUR CONVENIENCE, PLEASE USE
OUR VOICE RESPONSE SYSTEM AND SELECT OPTION 1, THEN OPTION 3.
ALL FIGURES SUBJECT TO FINAL VERIFICATION BY THE NOTEHOLDER.
ALL REMITTANCES MUST BE MADE BY CASHIER'S CHECK OR CERTIFIED FUNDS.

This loan is due for the August 01, 2004 payment.
Principal:
    Current total unpaid Principal Balance        $      218,954.70
Interest:
    Interest at  7.00000% from 07-01-04 to 10-01-04
                                                         3,827.92
Escrow Overdraft
Prorated Mortgage Insurance Due to HUD                   1,000.96
Unpaid Late Charges                                        179.44
Recording Fees                                             74.68
Fax Fee                                                      9.00
* * TOTAL AMOUNT TO PAY LOAN IN FULL * *                     5.00
                                               $      224,051.70

10F

Sep. 29 2004 12:19PM  P8/11          FAX NO. :             FROM :

EXHIBIT C                                    PAGE 1 OF 3

09/17/2004 08:18AM  Wells Fargo Home Mortgage            PAGE 3 OF 4

472/   1207553/XP522/3/4/0000022405170

Payoff - Page 3 - 472 Loan Number ▮▮▮▮▮

Timing of Last Payment:
This figure is accurate until October 01, 2004, or until any activity
occurs on the account.  Funds received after that date will be subject
to an additional $ 1,277.24 per Month.  If the payoff payment is
made 15 days beyond the current payment due date, a late charge of
$ 74.68 will be assessed.  Please add that amount to the payoff
total.

Escrow Disbursement Amounts & Dates:
Taxes                     $     1,338.94        03-23-04
Homeowners Insurance      $       798.00        02-17-04

Adjustments to Figures:  Figures may be adjusted if--
- additional mortgage insurance premiums become due, depending on payoff
  date
- escrow disbursements occur, requiring that additional funds are needed
  at payoff
- any check/draft previously credited is rejected by the institution
  upon which it is drawn

Unless you notify us otherwise, if you fail to remit sufficient funds
to pay your mortgage loan in full, we may, at our option, apply funds
from your escrow account to complete the payoff.  We must receive
funds to cover a deficiency on the following business day.  Interest
will continue to accrue until we receive full payment.

Borrower's Responsibilities:
Please do not place a stop payment on any monthly payment already made.
Any overpayment will be refunded to you.

Escrow disbursements will continue to be made as they become due.

In order to record the payoff of this loan with your county, any funds
previously received may not be rejected by the institution upon which
they are drawn.

EXHIBIT C                    PAGE 2 OF 3

09/17/2004 08:18AM  Wells Fargo Home Mortgage          PAGE 4 OF 4

472/   1207553/XP523/4/4/0000022405170

 WELLS HOME

PAYOFF TRANSMITTAL FORM
The attached coupon must accompany the payoff funds to ensure proper
processing and forwarding of future documentation.  If wiring the
funds and the mailing address is changing, please fax this form to
(515) 237-7014 to ensure proper forwarding of future documentation.

472 Loan Number ▓▓▓7553
James E Moore
1258 Duffy Way
Brentwood CA 94513

WHERE TO SEND PAYOFF FUNDS
By Wire:
Wells Fargo Bank, N.A.                    By Overnight:
Beneficiary Bank ABA: 121000248           Wells Fargo Home Mortgage
Beneficiary Bank Acct: 0007028209         Attn: Payoffs, MAC X2501-01D
Special Information for Beneficiary:      1 Home Campus
Apply funds to loan: 1207553              Des Moines  IA  50328
Mortgagor: James E Moore
Sender's Name and Phone Number

FUNDS MUST BE RECEIVED BY 2 P.M. CENTRAL TIME FOR SAME-DAY PROCESSING
PAYOFFS ARE NOT POSTED ON WEEKENDS OR HOLIDAYS.  INTEREST WILL BE
ADDED TO THE ACCOUNT FOR THESE DAYS.
ALL FIGURES ARE SUBJECT TO FINAL VERIFICATION BY THE NOTEHOLDER
ALL REMITTANCES MUST BE MADE BY CASHIER'S CHECK OR CERTIFIED FUNDS.

CHANGE OF ADDRESS/NEW MAILING ADDRESS
Please type or print below.  This ensures receipt of the escrow
balance, year-end interest statement, and all other applicable
documentation.

- - - - - - - - - - Please detach and include with payoff. - - - - - - - - -
- - - - - - - - - - - - - PAYOFF COUPON - - - - - - - - - - - - - - - - - -
James E Moore
1258 Duffy Way
Brentwood CA 94513
472 Loan Number: ▓▓▓▓▓▓▓       .

                              TOTAL PAYOFF AMOUNT $ 224,051.70
                              THIS FIGURE IS ACCURATE UNTIL 10-01-04

Wells Fargo Home Mortgage        AMOUNT REMITTED  _____
ATTN: PAYOFFS, MAC X2501-01D
1 HOME CAMPUS                    New Mailing Address:
DES MOINES, IA 50328
                                 Street  _____

                                 City/State/ZIP _____

FROM :          FAX NO. :          Sep. 29 2004 12:19PM  P10/11

EXHIBIT C                                    PAGE 3 OF 3

Irwin Home Equity Co 8/16/04    11:15   PAGE 4/4    RightFAX

PAYOFF DEPARTMENT
1-800-839-6600
FAX: 1-925-358-0294

XP102/RD5

Irwin Home Equity Co 9/16/04    11:15    PAGE 3/4    RightFAX

PAYOFF STATEMENT (page 2)                    Loan No:     ███████3768

RE:
James E. Moore                               Property Address:
1258 Duffy WY                                1258 Duffy Wy
Brentwood CA 94513

Principal Balance:
Interest at 18.15000%                                    $    44,792.35
Prepayment Penalty/Early Closure Fee                          1,122.84
Demand Fee                                                    3,248.16
Reconveyance Fee                                                 30.00
Miscellaneous                                                      .00
Recording Fee                                                     9.00

Total Payoff good until 10-15-04                        $     49,202.35

If payoff is not received by October 15, 2004 an additional $ 22.27
interest per Day will be due.

These figures are subject to final verification by us. Figures may be
adjusted for transactions in transit as well as for funds previously
received which are returned unpaid by the institution upon which they
were drawn.

THIS LOAN IS NOT ASSUMABLE.

Issuance of this statement does not suspend the contract requirement to
make the mortgage payments when due.

Next payment due September 25, 2004 $ 688.24

A late charge of $ 34.41 will be assessed 15 days after the
payment due data and should be included with the payoff if it is
received after that date.

Sep. 29 2004 12:19PM P6/11          FAX NO. :          FROM :

EXHIBIT D                                          PAGE 2 OF 2

LandAmerica/BNC MORTGAGE .C                                    Page 1 of 10

## INFO1 ™

| REGIONAL OFFICE: | LandAmerica |
| | 2445 Fire Mesa Dr |
| | Las Vegas, NV 89128 |
| | (800)480-2919  (800)215-6633 |

| FOR: 2376S | |
| BNC MORTGAGE INC | INFILE EFX/TRW/TU 7.50 |
| 1901 MAIN STREET | TOTAL 7.50 |
| IRVINE, CA 92614 | |

| Report No. | Date Ordered | Requested By | Loan Number | Prepared By | Date Completed | Date Revised |
|---|---|---|---|---|---|---|
| 06-8355356 | 09/14/04 | CREDIT MAN | ⬛8341 | | 09/14/04 | |
| Repositories | Infile Date | Property Address | | | | |
| EFX/TUC/XPN | 09/14/04 | | | | | |

| APPLICANT | | SPOUSE |
|---|---|---|
| MOORE, JAMES | Name  SSN/DOB | |
| Marital Status: Not Disclosed | Number of Dependents (including self): 0 | |

