]Thomas Spielbauer, Esq.
SBN 78281
THE SPIELBAUER LAW FIRM
1250 Oakmead Parkway, Suite 210
Sunnyvale, CA 94085
(408)451-8499
Fax: (610)423-1395
thomas@spielbauer.com

Attorneys for Jim E. Moore, Plaintiff

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JIM E. MOORE,<br><br>               Plaintiff.<br><br>v.s.<br><br>J. P. CHASE MORGAN BANK; BNC MORTGAGE, INC.; NDEx West LLC; STIRLING FUNDING CORPORATION; and KEVIN CAYLOR,<br><br>               Defendants. | No. 3:08-cv-00350-SC<br><br>Contra Costa County Superior Court No: MSC08-00040<br><br>**REPLY TO BNC'S OPPOSITION TO PRELIMINARY INJUNCTION MOTION**<br><br>Date: Friday, April 4, 2008<br>Time: 10:00 a.m.<br>The Honorable Samuel Conti<br>Courtroom 1, 17th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 |

Plaintiff Jim Moore submits this reply to the Opposition for a Preliminary Injunction filed by defendant BNC Mortgage.

**THE EVIDENCE MAKES SUCCESS LIKELY**

BNC's opposition concedes the merit of Jim Moore's complaint. It ignores the sworn statement of Mr. Moore as to the events which took place on September 15, 2004 and again in his home on September 23, 2004. Instead, BNC's justification commences sometime after September 23, 2004 when it received the documents in its offices and reviewed the documents to insure that they contained the signatures in the places they were suppose to have them.

BNC's opposition is essentially a statement that the papers appear in order

-1-

from its corporate perspective.

The only evidence which addresses the events which occurred during September 2004, and particularly on September 23, 2004, is the testimony of Jim Moore. BNC has offered no evidence to the contrary.

The two critical witnesses to the September 23, 2004 signing event were Jim Moore and BNC's signing agent, and notary, Denise Gonzalez. It is Ms. Gonzalez who would have been in a position to rebut some or all of Mr. Moore's claims. Noticeably, there is not a word to be heard from Ms. Gonzalez nor an explanation for her silence. Of course, then she would have to explain the blank notice of the right to rescind she furnished to Jim Moore on behalf of BNC, which is attached as exhibit 4 to the complaint.

The facts, as presented by Jim Moore, is the only evidence surrounding the September 2004 loan execution before this court. This alone establishes, for the purposes of this request for a preliminary injunction, that there is a likelihood that he will succeed on the merits of his case.[1]

## LET'S BLAME JIM MOORE

BNC's defense is to cast dispersions. It asks, how could Jim Moore expect to get a better loan than this predatory, 15.225%, exploding ARM? BNC never told Mr. Moore that his credit was so poor that he could only qualify for a predatory loan. It was BNC which approached Jim Moore, not vice-versa. Jim Moore did not need to refinance. Jim Moore did not need this loan.

BNC begs the question, if Jim Moore's credit was so bad, how did Mr. Moore qualify for the prior Wells Fargo loan which was paid off in September 2004? Addressing the present, the declaration of Patrick Pulatie directly rebuts BNC's and its employee, Linda DeNicola's, dispersion concerning Mr. Moore's credit-worthiness. Patrick Pulatie's declaration makes it clear that Mr. Moore

---

[1] *Doren v. Salem* (1976) 422 U.S. 922, 931.

now qualifies for an FHA Secured loan.

BNC argues that it and its agent should not be liable for their behavior on September 23, 2004 claiming that the mere passage of time and volume of use absolves it of wrongdoing. It also argues that since Jim Moore had signed a mortgage before with Wells Fargo Bank, he was an expert at reading these documents and thus there was in reality mutual consent.

The documents, particularly the adjustable rate note, is indeed incomprehensible and filled with legalese. BNC ignores the fact that the exploding note it required of Jim Moore was different from the prior note with Wells Fargo.

BNC then complains that Jim Moore should have brought the unjust terms of the exploding ARM to the attention of BNC when Mr. Moore first began having some difficulties with the note. The implication is that BNC would have made it right had Mr. Moore done this. This argument is disingenuous. What BNC does not tell this court is that BNC unloaded this loan like the hot potato that it was. Had Mr. Moore managed to speak to someone of authority at BNC, he would have simply been told that the loan had been sold and BNC could do nothing about it.