Current Address: 1258 DUFFY WY , BRENTWOOD, CA 94513

### RISK SCORING RESULTS

For: MOORE, JAMES E ⬛
XPN Fair, Isaac Risk Score: 515
Comments: 38 Serious delinquency and public record or collection filed
          13 Length of time (or unknown time) since account delinquent
          18 Number of accounts delinquent
          20 Length of time since legal item filed or collection item reported

For: MOORE, JAMES E ⬛
TUC Empirica Score: 536
Comments: 038 Serious delinquency, and public record or collection filed
          018 Frequent delinquency
          002 Level of delinquency on accounts
          020 Recent derogatory public record or collection

For: MOORE, JIM EDWARD ⬛
EFX Beacon 96 Score: 506
Comments: 00038 Serious delinquency, and derogatory public record or collection filed
          00034 Amount owed on delinquent accounts
          00020 Length of time since derogatory public record or collection is too short
          00013 Time since delinquency is too recent or unknown

THE SCORE RANGE FOR THE MODELS USED TO SCORE YOUR CREDIT IS 300 - 850

| CREDIT HISTORY | | | | | | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|---|---|---|
| WELLS FARGO HOME MTG ⬛ | | | Status: 30 Days Late M -2 | | | | | | |
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 03/02 | | Hi Credit: $224477 | | | 28 | 10 | 0 | 0 |
| Whose: Individual | Date Rptd: 09/04 | | Balance: $218954 | | | | | | |
| Terms: 360MOS-$1867 | Last Payment: 08/04 | | Past Due: $1866 | | | | | | |
| Comments: | | | | | | | | | |
| Prior Adverse Ratings: 08/04-2, 06/04-2, 05/04-2, 04/04-2, 12/03-2, 11/03-2, 10/03-2, | | | | | | | | | |
| 10/02-2, 09/02-2 | | | | | | | | | |
| Fha Real Estate Loan | | | | | | | | | |

| IRWIN HOME EQUITY ⬛ | Status: As Agreed M -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|

file://\\eastern\eastern\InfoOne\Receive\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.HTM

9/14/2004

LandAmerica/BNC MORTGAG. NC                                    Page 2 of 10

| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 09/02 | Hi Credit: $45000 | 21 | 2 | 0 | 0 |
|---|---|---|---|---|---|---|
| Whose: Individual | Date Rptd: 08/04 | Balance: $44802 | | | | |
| Terms: 300MOS-$688 | Last Payment: 08/04 | Past Due: $0 | | | | |

Comments:
Prior Adverse Ratings: 05/04-2, 04/04-2, 03/04-8
Real Estate Mortgage - With Or Without Other Collateral, Usually A Second Mortga 39
ACCOUNT WAS FORECLOSURE

| CAPITAL ONE BANK | | Status: As Agreed R -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 04/98 | Hi Credit: $870 | 77 | 4 | 3 | 0 |
| Whose: Joint | Date Rptd: 08/04 | Balance: $492 | | | | |
| Terms: Rev-$15 | Last Payment: 08/04 | Past Due: $0 | | | | |

Comments:
Prior Adverse Ratings: 07/03-2, 06/03-2, 05/03-2, 12/02-3, 11/02-3, 09/02-3, 08/02-2
Credit Card, Terms REV

| CBSJ FINANCIAL CORP. | | Status: Collection O -9 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 04/04 | Hi Credit: $152 | 5 | - | - | - |
| Whose: Individual | Date Rptd: 08/04 | Balance: $152 | | | | |
| Terms: Open- | Last Payment: 04/03 | Past Due: $0 | | | | |

Comments:
Collection
Collection Department/Agency/Attorney
Original Creditor: MEDICAL PAYMENT DATA

| AMER GEN FIN | | Status: As Agreed I -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source: TUC-1 | Date Opened: 08/94 | Hi Credit: $2896 | 1 | 0 | 0 | 0 |
| Whose: Joint | Date Rptd: 06/96 | Balance: $0 | | | | |
| Terms: $102 | Last Payment: 05/96 | Past Due: $0 | | | | |

Comments:
Refinanced
Installment Sales Contract
ACCT CLOSED

| AMERICAN GENERAL FIN | | Status: As Agreed I -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 06/96 | Hi Credit: $2740 | 10 | 0 | 0 | 0 |
| Whose: Joint | Date Rptd: 03/97 | Balance: $0 | | | | |
| Terms: 24MOS-$113 | Last Payment: 03/97 | Past Due: $0 | | | | |

Comments:
Paid
Auto Loan

| AMERICAN GENERAL FIN | | Status: As Agreed I -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 05/98 | Hi Credit: $2444 | 17 | 0 | 0 | 0 |
| Whose: Joint | Date Rptd: 09/99 | Balance: $0 | | | | |
| Terms: 24MOS-$126 | Last Payment: 09/99 | Past Due: $0 | | | | |

Comments:
Paid
Auto Loan

| BENEFICIAL/HFC | | Status: As Agreed R -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source: XPN-1 | Date Opened: 12/90 | Hi Credit: | 66 | 0 | 0 | 0 |
| Whose: Individual | Date Rptd: 05/96 | Balance: $0 | | | | |
| Terms: Rev- | Last Payment: 04/94 | Past Due: $0 | | | | |

Comments:
Revolving Charge Account

| CBT ASPIRE | | Status: As Agreed R -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|

LandAmerica/BNC MORTGAG_ _NC

| | | |
|---|---|---|
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 01/01 | Hi Credit: $2123 | 43 | - | - | - |
| Whose: Individual | Date Rptd: 08/04 | Balance: $0 |
| Terms: Rev- | Last Payment: 11/03 | Past Due: $0 |

Comments:
Prior Adverse Ratings: 11/03-2, 03/03-4, 02/03-3, 01/03-2, 10/02-3, 09/02-2
Settled
Credit Card, Terms REV
ELECTION OF REMEDY
SETTLEMENT ACCEPTED ON THIS ACCOUNT

**CHASE RECEIVABLES**

| | | Status: Collection O -9 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 04/04 | Hi Credit: $243 | 2 | - | - | - |
| Whose: Individual | Date Rptd: 07/04 | Balance: $0 |
| Terms: Open- | Last Payment: 06/04 | Past Due: $0 |

Comments:
Paid Collection
Collection Department/Agency/Attorney
Original Creditor: MEDICAL PAYMENT DATA

**FIRST USA BANK N A**

| | | Status: As Agreed R -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 09/01 | Hi Credit: $1256 | 32 | 3 | 2 | 2 |
| Whose: Individual | Date Rptd: 04/04 | Balance: $0 |
| Terms: Rev- | Last Payment: 04/04 | Past Due: $0 |

Comments:
Prior Adverse Ratings: 05/03-2, 02/03-4, 01/03-3, 12/02-2, 09/02-3, 08/02-2, 10/01-4
Paid
Credit Card, Terms REV
ACCT CLOSED BY GRANTOR

**MEGA/JC PENNEY**

| | | Status: As Agreed R -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source: XPN-1 | Date Opened: 05/90 | Hi Credit: $187 | 72 | 0 | 0 | 0 |
| Whose: Individual | Date Rptd: 04/96 | Balance: $0 |
| Terms: Rev- | Last Payment: 04/92 | Past Due: $0 |

Comments:
Revolving Charge Account
ACCT CLOSED BY GRANTOR

**PROVIDIAN FINANCIAL**

| | | Status: As Agreed R -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 10/99 | Hi Credit: $6587 | 52 | 1 | 1 | 4 |
| Whose: Individual | Date Rptd: 02/04 | Balance: $0 |
| Terms: Rev- | Last Payment: 02/04 | Past Due: $0 |

Comments:
Prior Adverse Ratings: 12/03-5, 11/03-5, 10/03-5, 09/03-5, 08/03-4, 07/03-3, 06/03-2
Paid
Credit Card, Terms REV
ACCT CLOSED BY CONSUMER