## TILA DISCLOSURES

BNC ignores the fact that the Truth-in-Lending disclosures, both of September 15, 2004 and again on September 23, 2004, are grossly inaccurate. The monthly payments which these statements set forth do not take into account the oppressive interest rate climb that would take effect after two years. BNC claims that the initial interest rate was 8.225%, whereas the true APR was higher than that, 9.186%. By the nearly incomprehensible terms of the note, the interest rate would adjust to either 10.225% or 11.186%. Thereafter, the loan would increase one percent every six months. With a ceiling or cap of 15.225%, this loan would take less than 2 years from the first adjustment to hit that ceiling. The

335 monthly payments of $2,429 stated by that September 23, 2004 Truth in Lending Disclosure does not come close to describing the true amount of the monthly payments required by this loan.

### HOEPA

BNC next argues that this loan was not a HOEPA (Home Equity Protection Act) loan. HOEPA is a part of the Truth in Lending Act. BNC's own documents undermine its statement that this is not a HOEPA loan. BNC claims that HOEPA is to be calculated on the lowest interest rate of the loan, conceding that this lowest interest rate is really 9.186% rather than what Linda Dinicola claimed was 8.225%. Their HOEPA worksheet is attached to BNC's opposition, and is the last page of its exhibits. BNC cites no authority that the initial rate of the exploding ARM is the basis of calculation for a HOEPA loan beyond that of employee Linda DeNicola's opinion.

The basis of the HOEPA calculation is the ceiling rate of 15.225%. The basis of the calculation is the amount that Jim Moore became legally obligated to pay at the time that he signed loan papers on September 23, 2004. This legal obligation is the basis of BNC's payment demands. BNC's position is that Mr. Moore became obligated to the ceiling of 15.225% at the time of signing. This legal obligation is what determines whether this note comes under HOEPA.

This finding was the determination of The Court in *Short v. Wells Fargo Bank et al.*[2] After considerable discussion, The Court wrote, "the term 'payable' should be interpreted as meaning 'legally enforceable' or 'obligation to pay.'"[3] It is and was this obligation to pay which brings the costs of the loan within the auspices of HOEPA according to the Federal Reserve Board's Official Staff Interpretation of 12 C.F.R. § 226.32, the Court found.

---

[2] *Short v. Wells Fargo Bank et al.* (2005) 401 F.Supp.2d 549.

[3] *Short v. Wells Fargo Bank et al.* (2005) 401 F.Supp.2d 549, 562.

1  The reason for this, the *Short* Court wrote, is due to the fact that TILA and
2  HOEPA is a remedial statute. The *Short* Court opined:

> It [TILA] was designed to protect consumers like the plaintiff here, not more sophisticated lending and financial institutions, who are able to control the structure of the loan transaction. Congress did not use the term "paid" in § 1602(aa), instead, it used the term "payable" which looks to the fact that the consumer bears the cost of those fees at the time of closing, not whether those fees were financed, paid separately or deducted from the loan proceeds. Given the statute's remedial purpose, the Court believes that to allow lenders and financial institutions to manipulate the payment of points and fees in these transactions to avoid triggering the HOEPA protections is unfair and defeats the purpose of the law.[4]

The repercussions of a finding that this is a HOEPA loan are impressive. BNC made no HOEPA disclosures. This failure not only enhances Jim Moore's caues of action. It also all assignees equally guilty of this BNC's sins.

## MANDATORY TELEPHONE NUMBER

BNC next argues that the mandate of California Civil Code §2924f(b)(1) doesn't really mean what it says. California Civil Code §2924f(b)(1) requires that the notice of trustee sale contain either a toll-free telephone number or a telephone number in California of the Trustee. The Notice of trustee sale merely contains a sales telephone number of (714)573-1695 to Priority Posting which is an automated sales information line. BNC also questions Jim Moore's ability to argue legislative intent, indicating that it was really okay with the California Legislature to place a non-responsive automated telephone answering system providing information to investors. That is what the Legislature had in mind during the early part of the twentieth century when this requirement was imposed upon trustees, according to BNC. Never mind the fact that during this time there

---

[4] *Short v. Wells Fargo Bank et al.* (2005) 401 F.Supp.2d 549, 562-563.

were no automated systems, let alone telephone answering machines, and no prospect of such, when this became a legal requirement to trustee sale notices in non-judicial foreclosure proceedings.

## STRICT COMPLIANCE

BNC's interpretation makes meaningless the legal requirement of Strict Compliance. The entire foreclosure process occurs without any judicial oversight.[5] "The exercise of the power of sale is a harsh method of foreclosing the rights of the grantor."[6]

The statutory requirements are intended to protect the trustor from a wrongful or unfair loss of the property[7], and a valid foreclosure by the private power of sale requires ***strict compliance*** with the requirements of the statute.[8] It has been a cornerstone of foreclosure law that the statutory requirements, intending to protect the trustor from a wrongful or unfair loss of the property, must be complied with strictly.[9] Close does not count.