**PROVIDIAN FINANCIAL**

| | | Status: 120 Days Lt R -5 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 04/99 | Hi Credit: $6371 | 56 | 2 | 1 | 4 |
| Whose: Individual | Date Rptd: 11/03 | Balance: $0 |
| Terms: Rev-$1917 | Last Payment: 11/03 | Past Due: $0 |

Comments:
Prior Adverse Ratings: 10/03-5, 09/03-5, 08/03-5, 07/03-4, 06/03-3, 05/03-2, 12/02-2
Credit Card, Terms REV
ACCT CLOSED
ACCOUNT TRANSFERRED
PURCHASED BY ANOTHER LENDER

**RNB - TARGET**

| | Status: As Agreed R -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|

LandAmerica/BNC MORTGAGE  C

| | | | | |
|---|---|---|---|---|
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 12/99 | Hi Credit: $714 | 57 | 0 | 0 | 0 |
| Whose: Joint | Date Rptd: 08/04 | Balance: $0 | | | | |
| Terms: Rev- | Last Payment: 10/01 | Past Due: $0 | | | | |

Comments:
Revolving Charge Account
ACCT CLOSED BY CONSUMER

**RNB-TGTVISA**

| | | Status: Not Rated R -0 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 12/99 | Hi Credit: $5375 | 34 | - | - | - |
| Whose: Joint | Date Rptd: 09/04 | Balance: $0 | | | | |
| Terms: Rev- | Last Payment: 11/03 | Past Due: $0 | | | | |

Comments:
Prior Adverse Ratings: 11/03-5, 10/03-4, 09/03-3, 08/03-2, 08/02-2
Settled
Credit Card, Terms REV
ELECTION OF REMEDY
SETTLEMENT ACCEPTED ON THIS ACCOUNT

**WFS FINANCIAL**

| | | Status: As Agreed I -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 12/00 | Hi Credit: $21658 | 22 | 0 | 0 | 0 |
| Whose: Individual | Date Rptd: 10/02 | Balance: $0 | | | | |
| Terms: 72MOS-$429 | Last Payment: 09/02 | Past Due: $0 | | | | |

Comments:
Auto Loan

## PUBLIC RECORDS

None Generated

## INQUIRIES

```
EFX/INQUIRY: 09/09/0ZB180ZB07452    CHASE CREDIT RESEARCH
EFX/INQUIRY: 09/06/0ZB180ZB07452    CHASE CREDIT RESEARCH
XPN INQUIRY: 08/31/04  FR3996926    CREDCO
TUC INQUIRY: 08/31/04  Z08257007    FAC
EFX INQUIRY: 08/31/0ZB181ZB06073    FAC/SAN
EFX INQUIRY: 08/31/0RZ236RZ01180    YOURENERGY
EFX INQUIRY: 08/30/0ZB181ZB03138    FAC-SCM
EFX INQUIRY: 08/30/0FP234FP13425    AM GEN FIN
TUC/INQUIRY: 08/25/04 FM08257261    FAC/FREMONTA
EFX INQUIRY: 08/25/0ZB181ZB03278    FACFRMNT
EFX/INQUIRY: 08/04/0FR447ZB01259    NATIONAL MORTGAGE REPO
TUC INQUIRY: 08/04/04  F02817041    NMR
XPN INQUIRY: 07/26/04  FR1972921    RELS REPORTING
```

## VARIATIONS

```
***** XPN-1 *****
JAMES E MOORE SSN:          DOB:
Also Known As: JIM E MOORE
Also Known As: JAMES E MOORE J
Current Address: 1258 DUFFY WAY, BRENTWOOD CA 945131214     1/ 3
Previous Address: 3193 CASTRO VALLEY BLVD SPC 18, CASTRO VALLEY CA 945466531   11/ 1
Previous Address: 3913 CASTRO VALLEY BLVD SPC 18, CASTRO VALLEY CA 945466035    2/ 1
Employer: WESTPACK ARCITECTURAL   8/ 4
Employer: WEST PAC  11/ 3
Infile Date: 09/14/2004

***** TUC-1 *****
JAMES E MOORE SSN:          DOB:
Current Address: 1258 DUFFY WY, BRENTWOOD CA 94513     3/ 2
Previous Address: 3913 CASTRO VALLEY BL, CASTRO VALLEY CA 94546    5/ 0
Previous Address: 3193 CASTRO VALLEY SPC BV, CASTRO VALLEY CA 94546
```

file:/\\eastern\eastern\InfoOne\Receive\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.HTM

9/14/2004

LandAmerica/BNC MORTGAGE IC

Employer: WESTPACK ARCITECTUR   8/ 4
Infile Date: 09/14/2004
Infile Since: 11/01/1989
OFAC ALERT: CLEAR

***** EFX-1 *****
JIM EDWARD MOORE SSN:          DOB:
SAFESCANNED: Your inquiry has gone through our SAFESCAN data base
SSN          ISSUE YEAR: 1972, STATE: CA
Also Known As: JAMES E MOORE
Current Address: 1258 DUFFY WAY, BRENTWOOD CA 94513    3/ 2
Previous Address: 3913 CASTRO VALLEY BLVD SPC 18, CASTRO VALLEY CA 94546    3/ 1
Previous Address: 3193 CASTRO VALLEY BLVD SPC 18, CASTRO VALLEY CA 94546    12/ 0
Employer: AMERICAN FUMIGATIONS
Employer: ALAMEDA COUNTY, HAYWARD CA
Infile Date: 09/14/2004
Infile Since: 07/07/1989

---

### ADDITIONAL INFORMATION

Consumer Referral:
EXPERIAN
701 EXPERIAN PARKWAY
PO BOX 2002
ALLEN, TX 75013
8883973742

Consumer Referral:
TRANS UNION
2 BALDWIN PLACE, P. O. BOX 1000
CHESTER, PA. 19022
800-888-4213

Consumer Referral:
EQUIFAX INFORMATION SERVICES LLC
P O BOX 740241
ATLANTA, GA 303740241
800-685-1111

---

### CREDITOR CONTACT INFORMATION

AMERICAN GENERAL FIN  234FP13425
  98-1254 KAAHUMANU STREET, PEARL CITY, HI  96782 (808)487-0011
AMERICAN GENERAL FINAN  3599027
  3100 MOWRY AVE STE 101, FREMONT, CA  94538 (510)793-6340
BENEFICIAL/HFC  1521730
  2700 SANDERS RD, PROSPECT HEIGHTS, IL  60070
CAPITAL ONE BANK  1270246
  PO BOX 85520, RICHMOND, VA  23285
CBSJ FINANCIAL CORP.  3980320
  299 STOCKTON AVE, SAN JOSE, CA  95126 (408)297-7000
CBT ASPIRE  1209070
  PO BOX 105555, ATLANTA, GA  30348
CHASE RECEIVABLES  3980584
  1247 BROADWAY, SONOMA, CA  95476 (707)933-3600
CREDCO  3996926
  12395 FIRST AMERICAN WAY, POWAY, CA  92064 (800)637-2422
FIRST USA BANK N A  1260958
  1001 JEFFERSON PLAZA, WILMINGTON, DE  19701 (800)955-9900
IRWIN HOME EQUITY  3510710
  12677 ALCOSTA BLVD STE 5, SAN RAMON, CA  94583 (925)277-2001
MBGA/JC PENNEY  3321860
  PO BOX 981131, EL PASO, TX  79998 (800)527-4403

file://\\eastern\eastern\InfoOne\Receive\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.HTM

9/14/2004

LandAmerica/BNC MORTGAGE, NC

```
PROVIDIAN  163BB30388
   P.O. BOX 9007, PLEASANTON, CA  94566
PROVIDIAN FINANCIAL  3208460
   PO BOX 9180, PLEASANTON, CA  94566
RELS REPORTING  1972921
   12395 FIRST AMERICAN WAY, POWAY, CA  92064 (866)646-8448
RNB - TARGET  2390511
   PO BOX 9745, MINNEAPOLIS, MN  55440
RNB TARGET  2218220
   PO BOX 9475, MINNEAPOLIS, MN  55440
THE LAVENNIS COMPANY  236RZ01180
   11500 SUNRISE GOLD CIRCLE # D, DBA YOUR ENERGY SOURCE, RANCHO CORDOVA, CA  95742
   (916)861-7800

WELLS FARGO HOME MTG I  2990864
   405 SW 5TH ST, DES MOINES, IA  50309
WFS FINANCIAL  3828796
   PO BOX 19752, IRVINE, CA  92623
```