---

[5] Miller & Starr, California Real Estate (3d ed.), Deeds of Trust and Mortgages, Chapter 10 §10.179; *I. E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal. 3d 281.

[6] *Anderson v. Heart Federal Savings* (1989) 208 Cal.App.3d 202, 215, citing to *System Inv. Corporation v. Union Bank* (1971) 21 Cal.App.3d 137, 153.

[7] *Moeller v. Lien* (1994) 25 Cal.App.4th 822, 830; accord, *Hicks v. E.T. Legg & Associates* (2001) 89 Cal.App.4th 496, 503; *Lo Nguyen v. Calhoun* (6th District 2003) 105 Cal.App.4th 428, 440.

[8] Miller & Starr, California Real Estate (3d ed.), Deeds of Trust and Mortgages, Chapter 10 §10.179; *Anderson v. Heart Federal Sav. & Loan Assn.*, 208 Cal. App. 3d 202, 211 (3d Dist. 1989), reh'g denied and opinion modified, (Mar. 28, 1989); *Miller v. Cote* (4th Dist. 1982) 127 Cal. App. 3d 888, 894; *System Inv. Corp. v. Union Bank* (2d Dist. 1971) 21 Cal. App. 3d 137, 152-153; *Bisno v. Sax* (2d Dist. 1959) 175 Cal. App. 2d 714, 720.

[9] Miller & Starr, California Real Estate (3d ed.), Deeds of Trust and Mortgages, Chapter 10 §10.182.

As a result, any trustee's sale based on a statutorily deficient Notice of Default is invalid.[10] Additionally, any trustee's sale based on a statutorily deficient Notice of Trustee Sale is invalid.[11]

BNC cites two cases to support its contention that failure to comply with California Civil Code §2924f(b)(1) is in effect harmless error which is de minimus. Those cases are the case of *Williams v. Koenig*[12] and the *Doherty v. Knapp*[13].

In *Williams v. Koenig*[14], Mr. Williams purchased a piece of property but subsequently failed to make mortgage payments and pay the taxes. A notice of default was recorded and thereafter a notice of trustee sale. Thereafter, a foreclosure auction occurred. Williams apparently did nothing during the 110 days constituting the foreclosure period but waited until after the foreclosure sale had occurred. He then brought an action to set aside the sale on the basis of inadequacy of notice. The basis of this inadequacy was a clerical error in the previously executed deed of trust, which error recited in "liber 1095" instead of in "liber 1691." The notices apparently contained this same error. In all other aspects, the notice was proper and Mr. Williams had actual notice of the

---

[10] Miller & Starr, California Real Estate (3d ed.), Deeds of Trust and Mortgages, Chapter 10 §10.182; *Anderson v. Heart Federal Sav. & Loan Assn.* (3d Dist. 1989) 208 Cal. App. 3d 202, 211, reh'g denied and opinion modified, (Mar. 28, 1989); *Miller v. Cote* (4th Dist. 1982) 127 Cal. App. 3d 888, 894; *System Inv. Corp. v. Union Bank* (2d Dist. 1971) 21 Cal. App. 3d 137, 152-153; *Saterstrom v. Glick Bros. Sash, Door & Mill Co.*(3d Dist. 1931) 118 Cal. App. 379.

[11] *Anderson v. Heart Federal Sav. & Loan Assn.* (3d Dist. 1989) 208 Cal. App. 3d 202, 211, ,reh'g denied and opinion modified, (Mar. 28, 1989).

[12] *Williams v. Koenig* (1934) 219 Cal. 656.

[13] *Doherty v. Knapp* (2004) 123 Cal.App.4th 76.

[14] *Williams v. Koenig* (1934) 219 Cal. 656.

foreclosure activities.  The *Williams* Court found this sole basis of challenging the foreclosure sale to be non-meritorious.

In *Doherty*[15], the trustee recorded a notice of sale six days prematurely.  The sale date, however, was nine days more than the minimum 20 days required under California Civil Code §2924f(b).  The homeowners did nothing to prevent the foreclosure sale even though they had actual notice of it.  After the foreclosure sale, they sought to set aside the sale (as a part of an unlawful detainer defense) due to the premature recording of the notice of trustee sale.  Given the circumstances of the case, the Court found that the additional nine days compensated for the premature six days.