## SSN CHECK RESULTS

```
For: MOORE, JAMES E
EXPERIAN REPORTS THE FOLLOWING INFORMATION:
FIRST POSSIBLE SSN YEAR: 1972, LAST POSSIBLE SSN YEAR: 1974

For: MOORE, JAMES E
TRANSUNION REPORTS THE FOLLOWING INFORMATION:
SSN MATCH: DIFFERENCE OF 1 DIGIT BETWEEN SSN ON INPUT AND SSN ON FILE
TRANSALERT: INQUIRIES IN PAST 60 DAYS: 5
TRANSALERT: SSN ALERT: MISMATCH - INPUT DOES NOT MATCH FILE
HAWK ALERT DELIVERED
HAWK ALERT: FILE PREVIOUS ADDRESS IS REPORTED USED IN TRUE-NAME FRAUD OR CREDIT FRAUD
INPUT SSN ISSUED:  YEAR ISSUED: 1973-0000; STATE: CA;
FILE SSN ISSUED:  YEAR ISSUED: 1973-0000; STATE: CA; EST AGE OBTAINED: 02-03;
OFAC ALERT: CLEAR

For: MOORE, JIM EDWARD
EQUIFAX REPORTS THE FOLLOWING INFORMATION:
SAFESCANNED: Your inquiry has gone through our SAFESCAN data base
SSN           ISSUE YEAR: 1972, STATE: CA
```

### Credit Summary

| ACCT TYPE | NBR | W/BAL | BALANCES | PAYMENTS | PAST DUE | 30 | 60 | 90+ | LAST P/D |
|---|---|---|---|---|---|---|---|---|---|
| REAL ESTATE | 2 | 2 | $263756 | $2555 | $1866 | 12 | 0 | 0 | |
| INSTALLMENT | 4 | 0 | $0 | $0 | $0 | 0 | 0 | 0 | |
| REVOLVING | 9 | 2 | $492 | $15 | $0 | 10 | 7 | 10 | |
| COLLECTION | 0 | | $0 | $0 | $0 | – | – | – | |
| OTHER | 2 | 2 | $152 | $0 | $0 | 0 | 0 | 0 | |
| | | | | | | | | | |
| TOTAL | 17 | 4 | $264400 | $2570 | $1866 | 22 | 7 | 10 | |

Revolving Credit Available: 94%of $8368

```
Accounts paid as agreed:          12     Public Records Breakdown
Accounts currently delinquent: 4          Liens:         0
All delinquent accounts:         10       Judgements:    0
Inquiries:                       13       Foreclosures: 0
Public records:                   0       Bankruptcies: 0
                                          Other:         0
```

**** End of Report 09/14/04  04:15PM ****

file://\\eastern\eastern\InfoOne\Receive\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.HTM

LandAmerica/BNC MORTGAG. NC 

# ADVERSE SUMMARY

| REGIONAL OFFICE: | LandAmerica |
| --- | --- |
| | 2445 Fire Mesa Dr |
| | Las Vegas, NV 89128 (800)480-2919 (800)215-6633 |

**FOR: 2376S**
BNC MORTGAGE INC
1901 MAIN STREET
IRVINE, CA 92614

INFILE EFX/TRW/TU 7.50
TOTAL 7.50

| Report No. 06-8355356 | Date Ordered 09/14/04 | Requested By CREDIT MAN | Loan Number ▮▮9341 | Prepared By | Date Completed 09/14/04 | Date Revised |
| --- | --- | --- | --- | --- | --- | --- |
| Repositories EFX/TUC/XPN | Infile Date 09/14/04 | Property Address | | | | |

## APPLICANT

| MOORE, JAMES | | SPOUSE |
| --- | --- | --- |
| | Name  SSN/DOB | |
| Marital Status: Not Disclosed | Number of Dependents (Including self): 0 | |

Current Address: 1258 DUFFY WY , BRENTWOOD, CA 94513

## ADVERSE CREDIT HISTORY

| WELLS FARGO HOME MTG | | Status: 30 Days Late M −2 | MR | 30+ | 60+ | 90+ |
| --- | --- | --- | --- | --- | --- | --- |
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 03/02 | Hi Credit: $224477 | 28 | 10 | 0 | 0 |
| Whose: Individual | Date Rptd: 09/04 | Balance: $218954 | | | | |
| Terms: 360MOS-$1867 | Last Payment: 08/04 | Past Due: $1866 | | | | |

Comments:
Prior Adverse Ratings: 08/04-2, 06/04-2, 05/04-2, 04/04-2, 12/03-2, 11/03-2, 10/03-2,
10/02-2, 09/02-2
Fha Real Estate Loan

| IRWIN HOME EQUITY | | Status: As Agreed M −1 | MR | 30+ | 60+ | 90+ |
| --- | --- | --- | --- | --- | --- | --- |
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 09/02 | Hi Credit: $45000 | 21 | 2 | 0 | 0 |
| Whose: Individual | Date Rptd: 08/04 | Balance: $44802 | | | | |
| Terms: 300MOS-$688 | Last Payment: 08/04 | Past Due: $0 | | | | |

Comments:
Prior Adverse Ratings: 05/04-2, 04/04-2, 03/04-8
Real Estate Mortgage − With Or Without Other Collateral, Usually A Second Mortga 39
ACCOUNT WAS FORECLOSURE

| CAPITAL ONE BANK | | Status: As Agreed R −1 | MR | 30+ | 60+ | 90+ |
| --- | --- | --- | --- | --- | --- | --- |
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 04/98 | Hi Credit: $870 | 77 | 4 | 3 | 0 |
| Whose: Joint | Date Rptd: 08/04 | Balance: $492 | | | | |
| Terms: Rev-$15 | Last Payment: 08/04 | Past Due: $0 | | | | |

Comments:
Prior Adverse Ratings: 07/03-2, 06/03-2, 05/03-2, 12/02-3, 11/02-3, 09/02-3, 08/02-2
Credit Card, Terms REV

| CBSJ FINANCIAL CORP. | | Status: Collection O −9 | MR | 30+ | 60+ | 90+ |
| --- | --- | --- | --- | --- | --- | --- |
| Source: EFX-1/TUC-1/XPN-1 | Date Opened: 04/04 | Hi Credit: $152 | 5 | − | − | − |
| Whose: Individual | Date Rptd: 08/04 | Balance: $152 | | | | |
| Terms: Open− | Last Payment: 04/03 | Past Due: $0 | | | | |

Comments:
Collection
Collection Department/Agency/Attorney
Original Creditor: MEDICAL PAYMENT DATA

file://\\eastern\eastern\InfoOne\Receive\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.HTM

9/14/2004

LandAmerica/BNC MORTGAGE IC

| CBT ASPIRE ▋▋▋ ● ▋ R -1 | | Status:  As Agre ● R -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source:  EFX-1/TUC-1/XPN-1 | Date Opened:  01/01 | Hi Credit:     $2123 | 43 | -- | -- | -- |
| Whose:   Individual | Date Rptd:   08/04 | Balance:         $0 | | | | |
| Terms:   Rev- | Last Payment: 11/03 | Past Due:        $0 | | | | |