Both of these cited cases involved actions <u>to set aside a foreclosure sale</u>.  No foreclosure sale has occurred in this case.  After a foreclosure sale has occurred, California courts have been less sympathetic to the trustor.  In neither of these two cited cases did the property owner establish any reason failure to assert his rights in a more timely fashion, i.e., before the foreclosure sale.  Jim Moore has acted promptly.

Setting aside a foreclosure sale is much more problematic than enjoining a sale.  Once a foreclosure sale has occurred, the trustee (NDEx West) issues a trustee's deed upon sale, which is effective as of 8:00 a.m. on the date of the sale, and which is recorded with the County Recorder.  The purchaser at the trustee sale is granted special protection under law as a bona fide purchaser for value.[16]  The trustee sale is presumed to have been conducted properly, and such presumption is <u>conclusive</u> as to a bona fide purchaser for value.[17]  Thus the reluctance of the appellate courts to set aside a sale for what could be argued to be minor and

---

[15] *Doherty v. Knapp* (2004) 123 Cal.App.4th 76.

[16] *Moeller v. Lien* (1994) 25 Cal.App.4th 822, 830-832.

[17] Miller & Starr, Cal. Real Estate (3d ed.2000) § 10:211, p. 679.

1 technical violations of California non-judicial foreclosure law.  By that late point
2 in time, money damages are viewed as the more appropriate remedy.  Verily, had
3 the property been truly important to the trustor, he would have acted promptly
4 rather than waiting for the property to go to sale.  Each of these two courts were
5 greatly disturbed that the homeowners sat on their hands and did nothing to
6 protect their rights prior to the foreclosure sale, knowing of the sale, and  acting
7 for the first time after the foreclosure sale had occurred.

## PUBLIC POLICY

9     BNC goes on to argue that this Court must permit the foreclosure sale.  If it
10 does not, the investors and lenders will lose faith that their agreements will be
11 enforced, it argues.  Investors have in fact lost faith in the kinds of activities which
12 BNC conducted in this loan transaction.  BNC's activity is a poster child example
13 of the cause of the current subprime meltdown.  BNC's activity is a poster child
14 example of the greed, i.e., credit card interest rates on a home mortgage, which led
15 to the real estate collapse.   BNC admits that it qualified Jim Moore at the lowest
16 rate possible in this loan and without any kind of consideration, nor meaningful
17 disclosure, of the exploding payments which were clearly beyond the means of
18 Jim Moore.  This loan, and BNC's underwriting of it, was one designed to reduce
19 Jim Moore into slavery or lead to foreclosure.

## BOND

21     BNC requests, in its opposition, that Jim Moore be required to post a bond
22 in the amount of the loan debt as reflected in the Notice of Trustee Sale dated
23 November 9, 2007.  This amount is $307,067.68.  BNC then argues that it is
24 entirely equitable to do this.
25     BNC, of course, having unloaded this predatory loan, is in no danger of loss
26 should no bond be posted.  The reality of this bond request is to insure, by nook or
27 crook, that no injunction be issued.  BNC knows full well that Jim Moore cannot
28 post such a bond.  This was established in Mr. Moore's moving papers.

BNC's true danger, beyond this action by Jim Moore, are the indemnification actions that could be brought by LaSalle, Chase and any other assignees of this HOEPA and unlawful loan.

Regardless of what happens, however, BNC cannot be harmed by no bond. It no longer owns this note. It has no ownership interest. LaSalle does. BNC is in danger of losing nothing.

However, even if harm can somehow be argued, this harm is exactly what BNC deserves for having originated this and its other predatory loans. It knew what it was doing. These greed-oriented actions have now placed the entire United States economy in peril. BNC, of course, neglects to mention this.

**PRAYER**

For the reasons set forth in his moving papers, and in this reply, Jim Moore requests that this Court issue a preliminary injunction and requiring no bond or in an amount of $100.

Dated: March 21, 2008

                Respectfully Submitted
                THE SPIELBAUER LAW FIRM

                by Thomas Spielbauer, Esq.
                Attorney for Plaintiff, Jim Moore

Thomas Spielbauer, Esq.
SBN 78281
THE SPIELBAUER LAW FIRM
1250 Oakmead Parkway, Suite 210
Sunnyvale, CA 94085
(408)451-8499
Fax: (610)423-1395
thomas@spielbauer.com

Attorneys for Jim E. Moore, Plaintiff

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JIM E. MOORE,<br><br>                Plaintiff.<br><br>v.s.<br><br>J. P. CHASE MORGAN BANK; BNC MORTGAGE, INC.; NDEx West LLC; STIRLING FUNDING CORPORATION; and KEVIN CAYLOR,<br><br>                Defendants. | No. 3:08-cv-00350-SC<br><br>Contra Costa County Superior Court No: MSC08-00040<br><br>REQUEST TO STRIKE DECLARATION OF LINDA DENICOLA<br><br>Date: Friday, April 4, 2008<br>Time: 10:00 a.m.<br>The Honorable Samuel Conti<br>Courtroom 1, 17th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102 |

    Plaintiff Jim Moore objects to Linda DeNicola's declaration in support of BNC's Opposition and asks that this court strike it.