Comments:
Prior Adverse Ratings: 11/03-2, 03/03-4, 02/03-3, 01/03-2, 10/02-3, 09/02-2
Settled
Credit Card, Terms REV
ELECTION OF REMEDY
SETTLEMENT ACCEPTED ON THIS ACCOUNT

| CHASE RECEIVABLES ▋▋▋ | | Status:  Collection O -9 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source:  EFX-1/TUC-1/XPN-1 | Date Opened:  04/04 | Hi Credit:      $243 | 2 | -- | -- | -- |
| Whose:   Individual | Date Rptd:   07/04 | Balance:         $0 | | | | |
| Terms:   Open- | Last Payment: 06/04 | Past Due:        $0 | | | | |

Comments:
Paid Collection
Collection Department/Agency/Attorney
Original Creditor: MEDICAL PAYMENT DATA

| FIRST USA BANK N A | | Status:  As Agreed R -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source:  EFX-1/TUC-1/XPN-1 | Date Opened:  09/01 | Hi Credit:     $1256 | 32 | 3 | 2 | 2 |
| Whose:   Individual | Date Rptd:   04/04 | Balance:         $0 | | | | |
| Terms:   Rev- | Last Payment: 04/04 | Past Due:        $0 | | | | |

Comments:
Prior Adverse Ratings: 05/03-2, 02/03-4, 01/03-3, 12/02-2, 09/02-3, 08/02-2, 10/01-4
Paid
Credit Card, Terms REV
ACCT CLOSED BY GRANTOR

| PROVIDIAN FINANCIAL ▋▋▋ | | Status:  As Agreed R -1 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source:  EFX-1/TUC-1/XPN-1 | Date Opened:  10/99 | Hi Credit:     $6587 | 52 | 1 | 1 | 4 |
| Whose:   Individual | Date Rptd:   02/04 | Balance:         $0 | | | | |
| Terms:   Rev- | Last Payment: 02/04 | Past Due:        $0 | | | | |

Comments:
Prior Adverse Ratings: 12/03-5, 11/03-5, 10/03-5, 09/03-5, 08/03-4, 07/03-3, 06/03-2
Paid
Credit Card, Terms REV
ACCT CLOSED BY CONSUMER

| PROVIDIAN FINANCIAL ▋▋▋ | | Status:  120 Days Lt R -5 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source:  EFX-1/TUC-1/XPN-1 | Date Opened:  04/99 | Hi Credit:     $6371 | 56 | 2 | 1 | 4 |
| Whose:   Individual | Date Rptd:   11/03 | Balance:         $0 | | | | |
| Terms:   Rev-$1917 | Last Payment: 11/03 | Past Due:        $0 | | | | |

Comments:
Prior Adverse Ratings: 10/03-5, 09/03-5, 08/03-5, 07/03-4, 06/03-3, 05/03-2, 12/02-2
Credit Card, Terms REV
ACCT CLOSED
ACCOUNT TRANSFERRED
PURCHASED BY ANOTHER LENDER

| RNB-TGTVISA ▋▋▋ | | Status:  Not Rated R -0 | MR | 30+ | 60+ | 90+ |
|---|---|---|---|---|---|---|
| Source:  EFX-1/TUC-1/XPN-1 | Date Opened:  12/99 | Hi Credit:     $5375 | 34 | -- | -- | -- |
| Whose:   Joint | Date Rptd:   09/04 | Balance:         $0 | | | | |
| Terms:   Rev- | Last Payment: 11/03 | Past Due:        $0 | | | | |

Comments:
Prior Adverse Ratings: 11/03-5, 10/03-4, 09/03-3, 08/03-2, 08/02-2
Settled
Credit Card, Terms REV

file://\\eastern\eastern\InfoOne\Receive\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.HTM

**TRUTH-IN-LENDING DISCLOSURE STATEMENT**
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

CREDITOR:
　　BNC MORTGAGE, INC.
　　P.O. BOX 19656
　　IRVINE, CA 92623-9656
BORROWERS: JAMES E. MOORE

　　　　　　　　　　　Preliminary　　X　Final
DATE: 09/23/2004
LOAN NO.: ████8341
Type of Loan: 2 YEAR FIXED 1/7

ADDRESS: 1258 DUFFY WY
CITY/STATE/ZIP: BRENTWOOD, CA 94513
PROPERTY: 1258 DUFFY WY BRENTWOOD CA 94513

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 9.186 (e) % | $ 577,381.07 (e) | $ 293,180.58 (e) | $ 870,561.65 (e) |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE monthly BEGINNING |
|---|---|---|---|---|---|
| 24 | $2,268.02 | 11/01/2004 | | | |
| 335 | $2,428.98 | 11/01/2006 | | | |
| 1 | $2,420.87 | 10/01/2034 | | | |

DEMAND FEATURE: [X] This loan does not have a Demand Feature. [ ] This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE:
[X] This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at: 1258 DUFFY WY BRENTWOOD CA 94513

ASSUMPTION: Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms [ ] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES: $ 70.00

PROPERTY INSURANCE: [ ] Property hazard insurance in the amount of $0.00 with a mortgage clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender. Hazard Insurance [ ] is [X] is not available through the lender at an estimated cost of $0.00 for a ____ year term.

LATE CHARGES: If your payment is more than 10 days late, you will be charged a late charge of 6.000 % of the overdue payment.

PREPAYMENT: If you pay off your loan early, you
[X] may [ ] will not    have to pay a penalty.
[ ] may [X] will not    be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.
e means estimate . All of the numerical disclosures except the late fee disclosure are estimates.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_Jas E Moo_　　　　　9-24-04
JAMES E. MOORE　　　　BORROWER/DATE

　　　　　　　　　　BORROWER/DATE

　　　　　　　　　　BORROWER/DATE

　　　　　　　　　　BORROWER/DATE

　　　　　　　　　　BORROWER/DATE

 

## DEFINITION OF TRUTH-IN-LENDING TERMS

### ANNUAL PERCENTAGE RATE

This is not the Note rate for which the borrower applied. The Annual Percentage Rate (APR) is the cost of the loan in percentage terms taking into account various loan charges of which interest is only one such charge. Other charges which are used in calculation of the Annual Percentage Rate are Private Mortgage Insurance or FHA Mortgage Insurance Premium (when applicable) and Prepaid Finance Charges (loan discount, origination fees, prepaid interest and other credit costs). The APR is calculated by spreading these charges over the life of the loan which results in a rate generally higher than the interest rate shown on your Mortgage/Deed of Trust Note. If interest was the only Finance Charge, then the interest rate and the Annual Percentage Rate would be the same.

### PREPAID FINANCE CHARGES

Prepaid Finance Charges are certain charges made in connection with the loan and which must be paid upon the close of the loan. These charges are defined by the Federal Reserve Board in Regulation Z and the charges must be paid by the borrower. Non-inclusive examples of such charges are: Loan origination fee, "Points" or Discount, Private Mortgage Insurance or FHA Mortgage Insurance, Tax Service Fee. Some loan charges are specifically excluded from the Prepaid Finance Charge such as appraisal fees and credit report fees.

Prepaid Finance Charges are totaled and then subtracted from the Loan Amount (the face amount of the Deed of Trust/Mortgage Note). The net figure is the Amount Financed as explained below.

### FINANCE CHARGE

The amount of interest, prepaid finance charge and certain insurance premiums (if any) which the borrower will be expected to pay over the life of the loan.

### AMOUNT FINANCED

The Amount Financed is the loan amount applied for less the prepaid finance charges. Prepaid finance charges can be found on the Good Faith Estimate/Settlement Statement (HUD-1 or 1A). For example if the borrower's note is for $100,000 and the Prepaid Finance Charges total $5,000, the Amount Financed would be $95,000. The Amount Financed is the figure on which the Annual Percentage Rate is based.

### TOTAL OF PAYMENTS

This figure represents the total of all payments made toward principal, interest and mortgage insurance (if applicable).

### PAYMENT SCHEDULE

The dollar figures in the Payment Schedule represent principal, interest, plus Private Mortgage Insurance (if applicable). These figures will not reflect taxes and insurance escrows or any temporary buydown payments contributed by the seller.