    By her own admission, Ms. DeNicola has been an employee of BNC for a mere one year and five months. She reflects no other experience in her foundation to her declaration. She provides not further credentials other than her short employment with BNC. She does boast, however, a fancy title, that being of Senior Vice President of Quality Control.

    Ms. DeNicola's expertise comes solely from her title and her statement that she has "examined large numbers of loan origination files." Quite a feat for less then a year and half of employment.

Beyond this lack of foundation, Ms. DeNicola renders opinions which she is clearly not qualified to render as a Senior Vice President of Quality Control with less than a year and a half of experience. She states, in paragraph 9, that there is no contradiction between the preliminary Truth in Lending Disclosure and the final Truth in Lending Disclosure. While this is false, the documents speak for themselves.

Ms. DeNicola opines in paragraph 10, page iv, line 1 to 3, that "Mr. Moore's assertion that he somehow believed ht would receive a 30 year fixed rate note at somewhere between 6.5 and 7.5% simply cannot be believed" is again without foundation and is an opinion she does not have the capacity to render.

Ms. DeNicola justifies the incomprehensible exploding ARM note by saying that this is proper since BNC uses these as standard forms in California. Repetitious volume of use makes them legal, she opines.

As her final conclusion, Ms. DeNicola provides a legal interpretation as to HOEPA. She renders, again without any legal foundation to do so nor any citation to authority, her opinion that the initial interest rate of 9.186% is the rate that the HOEPA qualification is to be calculated, not the ceiling rate of 15.225%. Thus plaintiff is in error in his allegation of the HOEPA violation. Ms. DeNicola is not licensed to practice law, nor does she set forth and special qualifications to render this legal opinion.

For the reasons set forth, Jim Moore requests that this court strike Linda DeNicola's declaration as well as any references to her declaration in BNC's Opposition.

//

//

1  Dated: March 17, 2008

2
3                            THE SPIELBAUER LAW FIRM
4
5                            *[signature: Thomas J. Spielbauer]*
6                            by Thomas Spielbauer, Esq.
                             Attorney for Plaintiff, Jim Moore

-3-

1 | *Moore v. J. P. Chase Morgan Bank et Al.*
Northern District of California Case Number 3:08-cv-00350-SC

2

3 | **CERTIFICATE OF SERVICE**

4 | I, Thomas Spielbauer, declare:

5 | I am a resident of Santa Clara County, California. I am now, and at all times

6 | herein mentioned was, over the age of eighteen years. I am not a party to this

7 | action. My business address is 1250 Oakmead Parkway, Suite 210, Sunnyvale,

8 | CA 94085.

9 | On March 21, 2008, I filed electronically plaintiff's REPLY TO BNC'S

10 | OPPOSITION TO PRELIMINARY INJUNCTION MOTION and REQUEST TO

11 | STRIKE DECLARATION OF LINDA DENICOLA via the Northern District of

12 | California Court's website.

13 | Counsel for BNC Mortgage, Inc., aka BNC Mortgage, LLC is a registered

14 | user of the ECF for the Northern District of California Federal Court. His name is

15 | Eric D. Houser, Esq.. His email address of appears on the docket of this matter.

16 | Counsel for J.P. Chase Morgan Bank aka J.P. Morgan Chase Bank is a

17 | registered user of the Northern District of California Federal Court. His name is

18 | John M. Sorich, Esq.. His email address of appears on the docket of this matter.

19 | Counsel for NDEx West is a registered user of the Northern District of

20 | California Federal Court. His name is Edward Treder, Esq.. His email address of

21 | appears on the docket of this matter. It should be noted that NDEx West filed a

22 | declaration pursuant to California Civil Code §2924l in the Contra Costa Superior

23 | Court at the time of or just prior to removal, on January 18, 2008.

24 | Pursuant to Northern District General Order 45, the service of the

25 | OPPOSITION TO MOTION TO DISMISS was effected at the time of filing, and

26 | notification by email to counsel by the ECF website.

27 | //

28 | //

1 | I declare under penalty of perjury that the foregoing is true and correct to
2 | the best of my knowledge.  Executed in San Jose, California this March 21, 2008.

*[signature]*

Thomas Spielbauer