**ADJUSTABLE RATE NOTE**
(LIBOR 6-Month Index-Rate Caps)

Loan No.: 8341

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

September 23, 2004          IRVINE          CALIFORNIA
[Date]                     [City]          [State]

1258 DUFFY WY, BRENTWOOD, CA 94513
[Property Address]

**1. BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $ 302,600.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is BNC MORTGAGE, INC., A DELAWARE CORPORATION . I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 8.225 %. The interest rate I will pay will change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**
(A) Time and Place of Payments
I will pay principal and interest by making payments every month. I will make my monthly payments on the first day of each month beginning on November 1, 2004 .
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on October 1, 2034 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at 6501 IRVINE CENTER DRIVE, IRVINE, CA 92618
or at a different place if required by the Note Holder.
(B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 2,268.02 . This amount may change.
(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The interest rate I will pay may change on the first day of October, 2006 , and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6-month U.S. dollar-denominated deposits in the London market based on quotations of major banks, as published in the "Money Rates" section of The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.
(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding Six And 925/1000 percentage points ( 6.925 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125 %). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.
(D) Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than 10.225 % or less than 8.225 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage points ( 1.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 15.225 % or less than 8.225 %.

ADJUSTABLE RATE NOTE-LIBOR 6-MONTH INDEX - Single Family

BMIPRN
VM-163RR

Page 1 of 3

Borrower Initials

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

If within    twenty-four    (    24    ) months after the date of execution of the Security Instrument (as defined below) I make a full Prepayment or partial Prepayment(s), I will at the same time pay to the Note Holder a prepayment charge equal to six (6) months' advance interest on the amount of the Prepayment that, when added to all other amounts prepaid during the 12-month period immediately preceding the date of the Prepayment, exceeds twenty percent (20%) of the original Principal amount of this Note. However, for purchase loans only (this does not include refinance loans), I have a 90 day window period from the date of the "Notice of Interest Rate Change" to make a prepayment on my loan without a prepayment penalty charge. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial prepayment without imposition of a prepayment charge.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    10 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 6 %    of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

ADJUSTABLE RATE NOTE-LIBOR 6-MONTH INDEX - Single Family

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
JAMES E. MOORE                  -Borrower                                          -Borrower

                                (Seal)                                           (Seal)
                                -Borrower                                         -Borrower

_____ (Seal)          _____ (Seal)
                                -Borrower                                         -Borrower

ADJUSTABLE RATE NOTE-LIBOR 6-MONTH INDEX - Single Family

Page 3 of 3

Borrower Initials

Recording Requested By:

Return To:

BNC MORTGAGE, INC.
P.O. BOX 19656
IRVINE, CA 92623-9656

Prepared By:

--------[Space Above This Line For Recording Data]--------

# DEED OF TRUST

MIN 1001<span>2</span>-<span>2</span>00<span>0</span>01177267

Loan No.: ██████8341

*CERTIFIED THAT THIS IS A TRUE & CORRECT COPY OF THE ORIGINAL* (signature)

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated September 23, 2004 together with all Riders to this document.

(B) "Borrower" is JAMES E. MOORE, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY.

Borrower's address is 1258 DUFFY WY
BRENTWOOD,CA 94513              . Borrower is the trustor under this Security Instrument.
(C) "Lender" is BNC MORTGAGE, INC., A DELAWARE CORPORATION

Lender is a corporation
organized and existing under the laws of Delaware

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005 1/01

VMP®-6A(CA) (0207)
Page 1 of 15          Initials: ____
VMP MORTGAGE FORMS - (800)521-7291

Lender's address is P.O. BOX 19656, IRVINE, CA 92623-9656

(D) "Trustee" is T.D. SERVICE COMPANY

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated September 23, 2004
The Note states that Borrower owes Lender three hundred two thousand six hundred and 00/100                                                                                                      Dollars
(U.S. $ 302,600.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than October 1, 2034

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [x] Adjustable Rate Rider
- [ ] Balloon Rider
- [ ] VA Rider
- [ ] Condominium Rider
- [ ] Planned Unit Development Rider
- [ ] Biweekly Payment Rider
- [ ] Second Home Rider
- [ ] 1-4 Family Rider
- [ ] Other(s) [specify]

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

-6A(CA) (0207)                              Page 2 of 15                    Initials: [signature]                 Form 3005   1/01



(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                    of         CONTRA COSTA, CALIFORNIA          :
     [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HERETO AS EXHIBIT A.

Parcel ID Number: 017-201-019                         which currently has the address of
1258 DUFFY WY                                                              [Street]
BRENTWOOD                               [City], California 94513        [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

-6A(CA) (0207)                         Page 3 of 15                Initials:                Form 3005  1/01



of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges*and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

*For purchase loans only (this does not include refinance loans), borrower shall have a 90 day window period from the date of the "Notice of Interest Rate Change" to make a prepayment on Note without a prepayment penalty charge.

Initials: _____

-6A(CA) (0207)    Page 4 of 15    Form 3005  1/01



in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.  Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

-6A(CA) (0207)                         Page 6 of 15              Initials:_____              Form 3005   1/01



lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

-6A(CA) (0207)                     Page 6 of 15                 Initials: ____     Form 3005  1/01



the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(CA) (0207)                    Page 7 of 15                    Initials: _____    Form 3005  1/01



attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.



(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

-6A(CA) (0207)                        Page 9 of 16              Initials:                      Form 3005   1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6A(CA) (0207)                     Page 10 of 15            Initials                Form 3005   1/01



**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA



requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____ (Seal)
JAMES E. MOORE                                    -Borrower

_____

_____ (Seal)
                                                              -Borrower

_____ (Seal)           _____ (Seal)
                                  -Borrower                                                  -Borrower

_____ (Seal)           _____ (Seal)
                                  -Borrower                                                  -Borrower

_____ (Seal)           _____ (Seal)
                                  -Borrower                                                  -Borrower

State of California
County of *Contra Costa*                                    } ss.

On *September 26, 2004* before me, *Denise Ann Gonsalves*

personally appeared

JAMES E. MOORE

, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_Denise Ann Gonsalves_ (Seal)

DENISE ANN GONSALVES
Commission # 1319867
Notary Public - California
Alameda County
My Comm. Expires Sep 3, 2005

-6A(CA) (0207)          Page 15 of 15       Initials: ___      Form 3005   1/01



Loan No.: 8341

### ADJUSTABLE RATE RIDER
(LIBOR 6-Month Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this          23rd day of September, 2004 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
BNC MORTGAGE, INC., A DELAWARE CORPORATION
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

### 1258 DUFFY WY, BRENTWOOD, CA 94513
[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of        8.225          %. The Note provides for changes in the interest rate and the monthly payments, as follows:

"4. INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The interest rate I will pay may change on the first day of October, 2006 , and on that day every   6th    month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6-month U.S. dollar-denominated deposits in the London market based on quotations of major banks, as published in the "Money Rates" section of The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

---

ADJUSTABLE RATE RIDER-LIBOR  6 MONTH INDEX-Single Family-                  Rev. 10/95
Page 1 of 2

Borrower Initials ___  ___  ___  ___  ___  ___

EXHIBIT I                          PAGE 1 OF 2

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Six And 925/1000** percentage point(s) ( **6.925** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.225** % or less than **8.225** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **ONE AND 00/100** percentage point(s) **1.00** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **15.225** % or less than **8.225** % .

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice. "

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 and 2 of this Adjustable Rate Rider.

| | | |
|---|---|---|
| _James E. Moore_ (Seal) | | _____ (Seal) |
| JAMES E. MOORE -Borrower | | -Borrower |
| _____ (Seal) | | _____ (Seal) |
| -Borrower | | -Borrower |
| _____ (Seal) | | _____ (Seal) |
| -Borrower | | -Borrower |

ADJUSTABLE RATE RIDER-LIBOR  6 MONTH INDEX-Single Family-                    Rev. 10/95
Page 2 of 2

Borrower Initials _JLM_ ____ ____ ____ ____ ____

EXHIBIT I                    PAGE 2 OF 2

Lender: BNC MORTGAGE, INC., A DELAWARE CORPORATION          DATE:  September 23, 2004
P.O. BOX 19656
IRVINE, CA 92623-9656

# GOOD FAITH ESTIMATE

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates -- the actual charges may be more or less. Your transaction may not involve a fee for every item listed.

The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A settlement statement that you will be receiving at settlement. The HUD-1 or HUD-1A settlement statement will show you the actual cost for items paid at settlement.

| HUD-1 OR HUD-1A | | PAYABLE TO | AMOUNT OR RANGE |
|---|---|---|---|
| 808 | Broker Fee* | BROKER | 5,995.00 |
| 809 | Processing Fee* | BROKER | 695.00 |
| 810 | Tax Service Fee* | LENDER | 70.00 |
| 813 | ADMINISTRATION FEE* | BROKER | |
| 815 | FLOOD CERTIFICATION* | LENDER | 595.00 |
| 901 | Prepaid Interest for 3 days* | LENDER | 17.00 |
| 1101 | Settlement or Closing Fee* | CLOSING AGENT | 207.42 |
| 1108 | Title Insurance | TITLE COMPANY | 950.00 |
| 1201 | Recording Fees | RECORDING OFFICE | 1,115.00 |
| 1303 | Mortgage Broker Fee Paid by Lender (P.O.C.)** | BROKER | 70.00 |
| 1308 | ORIGINATION FEE | LENDER | 4,539.00 |
| | | | 890.00 |

_J. E. Moore_                    9-26-04
Applicant                        Date
JAMES E. MOORE

Applicant _____ Date _____

Applicant _____ Date _____          Applicant _____ Date _____

Applicant _____ Date _____          Applicant _____ Date _____

Authorized Official _____                              Date _____

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property.

Applicants' Name and Address:                    Loan Number: ███8341
JAMES E. MOORE

1258 DUFFY WY                                    Application Number: ███8341
BRENTWOOD, CA 94513
*Prepaid Finance Charge                          Loan Amount: 302,600.00
**P.O.C. means "paid outside of closing"

 

Lender: BNC MORTGAGE, INC., A DELAWARE
CORPORATION

Application No.: ██████8341
Loan No.: ██████8341

## MORTGAGE BROKER FEE DISCLOSURE

Your application for a residential mortgage loan has been submitted to BNC Mortgage, Inc. ("BNC", "we", "I", "us" or "our") by STERLING FUNDING CORPORATION                                    , a mortgage broker that you have hired to help you find a mortgage loan. Your broker may submit your application to more than one lender.

You can negotiate how much money your broker is paid and how the payment will be made. Your broker's compensation will typically take the form of "points" that you pay at closing. (One "point" equals 1 % of the loan amount.) You can pay the broker's fee out of funds you bring to the loan closing or, in some cases, have a portion of the broker's fee paid from the loan proceeds or by us. If we pay a portion of the broker's fee, we will generally increase the interest rate on your loan. For each point we pay to the broker, your interest rate will be between one quarter of one percentage point (0.25%) and one percentage point (1.0%) higher than the base interest rate for which you would otherwise qualify.

Whether the broker is paid directly by you or indirectly by us is up to you. We encourage you to discuss with your broker the specific effect these alternatives may have on the interest rate and total points that you will be obligated to pay under the terms of your loan.

We have provided you with a Good Faith Estimate of settlement costs that you will have to pay along with other disclosure documents. If your Good Faith Estimate disclosure shows any amounts described as "Mortgage broker fee paid by Lender" or similar language, then we have been instructed by your broker that we are to pay a portion of the broker compensation. As a result, your interest rate may be higher than it would be if you paid all of the broker's compensation yourself. If you want the lowest possible interest rate on your loan, you should ask your broker how much you will have to pay out of pocket at the loan closing so that the broker will not ask the lender to pay any of the broker's fees. A separate disclosure, called the HUD-1 or HUD-1A Settlement Statement, will be presented to you at the loan closing and will identify the actual amounts paid to your broker and whether they were paid by you or by us.

Your signature below indicates that you have read and understand this disclosure.

| | | | |
|---|---|---|---|
| _J. E. Moore_      9-26-04 | | | |
| Name                        Date | | Name                        Date | |
| JAMES E. MOORE | | | |
| | | | |
| Name                        Date | | Name                        Date | |
| | | | |
| Name                        Date | | Name                        Date | |

MORTGAGE BROKER FEE DISCLOSURE
BNC-18 10/2599

Loan No.: ███████834.

## STATEMENT OF LOAN - CLOSED END
(California Finance Lenders Law)

| Borrower Name and Address | Co-Borrower Name and Address |
|---|---|
| JAMES E. MOORE<br>1258 DUFFY WY<br>BRENTWOOD, CA 94513 | |

| Lender Name, Address and License Number | Broker Name, Address and License Number |
|---|---|
| BNC MORTGAGE, INC.<br>P.O. BOX 19656<br>IRVINE, CA 92623-9656<br>File No.: 6037829 | STERLING FUNDING CORPORATION<br>1800 THIBODO ROAD #300<br>VISTA, CA 92083<br>Not Applicable |

| Loan Date | Maturity Date | Principal Amount of Loan | Annual Percentage Rate |
|---|---|---|---|
| 09/23/2004 | 10/01/2034 | $ 302,600.00 | 9.186 % |

Terms of Repayment: Refer to the Note

Security for the Loan: 1258 DUFFY WY, BRENTWOOD, CA 94513

Amount of Funds Paid to Third Persons:
See your HUD-1 Settlement Statement for a statement of any fees, charges, costs, insurance premiums or other sums which have been paid or are to be paid by or on your behalf.

Check applicable box:

☐ A broker has not performed any act as a broker in connection with the making of this Loan.

☒ A broker has participated as a broker in connection with the making of this Loan. The broker has been paid or will be paid $ 11,824.00

See your HUD-1 Settlement Statement for a statement of any fees, charges, costs, insurance premiums or other sums which have been paid or are to be paid by or on your behalf.

You have the right to make payment in advance at any time and in any amount. (Please note that your loan may be subject to a prepayment penalty.)

## FOR INFORMATION, CONTACT THE
## DEPARTMENT OF CORPORATIONS, STATE OF CALIFORNIA.

This Loan is made pursuant to the California Finance Lenders Law, Division 9 (commencing with Section 22000) of the California Financial Code.

| | |
|---|---|
| _J EM_____<br>Signature of Borrower    JAMES E. MOORE | 9-26-04_____<br>Date |
| _____<br>Signature of Borrower | _____<br>Date |
| _____<br>Signature of Borrower | _____<br>Date |
| _____<br>Signature of Borrower | _____<br>Date |
| _____<br>Signature of Borrower | _____<br>Date |

Page 1 of 1

CA-CFL (2/02)

EXHIBIT L                    PAGE 1 OF 1

**bnc** www.bncmortgage.com
Corporate Headquarters
Tel. (949)260-6000
1901 Main St
Irvine, CA 92614

**Final**
**Conditional Loan Approval**

Modified Approval Date: ___

Date: 09/23/2004
Application No.: ____8341
Borrower: JAMES E. MOORE
Co-Borrower: ___
Property Address: 1258 DUFFY WY
City, Sate, Zip: BRENTWOOD, CA 94513
Broker/Correspondent: STERLING FUNDING CORPORATION

Broker No. 12407
Agent Name: DIANA CASJENS
Agent Phone: (949) 475-5013
Program: FULL-DOC
Occupancy: OWNER-OCCUPIED
Purpose: REFI-CASH OUT
Property Type: SPR

| Risk Grade | Start Rate | Margin | Index | Pre-Pay Penalty | | Approval Expires | OK to order Docs |
|---|---|---|---|---|---|---|---|
| B | 8.225 | 6.925 | LIBOR | YES | 2.0 Year | 10/02/2004 | YES |

| Loan Amount | LTV | CLTV | Review Value | Purchase Price | Kind | Loan Term |
|---|---|---|---|---|---|---|
| 302,600.00 | 85.000 | 85.000 | | 0.00 | 2 YEAR FIXED I/7 | 360 |

| Fees to BNC Mortgage, Inc. | | Fees to Correspondent/Broker | |
|---|---|---|---|
| Points: | | Points: 1.98116% | 5,995.00 |
| Yield Spread Premium: 1.500 | 4,539.00 | Processing Fee: | 695.00 |
| Underwriting Fee: | | Appraisal: | |
| MERS Registration Fee: | | Credit: | |
| Funding Fee: | | Administration: | 595.00 |
| Tax Service Fee: | 70.00 | Courier: | |
| Flood Certification: | 17.00 | | |
| ORIGINATION | 890.00 | | |
| NY Mortgage Tax: | | | |
| **Total Fees** | 977.00 | **Total Fees** | 7,285.00 |

This approval is subject to federal, state and local rules in effect at time of funding. Additional loan conditions may be required in order to comply with changes to applicable laws. This conditional approval is subject to revocation at the lender's discretion in the event of a change in law or regulation affecting this transaction.

Loan Approval is made subject to all the following conditions:
**Mandatory Conditions**

A  Satisfactory Appraisal Review (Desk/Field) by a BNC designated reviewer for $356,000.00
B  Original Hazard Insurance Policy/Binder; Loss Payee to be as follows:
C  BNC Mortgage Inc.; Its Successors and/or Assigns; P.O. Box 19656 Irvine, CA 92623-9656
D  Property Taxes to be paid current.
E  Certified Copy of Final HUD-1 Settlement Statement.
F  Phone Certification of employment at minimum 7 days prior to funding.
G  All Original documents prior to funding.
H  All Appraisal Review conditions to be met (if any) and Appraiser to be approved by BNC.
I  Broker/Correspondent must be approved by Lender for the property state.
J  Proof of all Down Payment/Earnest Money deposits paid through Escrow.
K  Copies of invoices for third party appraisal and credit report fees charged to borrower.
L  This loan is subject to the HOEPA rules in effect at time of funding. BNC does not originate Section 32 loans
M  The interest rate and other terms of this loan approval may be subject to change if this loan is not funded on or before the approval expiration date specified on this loan approval.

**Underwriting Conditions**
"D" Is for Prior to Doc and "F" is for Prior to Funding.

7F  Certified Copy of Signed Escrow Instructions and Amendments.
8F  Debts to be paid according to page 2 of this approval.
9F  Typed or H/W Loan Application (1003), signed and dated.
10F  Demand to show current on all mortgages (no more than 29 days delinquent at funding) 1st & 2nd
11F  Spouse to sign quitclaim or all legal documents except note.
12F  Signed LOE from borrower re: why current ytd income on pay stub is so much lower than previous yrs mo. avg.

**SATISFIED CONDITIONS**

| | | |
|---|---|---|
| JORTEGA | 1F | Complete pay history reflecting mortgage(s) lates; not to exceed established guidelines. |
| JORTEGA | 2D | Signed Preliminary Title Report or Title Commitment which is satisfactory BNC Mortgage. |
| JORTEGA | 3D | Original appraisal acceptable to BNC Mortgage with 36 months transfer & 12 months listing histories. |
| JORTEGA | 5F | Current pay stubs within 30 days of funding for Borrower. |
| JORTEGA | 6F | W-2s for 2002 & 2003, for Borrower. |
| JORTEGA | 13D | 12 month mortgage history max 1x60 last 12 months. |

Borrower: _[signature]_ Signature
Acknowledged & Agreed:

Co-Borrower: ___ Signature
Broker Signature    Date: ___

UWAPNEWD

# NOTICE OF RIGHT TO CANCEL

Application No. ●●●●8341                          Loan No. ●●●●8341
Borrowers: JAMES E. MOORE

Property Address: 1258 DUFFY WY, BRENTWOOD, CA 94513

---

**YOUR RIGHT TO CANCEL:**
You are entering into a transaction that will result in a mortgage, lien or security interest on/in your home. You have a legal right under federal law to cancel this transaction, within three business days from whichever of the following events occurs last:

[ENTER DATE]

1. the date of the transaction, which is _9-26-04_ ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on/in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL:**

If you decide to cancel this transaction, you may do so by notifying us by faxing this form to (877) 553-4058 or in writing, at:

BNC MORTGAGE, INC.
1901 Main Street
Irvine, CA 92614-6524
ATTN: Funding Dept.

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

[ENTER DATE]

If you cancel by mail or telegram, you must send a notice no later than midnight of _9-29-04_ (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time. Please note that if more than one consumer has the right to cancel this transaction, any such consumer acting alone may exercise his or her right to cancel and such cancellation shall be effective as to all consumers.

## I WISH TO CANCEL

_____          _____
Date                                        Consumer's Signature

---

ON THE DATE OF THE TRANSACTION LISTED ABOVE I/WE, THE UNDERSIGNED, EACH RECEIVED TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL IN THE FORM PRESCRIBED BY LAW ADVISING ME/US OF MY/OUR RIGHT TO CANCEL THIS TRANSACTION.

_Jim E Moore_                    _9-26-04_          _____    _____
JAMES E. MOORE                   Date                                          Date

_____          _____          _____    _____
                                 Date                                          Date

_____          _____          _____    _____
                                 Date                                          Date

BCANCEL-32

EXHIBIT N                                          PAGE 1 OF 1

Loan No.: ▓▓8341
Borrower(s): JAMES E. MO▓▓                    ▓mission Date:   09/14/2004

# SECTION 32 LOAN WORKSHEET
### (Place in Loan File)

Complete for **OWNER-OCCUPIED, REFINANCE** transactions to determine if this loan is a Section 32 Loan. If property is located in Arkansas; California; Oakland, CA; Cleveland, OH; Colorado; Connecticut; Georgia Illinois; Kentucky; Maryland; Massachusetts; New Jersey; New Mexico; New York; North Carolina; Oklahoma; South Carolina; Texas; or Washington, DC complete the High Cost Worksheet specific to that jurisdiction.

**STEP 1 – APR TEST**

Loan Amount: $  302,600.00          |  Loan Type:    REFI-CASH OUT

1.  Term of Loan:                                                                          30 YEARS

2.  Treasury Bond Rate as of the 15th day* of the
    month _prior_ to the month application was
    submitted to BNC.                                                                      5.020%

3.  Add eight percentage points (+8.00) to the
    applicable Treasury Bond Rate for 1st liens and          3.  13.020%
    ten percentage points (+10.00) for 2nd liens:

4.  Enter the APR shown on the Federal TIL
    Disclosure Statement:                                    4.  9.186

5.  Is Line 4 greater than Line 3?                                                         NO

**STEP 2 – POINTS & FEES TEST**

1.  Enter the AMOUNT FINANCED as shown
    on the Federal TIL Disclosure Statement:               1.  $293,180.58

2.  Enter the PREPAID FINANCE CHARGES (i.e., Loan Amount less
    Amount Financed):                                                      2.  9,419.42

3.  Enter the Prepaid Interest amount listed on the Good Faith Estimate:   - 3.  $207.42

4.  Enter the result of Line 2, less Line 3:                               = 4.  9,212.00

5.  Divide Line 4 by Line 1, then multiply by 100
    to determine the Fees and Costs Percentage:            5.   3.14%

6.  Is Line 5 greater than 7.99%?                                                          NO

_IF THE ANSWER TO EITHER STEP 1 OR 2 IS "YES," THE LOAN CANNOT BE MADE. BNC DOES NOT MAKE SECTION 32 HIGH COST LOANS._

PREPARED BY:  BGODOY                                         DATE:  09/23/04

_* Note: If 15th day is not a business day, use Treasury Bond Rate as of the business day immediately preceding the 15th._

Section 32 Worksheet
Effective for Fundings After 1/1/03
Rev. 6/25/03

S32LW4 02/03/2004